IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Natural Resources Defense Council, Environmental Justice Health Alliance, Public Citizen, Catskill Mountainkeeper, Center for Coalfield Justice, Clean Water Action, Coming Clean, Flint Rising, Indigenous Environmental Network, Just Transition Alliance, Los Jardines Institute, Southeast Environmental Task Force, Texas Environmental Justice Advocacy Services, Water You Fighting For, West Harlem Environmental Action, Inc., <br><br>        Plaintiffs, <br><br>     v. <br><br> Assistant Administrator Susan Parker Bodine, Administrator Andrew Wheeler, and the United States Environmental Protection Agency, <br><br>        Defendants. | Case No. 20-cv-3058 <br> ECF Case |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. In response to the COVID-19 pandemic, the U.S. Environmental Protection Agency published a policy on "enforcement discretion" on March 26, 2020. EPA's policy allows regulated companies to stop monitoring, reporting, and certifying their compliance with limits on air and water pollution if the company claims a pandemic-related constraint. The policy permits a company to document its noncompliance and the reason for it "internally" and tell EPA about it later, if asked.

2. EPA's policy, announced without notice and without consulting with affected communities, applies to every industry in the country: chemical manufacturing, oil and gas

extraction, coal-fired power plants, refineries, mining and smelting, factory farms, and every other federally regulated source of pollution.

3. The policy creates a serious and immediate risk that industrial facilities and other regulated entities will stop monitoring and reporting for compliance with pollution limits, with no contemporaneous notice to EPA or to the public. The programs implicated by EPA's non-enforcement policy provide vital protections and information to the public about hazardous air pollutants, toxic chemical releases, drinking water safety, and more.

4. EPA's new non-enforcement policy presents a huge threat to downstream, downwind, and fenceline communities around the country. Environmental monitoring and reporting are essential for those communities. Without timely information about air and water emissions, people are unable to take steps to protect themselves from pollution or pursue appropriate enforcement against polluters.

5. The data and reporting implicated by EPA's policy also inform local emergency managers and first responders about chemical risks from nearby industrial facilities and help them prepare response plans to address potential chemical accidents.

6. The information collected under these reporting programs also plays a key role in a range of EPA rulemakings and state permitting proceedings and can trigger additional pollution-control requirements and health-protective measures at specific facilities. Suspending collection or disclosure of this data, even for just a few months, could distort future rulemakings and permitting in harmful ways, and prevent adoption of necessary public safety measures.

7. Environmental monitoring and reporting serve an important deterrent function too: Facilities pollute less and comply with governing safeguards more faithfully if

they have to monitor their emissions and publicly report the results. EPA's policy therefore means not just less information available to the public, but more pollution.

8. EPA's policy is especially dangerous in light of recent research showing that increased air pollution causes a statistically significant increase in the COVID-19 death rate. Communities burdened by greater air pollution are more vulnerable to COVID-19.

9. The harms from EPA's policy will be borne disproportionately by people of color and low-income people, who are more likely to live near industrial facilities and other sources of pollution, and who are also disproportionately harmed by COVID-19.

10. Plaintiffs are a coalition of environmental justice, public health, and public interest organizations. Promptly after EPA's announcement of its new policy, Plaintiffs petitioned EPA to publish a rule, on an emergency basis, requiring any entity that stops monitoring and reporting for environmental pollution in response to the COVID-19 pandemic to provide written notice and justification to EPA, which EPA would then make available to the public. The requested rule would provide vulnerable communities nationwide with essential information about pollution risks. It would also ensure that first responders and state and local officials have timely access to information about the risks from chemical leaks and spills, drinking water threats, and other pollution hazards masked or worsened by EPA's policy.

11. Given the immediate impact and retroactive effect of EPA's policy, Plaintiffs' petition requested that EPA publish the rule within seven days and make it effective immediately. Plaintiffs asked EPA to provide public notice and comment on the rule at the same time and amend the rule as appropriate in response to comments.

12. To date, EPA has not responded to the petition. Every additional day of delay increases the risk of undisclosed violations of environmental laws by companies relying on EPA's non-enforcement policy. Further inaction by EPA will eliminate any opportunity for a meaningful rule mandating public disclosure of environmental monitoring violations during the pandemic. Late disclosure of such violations—six months or a year down the road—is of no help; the harm will be done.

13. The COVID-19 pandemic has caused widespread disruption and harm. But EPA's unprecedented non-enforcement policy risks suppressing critical data and information and creates a clear opportunity for abuse. Plaintiffs' petition seeks a common sense, straightforward rule that imposes minimal burden and will mitigate the most pernicious effects of EPA's new policy. EPA's failure to respond to the petition is unreasonable and unlawful.

14. Plaintiffs ask this Court to order EPA to respond to the emergency rulemaking petition as soon as possible, and no later than five days from the Court's entry of judgment.

## PARTIES

15. Plaintiff Natural Resources Defense Council (NRDC) is a nonprofit environmental membership organization that works to protect public health and the environment. NRDC has been committed to public disclosure of pollution risks for fifty years. NRDC relies on environmental monitoring and reporting to identify and publicize health and environmental threats, promote appropriate regulation, inform public comments that it files on agency rulemakings, and support citizen enforcement against polluting industries.

16. Plaintiff Environmental Justice Health Alliance (EJHA) is a collective of community-based environmental and economic justice organizations located around the country. These organizations work to eliminate the disproportionate impacts of chemical exposure and other environmental harms on people of color and low-income communities. EJHA provides capacity support and space for connecting grassroots and environmental justice advocacy groups with one another and with researchers or other experts in order to help transform EJHA's affiliates' local areas into healthy, sustainable, and just communities for youth, elders, and families. As part of its work, EJHA relies on environmental monitoring data that chemical facilities submit to EPA to educate the public, its partners, and government officials about the risks those facilities pose to surrounding communities.

17. Plaintiff Public Citizen, a nonprofit consumer advocacy organization with members in every state, appears before Congress, administrative agencies, and courts to advance and support enactment and enforcement of laws protecting consumers, workers, and the general public. Among other things, Public Citizen fights for openness and democratic accountability in government and for strong health, safety, and environmental protections.

18. Plaintiff Catskill Mountainkeeper is a nonprofit organization that works to protect the Catskill region's wild lands and natural resources, support smart development to sustainably grow our economy, nurture healthy communities, and accelerate the transition to a 100% clean energy future in New York and beyond.

19. Plaintiff Center for Coalfield Justice is a Pennsylvania-based nonprofit membership organization dedicated to improving policy and regulations for the oversight of

fossil fuel extraction and use; to educating, empowering, and organizing coalfield residents; and to protecting public and environmental health.

20.     Plaintiff Clean Water Action is a national, nonprofit environmental membership organization. Clean Water Action's mission includes preventing pollution in the nation's waters, protecting natural resources, creating environmentally safe jobs and businesses, and empowering people to make democracy work. Its activities include policy research and advocacy, public education, and grassroots mobilization. Clean Water Action's core programs include efforts to strengthen the Clean Water Act's implementation and enforcement and protect drinking water sources from contamination.

21.     Plaintiff Coming Clean is a national environmental public health collaborative of approximately 175 diverse organizations representing communities and constituencies directly impacted by chemical hazards. Coming Clean works to reduce and eliminate these harms. In support of its work, Coming Clean uses monitoring data submitted to EPA by chemical facilities to evaluate the hazards to people across the country from industrial pollution and the risk of chemical disasters, and to document the disproportionate burden those hazards place on people of color and low-income communities.

22.     Plaintiff Flint Rising is a nonprofit community organization based in Flint, Michigan, that works to ensure that directly impacted people have the organizing infrastructure and leadership necessary for the long-haul fight for justice Flint families need and deserve in the wake of the Flint water crisis.

23.     Plaintiff Indigenous Environmental Network is an alliance of Indigenous peoples whose mission it is to protect the sacredness of Earth Mother from contamination

and exploitation by strengthening, maintaining and respecting Indigenous teachings and natural laws.

24. Plaintiff Just Transition Alliance (JTA) is a coalition of environmental justice and labor organizations and is an affiliate member of Plaintiff EJHA. JTA serves people of color, indigenous peoples, and low-income communities living under the threat of polluting industries, and workers in the service, energy, farmworker, and chemical sectors. JTA also focuses on community education to raise awareness about toxic chemical issues.

25. Plaintiff Los Jardines Institute is a nonprofit organization based in the South Valley of Albuquerque, New Mexico that builds and supports healthy and sustainable communities and workplaces by creating opportunities that promote multigenerational learning, sharing, and movement building. The Institute honors land-based and grassroots ways of knowing in the places where we live, work, play, pray, and go to school. The Institute is an affiliate member of Plaintiffs EJHA and JTA.

26. Plaintiff Southeast Environmental Task Force is an environmental nonprofit organization dedicated to serving the southeast side and south suburbs of Chicago by promoting environmental education, pollution prevention, and sustainable development.

27. Plaintiff Texas Environmental Justice Advocacy Services (t.e.j.a.s.) is dedicated to providing community members with the tools necessary to create sustainable, environmentally healthy communities by educating individuals on health concerns and implications arising from environmental pollution, empowering individuals with an understanding of applicable environmental laws and regulations and promoting their enforcement, and offering community-building skills and resources for effective community

action and greater public participation. T.e.j.a.s. is based in Houston, Texas, and is an affiliate member of EJHA.

28. Plaintiff Water You Fighting For is a community-led, grassroots group in Flint, Michigan focused on ensuring everyone has access to clean, safe, and affordable water.

29. Plaintiff West Harlem Environmental Action, Inc. (WE ACT for Environmental Justice) is a nonprofit membership organization based in New York City dedicated to building healthy communities by ensuring that people of color and/or low-income residents participate meaningfully in the creation of sound and fair environmental health and protection policies and practices.

30. Plaintiffs bring this action on behalf of their members. Plaintiffs' membership includes individuals and families who depend on timely environmental monitoring and reporting to advocate for a safe environment in their communities and to protect themselves against health risks from pollution, and who are concerned that regulated entities will stop monitoring and reporting in reliance on EPA's policy, with no notice to the public. Plaintiffs' members are unable to take steps to protect themselves absent the public disclosure requested in the emergency rulemaking petition and may be exposed to greater pollution without knowing it.

31. Plaintiffs also bring this action on behalf of themselves. Plaintiffs rely on environmental-monitoring data and other information that regulated entities report to EPA as an important source of information in their work promoting stronger public-health and environmental laws. Plaintiffs also use this information to educate their members, the public, and elected officials about environmental harms and human health risks from

pollution. Plaintiffs' efforts will be harmed if regulated entities stop complying with their monitoring and reporting requirements in reliance on EPA's policy and with no notice to the public. The requested rule would help mitigate those harms by informing Plaintiffs when regulated entities stop complying with those requirements and helping Plaintiffs educate their members and the public about increased risks in their communities.

32. Defendant Susan Parker Bodine is the Assistant Administrator for Enforcement and Compliance Assurance at the U.S. Environmental Protection Agency. Assistant Administrator Bodine signed the Policy. She is sued in her official capacity.

33. Defendant Administrator Andrew Wheeler is the highest-ranking official in the U.S. Environmental Protection Agency. He is sued in his official capacity.

34. Defendant U.S. Environmental Protection Agency is an agency of the United States government. Defendants are referred to collectively in this Complaint as EPA.

## JURISDICTION AND VENUE

35. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

36. The Court has authority to issue declaratory relief pursuant to 28 U.S.C. § 2201(a).

37. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C), because plaintiffs Natural Resources Defense Council, Catskill Mountainkeeper, and West Harlem Environmental Action reside in this district and no real property is involved in this action.

## BACKGROUND

EPA's non-enforcement policy

38. On March 26, 2020, EPA published a memorandum titled "COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program." The

memorandum announces the governing "policy regarding EPA enforcement of environmental legal obligations during this time" (the Policy). The Policy is retroactive to March 13, 2020, and is in place indefinitely.

39. EPA published the Policy three days after receiving a letter from an oil industry trade group asking for a broad waiver of environmental rules during the pandemic.

40. Among other things, the Policy states that the COVID-19 pandemic may constrain the ability of companies to perform routine monitoring, sampling, lab analysis, reporting, or certification for compliance with governing pollution limits (these activities are referred to in this Complaint as monitoring and reporting, for short). The Policy states that entities "should" use existing procedures under a governing statute, regulation, or permit to disclose violations of monitoring and reporting requirements. But if, in the regulated entity's sole discretion, "reporting is not reasonably practicable due to COVID-19," the Policy states that the entity should simply "maintain this information internally" and "make it available to the EPA or an authorized state or tribe upon request."

41. EPA announced in the Policy that it does not expect to seek penalties for monitoring and reporting violations, assuming it becomes aware of them, if it later agrees that COVID-19 was the cause of the violation and if the regulated entity provides a justification to EPA "upon request."

42. The Policy does not describe the circumstances in which EPA believes a facility could safely continue to operate during the pandemic but not safely perform "routine activities" such as monitoring for compliance with pollution limits or other public-health or environmental protections.

## The monitoring and reporting requirements at issue

43.     EPA provided a long list of examples of monitoring and reporting requirements covered by its non-enforcement policy. Those examples include stack tests, continuous emission monitoring systems, fenceline monitoring, leak detection and repair monitoring, tank and piping inspections, tank-integrity testing, effluent sampling, and Toxics Release Inventory reporting.

44.     The list of affected requirements covers virtually every type of monitoring related to EPA regulation of air and water pollution, chemical releases, oil spills, hazardous waste storage, leaking tanks and pipelines, and more.

45.     The data implicated by EPA's policy are used to inform people about local environmental quality in their communities, to help workers and unions prevent on-the-job excessive exposure to hazardous chemicals, to help emergency managers prepare plans to address chemical accidents, and to document and disclose violations of drinking water standards, among other crucial functions.

46.     Stack testing, for example, is necessary to determine facilities' compliance with standards for hazardous air pollutants under the Clean Air Act. A stack test measures the amount of a specific regulated pollutant being emitted and demonstrates the efficacy of the pollution controls used at facilities subject to the Clean Air Act's requirements.

47.     A continuous emission monitoring system, or CEMS, is a system that continuously monitors air emissions from a facility for compliance with standards for pollutants ranging from ammonia to particulate matter. CEMS are required under some of EPA's most important air-pollution programs, including the Acid Rain Program and cross-state sulfur dioxide and nitrogen oxides air pollution programs.

48. Fenceline monitoring helps protect those communities most burdened by pollution: low-income and communities of color that live near oil, gas, and chemical facilities. Not all air pollution comes from smoke stacks. "Fugitive emissions" that escape from refineries, energy production sites, and natural gas pipelines are a major source of harmful pollution to surrounding communities. Fixing leaks that cause these emissions can protect workers and nearby communities and assist regulators with implementing source emissions and air quality standards under the Clean Air Act. Without fenceline monitoring, facilities may not detect harmful leaks, and communities cannot know the extent to which fugitive air emissions are threatening their health.

49. Leak detection and repair (or LDAR) monitoring is required under more than two dozen EPA programs. LDAR monitoring is important because leaking equipment, such as valves, pumps, and connectors, is the largest source of emissions of volatile organic compounds (VOCs) and volatile hazardous air pollutants from petroleum refineries and chemical manufacturing facilities. EPA has estimated that equipment leaks emit more than 70,000 tons per year of VOCs and nearly 10,000 tons per year of hazardous air pollutants. LDAR programs are a key way for facilities to control emissions from equipment leaks and to identify equipment repairs necessary to prevent future releases. Abandonment of LDAR monitoring increases the risk that harmful air pollutants leak and harm workers or neighboring communities.

50. Tank-integrity testing is intended to detect oil leaks, spills, or other potential infrastructure integrity issues before they can result in a discharge of oil to rivers or shorelines. These tests are also a critical component of the Clean Air Act's Risk

Management Program, which aims to prevent chemical disasters at the most dangerous industrial facilities in the country.

51. Effluent sampling is the backbone of the Clean Water Act's point-source pollution control regime, which prohibits the unpermitted discharge of pollutants into the nation's waters. Regular sampling is necessary to evaluate whether a facility is complying with effluent limits for myriad pollutants, including heavy metals, bacteria and other pathogens, nutrients, and toxic chemicals. Those limits serve as the primary mechanism in discharge permits issued and enforced by states, tribes, and the federal government to control the discharge of pollutants to waterways. The Clean Water Act requires EPA (or the relevant state or tribe) to set such limits in line with the Act's overarching goal to eliminate the discharge of all pollutants into the nation's waters, in order to protect public health, public water supplies, agricultural uses, and wildlife.

52. Toxics Release Inventory (TRI) reporting under the Emergency Planning and Community Right-to-Know Act serves to provide communities with information on potential chemical hazards within their boundaries and to facilitate awareness and planning for accidental and emergency chemical releases. The Emergency Planning and Community Right-to-Know Act mandates that a facility manufacturing, processing, or using certain toxic chemicals report annually on the presence of those chemicals at the facility, the uses of the chemicals, an estimate of the maximum amounts of the chemicals present at any time, methods of disposal and treatment of waste, and the extent to which those chemicals are being released into the environment. EPA and state governments, in turn, make this information available to local governments and citizens in the community, who can then develop emergency response plans that are required by law.

53. Safe drinking water regulations cover nearly 100 contaminants that can cause serious acute and chronic health harms, including arsenic, lead, bacteria, nitrate, and disease-causing microorganisms like cryptosporidium. These regulations require drinking water monitoring, reporting of violations of drinking water standards, and notification to the public of violations. EPA states in the Policy that it has "heightened expectations" for public water systems and "expects" water systems to continue to comply with monitoring requirements, but nevertheless, the Policy does not exempt drinking water systems from the non-enforcement approach EPA has announced.

54. The Policy creates a new exception for industrial livestock facilities known as animal feeding operations that, "due to disruptions caused by the COVID-19 pandemic," now meet the regulatory definition of a "concentrated animal feeding operation" (CAFO), because they have a sufficiently large number of animals onsite. The Policy states that EPA will not treat any such facility as a CAFO. The effect is to allow those facilities, which otherwise would be subject to pollution controls in a Clean Water Act permit, to discharge manure or litter into waterways without a federal permit, harming water quality and posing a risk to downstream communities without any public notice.

55. The Policy also announces special treatment for hazardous waste generators that, "due to disruptions caused by the COVID-19 pandemic," are storing large volumes of hazardous waste onsite rather than transferring it to properly regulated storage and disposal facilities. The Policy announces that EPA will not treat those hazardous waste generators as "treatment, storage, and disposal" facilities. The Policy thus allows those facilities to ignore the disaster prevention, preparedness, and response regulations that otherwise strictly govern treatment, storage, and disposal of hazardous waste. The result is that communities

near these facilities are less safe from a hazardous waste disaster than they would be if the applicable regulations remained in effect, and those communities will have no notice that otherwise-unlawful volumes of hazardous waste are being stored nearby.

56. The monitoring and reporting requirements implicated by EPA's non-enforcement policy are essential to protect public health and, in some instances, to prevent catastrophic harm.

<u>Plaintiffs' petition for emergency rulemaking</u>

57. In response to EPA's policy and the risks it creates, Plaintiffs filed a petition for emergency rulemaking on April 1, 2020. The petition is attached to this Complaint as Exhibit A.

58. Plaintiffs' petition asked EPA to publish an interim final rule, within seven days and effective immediately, to ensure prompt public notice of any regulated entity's failure to conduct required monitoring or reporting in reliance on EPA's policy.

59. The petition asked that the requested rule require any entity that does not conduct required monitoring or reporting for reasons related to COVID-19 to notify EPA and the relevant state or tribe immediately, disclosing: (1) the pollution limit or standard involved, (2) the relevant statute, regulation, or permit provision that compels the monitoring or reporting at issue, (3) whether and to what extent the entity's operations are continuing in other respects, (4) a justification for the failure to monitor or report, and (5) a description of the efforts being made to return to compliance as soon as possible. The petition also asked that the rule require EPA to publish all such notifications online within a day of receipt, including the name and location of the facility and a link to the complete submission.

60. The petition further asked that the requested rule require facilities to report when they return to compliance and provide that EPA publish those submissions online within a day of receipt.

61. The petition asked EPA to publish the requested rule without first providing notice and seeking comment, because EPA's policy—which was effective immediately and retroactive to March 13—creates an urgent need for facilities to disclose publicly if and when they fail to monitor or report. The petition asked EPA to solicit public comment through a notice of proposed rulemaking at the same time as the interim final rule and then amend the rule in the future, as appropriate, based on any comments it receives.

62. The petition describes the enormous health consequences at stake. As summarized above, the petition explains that pollution limits, leak detection, hazardous waste reporting rules, and other compliance obligations exist to protect people who work in or live downwind, downstream, or along the fenceline of regulated facilities. If those facilities are allowed to stop monitoring their compliance with those requirements and stop reporting violations, without notice to the public, people will not know the levels of pollution they are exposed to, will not know about risks from chemicals or hazardous waste stored nearby, and will not be able to take steps to protect themselves.

63. The petition also explains that the risks from EPA's non-enforcement policy are especially pronounced in the context of safe drinking water, where failure to timely monitor and disclose contamination can be catastrophic.

64. The petition further establishes that EPA's policy dangerously hampers emergency preparedness, by impeding timely collection and disclosure of data that Congress deemed "essential" to help respond to chemical accidents and disasters.

65. The petition explains that the requested rule would mitigate the threat of harm immediately posed by EPA's policy, by ensuring the public knows when regulated facilities cease to comply with their monitoring and reporting requirements.

66. In a letter to EPA on April 9, 2020, California Attorney General Xavier Becerra supported the petition's request for immediate public disclosure when regulated entities fail to comply with environmental obligations in reliance on EPA's policy. In a letter on April 15, fourteen more state attorneys general called on EPA to rescind the policy, noting that without any requirement for industry to disclose monitoring and reporting violations, "fence line communities could be exposed to harmful pollution without adequate warning."

<u>EPA's failure to respond to the petition for emergency rulemaking</u>

67. Plaintiffs submitted the petition more than two weeks ago, on April 1, 2020.

68. Because EPA's policy was retroactive to March 13, undisclosed monitoring and reporting violations may now date back more than a month.

69. Despite the petition's request for and showing of need for prompt action, EPA, to date, has not responded to the petition.

70. There is no indication that EPA staff or decisionmakers are hampered in their ability to respond to the petition. To the contrary, during the COVID-19 pandemic, EPA has pressed forward with major deregulatory actions, including rolling back clean car standards, relaxing emission limits for acid gases from power plants that burn coal refuse, and drafting a final rule to limit states' and tribes' ability to place conditions on federally permitted projects that could harm state and tribal waters.

71. EPA's delay harms Plaintiffs' interests and the public interest. The public may be denied access to information to which it is entitled under the law, and people are at risk of being exposed to more air and water pollution because oversight has been dramatically relaxed. That risk is even more intolerable in light of recent research from the Harvard School of Public Health concluding that a small increase in long-term exposure to air pollution leads to a large increase in COVID-19 death rate.

## RELEVANT LEGAL FRAMEWORK

72. Plaintiffs have a fundamental right, preserved under the First Amendment, "to petition the Government for a redress of grievances." U.S. Const. amend. I.

73. The Administrative Procedure Act (APA) also creates a statutory right that requires EPA to provide "interested person[s]"—like Plaintiffs—"the right to petition for the issuance . . . of a rule." 5 U.S.C. § 553(e).

74. The APA further requires that an agency "shall" "conclude a matter presented to it" "within a reasonable time," *id.* § 555(b), and states that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1).

75. EPA has authority under various environmental laws, including the Clean Air Act, the Clean Water Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act, and the Safe Drinking Water Act, to publish the rule requested in Plaintiffs' petition. Specifically, EPA has the authority to require regulated entities to document and timely report when and why they have stopped complying with environmental obligations imposed by federal law, and EPA has a duty to make that information available to the public.

CLAIM FOR RELIEF

76. EPA has delayed unreasonably by failing to respond to Plaintiffs' petition for emergency rulemaking, in violation of the APA.

REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court expedite this matter for good cause pursuant to 28 U.S.C. § 1657 and enter judgment against EPA as follows:

A. Declaring that EPA's failure to respond to the petition is unreasonable and unlawful;

B. Ordering EPA to issue a final response to the petition as soon as possible, and no later than five days from the Court's entry of judgment;

C. Awarding Plaintiffs their costs and reasonable attorneys' fees incurred in prosecuting this action under 28 U.S.C. § 2412; and

D. Granting such other relief that the Court considers just and proper.

Dated: April 16, 2020

Respectfully submitted,

*/s/ Michelle Wu*
Michelle Wu
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
T: 646-889-1489
F: (415) 795-4799
michellewu@nrdc.org

Aaron Colangelo, *pro hac vice* pending
Jared E. Knicley, *pro hac vice* pending
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
T: (202) 289-2376
F: (415) 795-4799

acolangelo@nrdc.org
jknicley@nrdc.org

*Counsel for Plaintiffs*

/s/ Allison Zieve
Allison Zieve, *pro hac vice* pending
Public Citizen
1600 20th Street, NW
Washington, DC 20009
T: 202-588-1000
azieve@citizen.org

*Counsel for Plaintiff Public Citizen*

20