# EXHIBIT A

## BEFORE THE ADMINISTRATOR OF THE
## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

### PETITION FOR EMERGENCY RULEMAKING

### April 1, 2020

This Petition for a final rule is filed pursuant to the Administrative Procedure Act, 5 U.S.C. § 553(e), and the First Amendment's petition clause.

The Environmental Protection Agency's non-enforcement policy announced on March 26 creates an immediate and serious risk to people and communities affected by pollution. That risk is heightened by EPA's broad invitation to regulated industries to suspend monitoring and reporting without public disclosure and without adequate justification or oversight. For the reasons below, Petitioners request that within seven days, EPA publish a final, enforceable rule to ensure that, at a minimum, the public receives prompt notice of any facility's failure to conduct required monitoring or reporting in reliance on the March 26 policy. Without such information, members of the public cannot adequately protect themselves against the increased risk of harm created by EPA's actions.

We fully appreciate the disruption and harm caused by the COVID-19 pandemic. But EPA's unprecedented non-enforcement policy creates a clear opportunity for abuse. The final rule we petition for here is necessary to lessen the health risk that may result from EPA's policy and to mitigate the potential for abuse. Given the policy's immediate impact, we petition EPA to publish the requested rule within seven days and make the rule effective immediately.

This Petition is submitted by the Natural Resources Defense Council, Environmental Justice Health Alliance, Asian Pacific Environmental Network, Catskill Mountainkeeper, Center for Coalfield Justice, Clean Water Action, Climate Justice Alliance, Coming Clean, Flint Rising, Indigenous Environmental Network, Just Transition Alliance, Little Village Environmental Justice Organization, Los Jardines Institute, Michigan Environmental Justice Coalition, New York City Environmental Justice Alliance, Public Citizen, Sane Energy Project, Southeast Environmental Task Force, Southeast Side Coalition to Ban Petcoke, Texas Environmental Justice Advocacy Service, Water You Fighting For, and West Harlem Environmental Action, Inc. (WE ACT for Environmental Justice).

## I.  BACKGROUND

### A.  EPA's non-enforcement policy

On March 26, 2020, EPA published a memorandum titled "COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program."[1] The memorandum announces the governing "policy regarding EPA enforcement of environmental legal obligations" during the COVID-19 pandemic (the Policy). The Policy is retroactive to March 13, 2020, and is in place indefinitely.

Among other things, the Policy states that the COVID-19 pandemic may constrain the ability of companies to perform routine compliance monitoring, integrity testing, sampling, lab analysis, training, and reporting or certification (these activities are referred to in this Petition as monitoring and reporting, for short). Policy at 3. The Policy states that entities "should" use existing procedures under a governing statute, regulation, or permit to disclose noncompliance with monitoring and reporting requirements. *Id*. But if, in the regulated entity's sole discretion, "reporting is not reasonably practicable due to COVID-19," the Policy states that the entity should simply "maintain this information internally" and "make it available to an authorized state or tribe upon request." *Id*. EPA announces that it does not expect to seek penalties for monitoring and reporting violations if EPA agrees that COVID-19 was the cause and the regulated entity provides supporting documentation to EPA "upon request." *Id*.

In a series of footnotes, EPA provides a long list of examples of monitoring and reporting requirements covered by its new non-enforcement policy. The list includes: continuous emission monitoring system (CEMS) and stack tests, leak detection and repair (LDAR) monitoring, fenceline monitoring, tank and piping inspections, stormwater inspections, tank integrity testing for compliance with good air pollution control practices, effluent sampling, cooling tower sampling, and Toxic Release Inventory (TRI) and greenhouse gas inventory reporting. *Id*.

### B.  The monitoring and reporting requirements involved

EPA's non-enforcement policy implicates monitoring and reporting requirements that are essential to protect public health.

Stack testing, for example, is necessary to determine facilities' compliance with New Source Performance Standards and National Emission Standards for Hazardous Air

---

[1] https://www.epa.gov/sites/production/files/2020-03/documents/oecamemooncovid19implications.pdf.

Pollutants. A stack test "measures the amount of a specific regulated pollutant, pollutants, or surrogates being emitted; demonstrates the capture efficiency of a capture system; or determines the destruction or removal efficiency of a control device used to reduce emissions at facilities subject to the requirements of the Clean Air Act."[2]

Similarly, a continuous emission monitoring system, or CEMS, *see* 40 C.F.R. § 72.3, is required under some of EPA's most important air-pollution programs, including the Acid Rain Program and the Cross-State $SO_2$ and $NO_X$ Air Pollution programs.[3] Relative accuracy test audits are required to determine the accuracy of CEMS. *See id.* pt. 60, app. F.

Leak detection and repair (or LDAR) monitoring is required under more than two dozen EPA programs. LDAR monitoring is important because "leaking equipment, such as valves, pumps, and connectors, are the largest source of emissions of volatile organic compounds (VOCs) and volatile hazardous air pollutants (VHAPs) from petroleum refineries and chemical manufacturing facilities."[4] EPA has found that "[e]missions from equipment leaks exceed emissions from storage vessels, wastewater, transfer operations, or process vents," and "has estimated that approximately 70,367 tons per year of VOCs and 9,357 tons per year of HAPs have been emitted from equipment leaks."[5] LDAR programs are a key way for facilities to "control emissions from equipment leaks,"[6] and to identify equipment repairs necessary to prevent future catastrophic releases.

Fenceline monitoring helps protect those communities most burdened by pollution— low-income and communities of color that live near oil, gas, and chemical facilities. As EPA recognizes, "Not all pollution comes from smoke stacks."[7] Rather, the "fugitive emissions" that come from "industry, refineries, energy production, and natural gas pipelines" "are a significant source of pollution."[8] "Fixing these leaks can protect workers and nearby communities, reduce operating costs for companies, and assist

---

[2] *See* EPA, Clean Air Act National Stack Testing Guidance 1 (Apr. 27, 2009), https://www.epa.gov/sites/production/files/2013-09/documents/stacktesting_1.pdf.

[3] *See* EPA, Air Emissions Center, (EMC): Continuous Emissions Monitoring Systems, Information and Guidelines, https://www.epa.gov/emc/emc-continuous-emission-monitoring-systems.

[4] EPA, Leak Detection and Repair: A Best Practices Guide, at 2 https://www.epa.gov/sites/production/files/2014-02/documents/ldarguide.pdf; *see id.* Appendix A (listing programs).

[5] *Id.* at 2.

[6] *Id.* at 3.

[7] EPA, Fenceline Monitoring: Finding air pollution leaks with smaller, faster, cheaper, measurement technologies (May 11, 2018), https://www.epa.gov/sciencematters/fenceline-monitoring.

[8] *Id.*

regulators with implementing source emissions and air quality standards under the Clean Air Act."[9] Without fenceline monitoring, nearby communities cannot know whether the facilities in their neighborhoods are polluting their air.

Similarly, monitoring from reciprocating internal combustion engines—stationary engines used at power plants and other facilities to generate electricity—is intended to identify the hazardous air pollutants those engines generate. 40 C.F.R. § 63.6580. These pollutants include "formaldehyde, acrolein, acetaldehyde and methanol," which "may produce a wide variety of health difficulties for people including irritation of the eyes, skin and mucous membranes, and central nervous system problems."[10] "Engines also emit the conventional air pollutants created when fuel is burned including carbon monoxide (CO), nitrogen oxides (NOx), volatile organic compounds (VOCs), and particulate matter (PM). The health effects of these pollutants include a range of respiratory (breathing) issues, especially asthma among children and seniors."[11]

Tank-integrity testing, consistent with industry standards, is intended to "detect oil leaks, spills, or other potential integrity or structural issues before they can result in a discharge of oil to navigable waters of the U.S. or adjoining shorelines."[12] See 40 C.F.R. § 112.8(c)(6). These tests are also a critical component of the Clean Air Act's Risk Management Program, see, e.g., id. § 68.73(d), with its goal of preventing chemical disasters at the most dangerous industrial facilities—facilities disproportionately located near low-income communities and communities of color.[13] Regulated facilities' abandonment of these important spill- and disaster-prevention measures would increase the risk of toxic chemical releases that "endanger public health, impact drinking water, devastate natural resources, and disrupt the economy."[14]

---

[9] Id.

[10] EPA, Basic Information for Stationary Engines, https://www.epa.gov/stationary-engines/basic-information-stationary-engines.

[11] Id.

[12] EPA, Spill Prevention, Control and Countermeasure Plan (SPCC) Program 1 (Aug. 2013), https://www.epa.gov/sites/production/files/2014-05/documents/bulk_storage_container_integrity-testing-factsheet.pdf.

[13] Envtl. Justice Health All. for Chemical Policy Reform, Who's in Danger: A Demographic Analysis of Chemical Disaster Vulnerability Zones 2-3 (May 2014), https://comingcleaninc.org/assets/media/images/Reports/Who's%20in%20Danger%20Report%20FINAL.pdf.

[14] See EPA, Spill Prevention, Control and Countermeasure (SPCC) Regulation, 40 CFR Part 112, A Facility Owner/Operator's Guide to Oil Pollution Prevention, https://www.epa.gov/sites/production/files/documents/spccbluebroch.pdf.

Effluent sampling is the backbone of the Clean Water Act's point-source pollution control regime, which prohibits the unpermitted "discharge of any pollutant" into the nation's waters. 33 U.S.C. § 1311(a). Regular sampling is necessary to evaluate whether a facility is complying with effluent limits for myriad pollutants. 40 C.F.R. pts. 401-471 (EPA's effluent guidelines and standards); *see Piney Run Preservation Ass'n v. Cty. Com'rs of Carroll Cty.*, 268 F.3d 255, 266 (4th Cir. 2001) ("The effectiveness of the permitting process is heavily dependent on permit holder compliance with the CWA's monitoring and reporting requirements."). Those limits "serve as the primary mechanism in [National Pollutant Discharge Elimination System] permits for controlling discharges of pollutants to receiving waters."[15] EPA (or the relevant state) must set effluent limits in line with the Act's overarching goal to "eliminat[e] the discharge of all pollutants" into our nation's waters, 33 U.S.C. § 1311(b)(2), and to "assure protection of public health, public water supplies, agricultural and industrial uses, and the protection and propagation of a balanced population of shellfish, fish and wildlife, and allow recreational activities in and on the water[s]," *id*. § 1312(a); *see also id*. § 1251(a); *Am. Petroleum Inst. v. EPA*, 540 F.2d 1023, 1028 (10th Cir. 1976) ("[T]he guiding star [under the Clean Water Act] is the intent of Congress to improve and preserve the quality of the Nation's waters.").

TRI reporting under the Emergency Planning and Community Right-to-Know Act (EPCRA) ensures that communities around the country know what risks they face from facilities in their backyards. "EPCRA was enacted to protect public health and the environment by arming communities with the right to know what chemicals manufacturing facilities are emitting into the air, land, and water, and by giving businesses a public relations incentive not to pollute." *Tozzi v. EPA*, 148 F. Supp. 2d 35, 38 (D.D.C. 2001); *see also* 42 U.S.C. § 11023(h). "The purpose behind the EPCRA is defeated, when persons subject to the EPCRA requirements fail to file information regarding release of toxic chemicals to the environment." *Del. Valley Toxics Coal. v. Kurz-Hastings, Inc.*, 813 F. Supp. 1132, 1139 (E.D. Pa. 1993). TRI data are used to inform "organizations and individuals about the local environmental quality" in their communities, to help workers and unions "prevent[] on-the-job excessive exposure to hazardous chemicals," *id*. at 1135, and to help emergency managers "prepar[e] response plans to address potential chemical accidents," *Atl. States Legal Found., Inc. v. Buffalo Envelope*, 823 F. Supp. 1065, 1070-71 (W.D.N.Y. 1993).

Finally, and as explained in more detail below, monitoring and reporting requirements are integral to providing safe drinking water nationwide. Regulations under the Safe

---

[15] EPA, NPDES Permit Limits, https://www.epa.gov/npdes/npdes-permit-limits (last visited March 31, 2020).

Drinking Water Act require tap water monitoring for dozens of contaminants, reporting of violations of drinking water standards, and notification to the public of violations.

All of these monitoring and reporting programs, among others implicated by EPA's non-enforcement policy, provide vital protections and information to the public.

## II.  REQUESTED ACTIONS

We petition EPA on an emergency basis to publish a final rule providing as follows:

A.  Any regulated entity that, for reasons related to COVID-19, fails to comply with required monitoring, reporting, testing, sampling, inspection, or certification (as broadly contemplated in EPA's non-enforcement policy at page 3) must notify EPA and the relevant state and regulatory authorities immediately, in writing and submitted electronically, and must include the following information:

1. The limitation or standard as to which the entity failed or is failing to monitor, report, test, or sample, including the specific pollutant or pollutants involved, or the inspection or certification no longer being performed or conducted;

2. The relevant permit provision, statute, or regulation that compels the monitoring, reporting, testing, sampling, inspection, or certification at issue;

3. Whether and to what extent the entity's operations are continuing in other respects;

4. A detailed explanation of the COVID-19-related reason claimed to justify the entity's non-compliance with monitoring, reporting, testing, sampling, inspection, or certification; and

5. A thorough description of the good faith efforts being made to return to compliance with the requirements as quickly as possible.

B.  EPA must promptly publish online an electronically searchable and sortable list of all regulated entities that provide a notification under subsection A. Specifically, within one business day of receiving a notification described under section A, EPA must add to the list: the name of the entity, the location of the facility involved, and a link to the complete submission.

C.  Any regulated entity that provides a notification under subsection A must notify EPA and the relevant state and regulatory authorities immediately, in writing and submitted electronically, when it returns to compliance with the required monitoring, reporting, testing, sampling, inspection, or certification

covered in its initial notification, and must in that notice include the following information:

    1. The date of the regulated entity's return to compliance with the relevant requirement,

    2. Documentation showing the regulated entity has returned to compliance, and

    3. A thorough description of the efforts taken to return to compliance.

D.  EPA must promptly publish online an electronically searchable and sortable list of all regulated entities that provide a notification under section C. Specifically, within one business day of receiving a notification described under section C, EPA must add to the list: the name of the entity, the location of the facility involved, and a link to the complete submission.

EPA should make explicit that the rule is enforceable and imposes judicially-reviewable requirements under the applicable environmental statutes.

We also petition EPA to publish this rule within seven days as an interim final rule effective immediately, without first providing notice and seeking comment. EPA has created an emergency by inviting widespread noncompliance, providing good cause for such action. EPA should solicit public comment in a notice of proposed rulemaking issued at the same time as the final rule and amend the rule, as appropriate, in the future based on public comment.

## III.  JUSTIFICATION

EPA's non-enforcement policy threatens environmental and health protections by inviting regulated entities to pollute and to hide crucial information from the public. It conveys a broad license to industry to quit monitoring and reporting indefinitely, based only on the honor system. EPA asks—but does not require—companies to let the agency know if they stop monitoring or reporting for reasons related to COVID-19. Existing permit obligations and statutory requirements remain in place, but EPA has signaled that it will not enforce them.

EPA's non-enforcement policy presents a huge risk to downstream, downwind, and fenceline communities. Environmental monitoring and reporting are essential for at-risk communities around the country. People can't take steps to protect themselves—or pursue appropriate enforcement against polluters—without timely information about air and water pollution. Monitoring and reporting also serve an important deterrent function; facilities are more likely to meet their pollution limits if they have to monitor

and report the results. EPA's policy will mean not just less information but more pollution in these already-overburdened communities.

We are filing this Petition pursuant to 5 U.S.C. §§ 553 and 555 and the First Amendment's petition clause. Existing provisions in the Clean Water Act (CWA), Clean Air Act (CAA), Safe Drinking Water Act (SDWA), Resource Conservation and Recovery Act (RCRA), and EPCRA provide EPA with all necessary legal authority. Consistent with the APA, the agency should publish the requested interim final rule promptly, with an immediate effective date, and concurrently issue a notice of proposed rulemaking and provide an opportunity for comment.

### A.  EPA has clear legal authority to publish the requested rule

The APA requires EPA to provide "interested person[s]"—like Petitioners—"the right to petition for the issuance . . . of a rule." 5 U.S.C. § 553(e). This statutory right is in addition to Petitioners' fundamental right, preserved under the First Amendment, "to petition the Government for a redress of grievances." U.S. Const. amend. I.

EPA may require regulated entities to document and timely report when and why they have stopped complying with environmental obligations imposed by federal law. EPA has explicit authority—and indeed an obligation—under various environmental laws to require the requested notification.

The CWA provides EPA broad authority to require reporting and recordkeeping "[w]henever required to carry out the objective" of the Act, including but not limited to "determining whether any person is in violation of" a standard or limit under the law. 33 U.S.C. § 1318(a). Among other things, this provision allows EPA to require the owner or operator of any point source to "make such reports" and "provide such [] information as [the Administrator] shall reasonably require." *Id*. § 1318(a)(A).[16] The CAA, SDWA, and RCRA all provide EPA similarly broad authority to require notifications from regulated entities to further the purposes of those statutes. *See* 42 U.S.C. § 7414(a)(1) (granting EPA authority to require regulated emissions sources under the CAA to "make such reports" and "provide such other information as the Administrator may reasonably require"); 42 U.S.C. § 300j-4(a)(1)(A) (granting EPA authority to require any person subject to SDWA requirements to "make such reports" and "provide such information as the Administrator may reasonably require by

---

[16] The CWA provides similar authority for EPA to require the owner or operator of certain facilities to "make such reports . . . and provide such other information" as the Administrator "may require to carry out the objectives" of the Act's oil and hazardous substance liability provisions. 33 U.S.C. § 1321(m)(2)(A).

regulation to assist the Administrator . . . in determining whether such person has acted or is acting in compliance with the [Act]"); 42 U.S.C. § 6927(a) (permitting EPA to require any person subject to RCRA to provide "information regarding [hazardous] wastes" for purposes of "enforcing the provisions of the Act"). And while EPCRA does not have a parallel information-collection provision, it provides EPA with the broad authority to "prescribe such regulations as may be necessary to carry out" the Act. 42 U.S.C. § 11048. Other environmental laws—including the CWA, CAA, and SDWA—include similar general authority. *See* 33 U.S.C. § 1361(a) (CWA); 42 U.S.C. § 7601(a)(1) (CAA); 42 U.S.C. § 300j-9(a)(1) (SDWA).

The touchstone of EPA's authority under these laws is whether it is "reasonable" to require the regulated entity to provide the information. Without question, EPA may reasonably require regulated entities subject to existing monitoring and reporting obligations to notify EPA immediately if they intend to cease that monitoring or reporting in reliance on EPA's new non-enforcement policy. Indeed, having extended an invitation to regulated entities to rely on the non-enforcement policy, it is unreasonable for EPA *not* to require such immediate notification.

EPA also has the authority—and obligation—to immediately make public any such notification. Once conveyed to EPA, any regulated entity's notice that it was availing itself of EPA's non-enforcement policy would become an agency record subject to disclosure under the Freedom of Information Act. 5 U.S.C. § 552. More importantly, the CWA, CAA, and RCRA all mandate a right of public access to any such notifications received by EPA, subject to narrow exceptions that do not apply here. 33 U.S.C. § 1318(b); *id.* § 1321(m)(2)(D); 42 U.S.C. § 7414(c); *id.* § 6927(b)(1). Just as it would be unreasonable for EPA not to require immediate notification from a regulated entity that has stopped or plans to stop monitoring or reporting, it would be unreasonable for EPA to keep that information hidden from members of the public, who can no longer rely on the essential protections that monitoring and reporting provide, and who are among the intended beneficiaries of that monitoring and reporting.

### B.  EPA's non-enforcement policy creates an urgent need for the requested rule

Environmental monitoring and reporting are critical to protecting the public from the serious health risks posed by exposure to pollution. EPA's non-enforcement policy encourages noncompliance with these requirements. The rule we petition for will mitigate harm to the public from that noncompliance, but only if EPA acts with urgency.

### 1.  EPA's policy undermines monitoring and reporting, which play a crucial role in environmental regulation and pollution control

Monitoring and reporting are central to the effective functioning of environmental law and regulation. *See* Robert V. Percival et al., *Environmental Regulation: Law, Science, and Policy* 1012 (6th ed. 2009) ("[E]nvironmental enforcement authorities rely heavily on self-monitoring and self-reporting requirements to detect violations."). Monitoring and reporting requirements "serve the particularly important purpose of ensuring that regulatory agencies and the public are immediately notified of any permit noncompliance." *Save Our Bays & Beaches v. City & Cty. of Honolulu*, 904 F. Supp. 1098, 1141 (D. Haw. 1994). A "critical part of the [CWA's] regulatory scheme is a strict self-reporting system requiring permittees to monitor carefully their permit compliance and to report their own permit violations." *Id*. at 1105; *see also Student Pub. Interest Research Grp. of N.J. v. Fritzsche, Dodge & Olcott, Inc.*, 579 F. Supp. 1528, 1531 (D.N.J. 1984) ("[A] discharger must report its own permit violations should they occur."). The "[p]ublic health and safety concerns" underlying our environmental statutes "obviously justify the strict . . . requirements for reporting" potentially hazardous emissions. *Save Our Bays*, 904 F. Supp. at 1141; *see also United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1015 n.3 (N.D. Cal. 2002) (noting that "[t]he critical importance of timely and accurate self reporting has been highlighted and emphasized in a number of SDWA cases" and citing cases).

Timely monitoring and reporting are critical "because the results of that process often determine when and what protective measures are required." *Indus. Union Dep't, AFL-CIO v. Hodgson*, 499 F.2d 467, 481 (D.C. Cir. 1974). In EPA's words, "[t]imely notice may allow the public and affected public entities to take steps to reduce the public's potential exposure" to pollutants. 83 Fed. Reg. 712, 712 (Jan. 8, 2018) (justifying public notification related to combined sewer overflows); *see also Hawaii's Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368, 1384 (D. Haw. 1993) (recognizing that failure to report water pollution deprived health agency "of the critical opportunity to . . . warn the public through the media, post signs, or require additional monitoring"); *In the Matter of: Anthony J. Taylor, Andover Water Corp.*, 1992 WL 293140, at *3 (EPA 1992) ("The self-submission of data is critical to the success of our public water supply program under the SDWA. Without this data, EPA and the State of New Jersey cannot know whether a drinking water supply is safe.").

Cessation of monitoring and reporting, on the other hand, "is tantamount to closing one's eyes" to the potential health and environmental effects of pollution. *United States v. City of N. Adams*, No. CIV. A. 89-30048-F, 1992 WL 391318, at *2 (D. Mass. May 18, 1992). Without timely and accurate reports on statutory, regulatory, and permit

exceedances, communities will not know when to take precautionary measures to limit their exposure to harmful contaminants. *See, e.g., Alisal Water Corp.*, 326 F. Supp. 2d at 1017 (explaining that "[c]ustomers' health could have been at risk" if they wrongly believed that their water was free of coliform and thus did not comply with orders to boil their water); 56 Fed. Reg. 26,460, 26,500-01 (June 7, 1991) (recognizing that the Lead and Copper Rule's public notification requirements provide "a means to reduce the public's exposure to drinking water contaminants").

By allowing companies to opt out of monitoring and reporting, EPA's policy makes it more likely that regulated entities will pollute more and violate permit limits or other restrictions. It is well-documented that enforceable regulations have a deterrent effect and lead to significant reductions in pollution.[17] Monitoring and reporting requirements contribute meaningfully to that deterrence because companies pollute less, and less often, when they have to monitor and report their pollution publicly. For instance, following the initial disclosures required under EPCRA's TRI program, regulated entities "dramatically reduced their TRI emissions."[18] And in the first ten years after TRI's enactment, total releases of reported pollutants decreased by over 44%.[19] EPA's non-enforcement policy makes it easier for regulated entities to violate environmental laws undetected and avoid both the deterrent value of penalties and injunctive relief, *see, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 185-86 (2000), as well as the public scrutiny that spurs compliance.

EPA has announced an across-the-board policy of presumptive non-enforcement based on a regulated entity's self-declaration that monitoring and reporting are impracticable. At the same time, EPA has failed to require contemporaneous disclosure to EPA or the public. The result is to encourage regulated entities to disregard critical monitoring and reporting requirements, exacerbating the very health and safety risks from air and water pollution those requirements are intended to reduce.

---

[17] *See, e.g.,* Wayne Gray & Jay Shimshack, *The Effectiveness of Environmental Monitoring and Enforcement: A Review of the Empirical Evidence*, Review of Environmental Economics and Policy 13-15 (2011), https://www.researchgate.net/publication/227356280 (empirical studies show deterrence impacts of monitoring and enforcement actions on air, water, and hazardous substance discharges and compliance with the law); Itzhak Ben-David et al., *Exporting Pollution: Where Do Multinational Firms Emit CO2?*, at 23 (Mar. 16, 2020), https://ssrn.com/abstract=3252563 (facilities in countries with more strongly enforced environmental regulations emit significantly less $CO_2$); Benoît Laplante & Paul Rilstone, *Environmental Inspections and Emissions of the Pulp and Paper Industry: The Case of Quebec* 2 (1999), https://www.researchgate.net/publication/23721797 ("Our results suggest that both inspections and the threat of inspections have a strong negative impact on pollution emissions.").
[18] Mark A. Cohen, *Monitoring and Enforcement of Environmental Policy* 45-46 (1998), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=120108.
[19] Tom Tietenberg, *Disclosure Strategies for Pollution Control*, 11 Envtl. & Resource Econ. 587, 593 (1998).

### 2.  The risks from EPA's non-enforcement policy are especially pronounced in the safe drinking water context

EPA states that it has "heightened expectations" for public water systems and "expects" water systems to continue to comply with monitoring requirements, but nothing in the Policy exempts public water systems from the non-enforcement approach EPA has announced. *See* Policy at 3-4, 6. The discussion of monitoring and reporting at Section I.B., *see* Policy at 3-4, is written so broadly as to include such activities conducted under the SDWA. (If EPA intended to exclude public water systems from its non-enforcement policy, it should clarify that immediately.)

By failing to expressly exclude SDWA monitoring, sampling, laboratory analysis, reporting, and certification from the Policy, EPA is putting public drinking water systems across the United States at risk. The SDWA works "to assure that water supply systems serving the public meet minimum national standards for the protection of public health," H.R. Rep. No. 93-1185 at 1 (1974), and SDWA regulations cover approximately 100 contaminants, ranging from toxic chemicals to microorganisms that can cause serious acute and chronic health impacts.[20] These regulations require tap water monitoring, reporting of violations of drinking water standards, and notification to the public of violations.

Even before the Policy, noncompliance with the SDWA's monitoring and reporting requirements was rampant.[21] The Policy effectively invites water systems to ignore those requirements, to the detriment of public health. First, because routine monitoring is essential to the detection of tap water contamination, a water system's failure to comply with SDWA-required monitoring means contamination that threatens public health may go unnoticed. For example, the SDWA requires water systems to monitor regularly (in some circumstances effectively continuously) for turbidity, a measure of how well a water system's filtration system is working.[22] High turbidity may indicate that microbial contaminants have not been removed by filtration and may not be effectively inactivated by disinfectants, and failure to detect increased turbidity in water can lead to serious public health harms. Such problems led to a massive outbreak of cryptosporidium infections in Milwaukee in 1993, which sickened more than 400,000

---

[20] NRDC, *Threats on Tap* 6 (May 2017), https://www.nrdc.org/sites/default/files/threats-on-tap-water-infrastructure-protections-report.pdf.

[21] *See id.* at 7.

[22] *See, e.g.,* 40 C.F.R. §§ 141.174(a), 141.74(b)(2), 141.560; U.S. EPA, National Primary Drinking Water Regulations, https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations.

residents.[23] Likewise, a failure to monitor for chlorine residual and contaminants such as total coliform can lead to immediate public health threats.[24] Failure to monitor for and detect nitrate and nitrite contamination also threatens grave health harms: infants exposed to high levels of nitrate/nitrite in drinking water can suffer serious illness, including blue baby syndrome, which may result in death.[25]

Further, EPA fails to mention—thus signaling that it will not enforce—monitoring requirements for other constituents that, if present at high levels in drinking water, can cause acute health harms.[26] For example, chlorite (a disinfection byproduct) and chlorine dioxide (a disinfectant) may cause serious adverse effects in fetuses, infants, and young children, including anemia and nervous system effects if present at elevated levels.[27] In short, EPA's pronouncement may leave tap water contamination undetected, posing serious threats to public health.

One need look no further than the water crisis in Flint, Michigan—where years-long systemic lead contamination exposed tens of thousands of Flint residents to toxic tap water—to understand the significant health consequences flowing from a failure to comply with tap water monitoring requirements. Indeed, in Flint, failure to monitor in compliance with the SDWA masked the extent of the lead contamination and prolonged residents' exposure to lead-tainted tap water.[28]

In addition to the risks posed by monitoring failures, the lack of prompt reporting of known SDWA violations can also lead to serious health harms. Reporting known violations to state and federal agencies allows those agencies to provide technical

---

[23] *See* William R. Mac Kenzie et al., *A Massive Outbreak in Milwaukee of Cryptosporidium Infection Transmitted Through the Public Water Supply*, 331 New England J. Medicine 161 (July 21, 1994).

[24] Required monitoring for chlorine, *e.g.*, 40 C.F.R. §§ 141.74, 141.403(b), helps ensure that disinfection is working to inactivate bacteria and viruses in water that can cause illness, *see* CDC, Free Chlorine Testing, https://www.cdc.gov/safewater/chlorine-residual-testing.html. Required monitoring for total coliform, *see* 40 C.F.R. §§ 141.853-.858, helps protect against fecal coliform contamination, which can cause acute gastrointestinal illness, *see* National Primary Drinking Water Regulations: Revisions to the Total Coliform Rule, 78 Fed. Reg. 10,270, 10,273 (Feb. 13, 2013).

[25] *See, e.g.*, U.S. EPA, Nitrates and Nitrites, TEACH Chemical Summary, https://archive.epa.gov/region5/teach/web/pdf/nitrates_summary.pdf.

[26] Policy at 6.

[27] *See* U.S. EPA, National Primary Drinking Water Regulations, https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations (noting anemia and neurodevelopmental effects on infants and children); National Primary Drinking Water Regulations: Disinfectants and Disinfection Byproducts, 63 Fed. Reg. 69,390, 69,403-04 (Dec. 16, 1998).

[28] *See, e.g.*, *Concerned Pastors for Social Action v. Khouri*, 217 F. Supp. 3d 960, 966-67 (E.D. Mich. 2016); Flint Water Advisory Task Force, Final Report 45 (Mar. 2016), https://www.michigan.gov/documents/snyder/FWATF_FINAL_REPORT_21March2016_517805_7.pdf.

assistance or other support to the water system to mitigate the health consequences of the violation and help assure a prompt return to compliance. Notification to the public allows people to understand the nature of the contamination in their drinking water, and how they can take measures to reduce their exposure to harmful contaminants.[29] EPA's suggestion that it will excuse reporting requirements could be extremely dangerous, as some violations, including for coliform, disinfection byproducts, turbidity, nitrate, and others, can have serious and even catastrophic adverse effects on thousands of people. If no one knows about these violations, a public health disaster can occur.

Finally, the Policy implies that EPA may look the other way if a water system is not being operated by a certified operator. Policy at 3-4. This possibility compounds the risks noted above. Drinking water regulations under the SDWA are often complex and require certified operators for a reason: it helps ensure that those in charge of a public water system, who are responsible for the safety of thousands of people, understand the nuances of water treatment chemistry and operations and can prevent significant lapses that lead to harmful contamination.[30]

### 3.   The Policy dangerously hampers emergency preparedness

EPA's policy also subverts EPCRA's important public health and emergency planning provisions, which are intended "to provide communities with information on potential chemical hazards within their boundaries and to facilitate awareness and planning for accidental releases." *Am. Chemistry Council v. Johnson*, 406 F.3d 738, 739 (D.C. Cir. 2005) (citation and internal quotation marks omitted); *see also United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1063 (W.D. Wis. 2001) ("The act has two goals: providing local communities with information about potential chemical hazards within their boundaries and encouraging state and local emergency planning for response to spills

---

[29] *See, e.g.*, 40 C.F.R. §§ 141.205 (public notice of drinking water violations must inform the public "[w]hether alternative water supplies should be used" and "[w]hat actions consumers should take, including when they should seek medical help"), 141.85(a)(iv) (required public notice for lead contamination must "[d]iscuss the steps the consumer can take to reduce their exposure to lead in drinking water"); *see also* H.R. Rep. No. 93-1185 (stating that a purpose of the public notification requirements is "to advise the public of potential or actual health hazards").

[30] *Cf.* Letter from Cheryl Newton, Dep. Reg'l Adm'r, U.S. EPA, to Hon. Karen Weaver, Mayor, City of Flint & Eric Oswald, Dir., Mich. Dep't of Env't, Great Lakes, & Energy (June 26, 2019), https://www.michigan.gov/documents/flintwater/Letter_to_City_Weaver_and_EGLE_Oswald_from_EPA_Newton_dated_062619_659372_7.pdf (stating concerns that the Flint water system's lack of sufficient operators with appropriate qualifications "has created conditions that could lead to errors at the [public water system] that could affect public health").

or releases of toxic or hazardous chemicals.”); *Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1197 (D.D.C. 1996) (The “central premise” of EPCRA is that “[s]tate and local governments, as well as the public at large, are entitled to access information concerning potential chemical hazards in their communities,” and “[t]he primary purpose of the law is to encourage state and local planning for spills or releases of toxic or hazardous chemicals”).

EPCRA fulfills its purpose in part through a “list of toxic chemicals subject to reporting under § 313 [that] is known as the Toxic Release Inventory (‘TRI’) list.” *Nat'l Oilseed Processors Ass'n*, 924 F. Supp. at 1197. Section 313 ”mandates that facilities manufacturing, processing or using certain toxic chemicals report annually on the presence of those chemicals at the facility, the uses of the chemicals, an estimate of the maximum amounts of the chemicals present at the facility at any time, methods of disposal and treatment of waste, and the extent to which those chemicals are being released into the environment.” *Id.*; *see* 42 U.S.C. § 11023(g). TRI reports are due annually on July 1. 42 U.S.C. § 11023(a). “EPA and state governments, in turn, make this information available to local governments and citizens in the community, who may then develop appropriate emergency response plans as required under Section 303 of EPCRA.” *Nat'l Oilseed Processors Ass'n*, 924 F. Supp. at 1197; *see* 42 U.S.C. §§ 11023(h), (j), 11044(a).

More broadly, the annual TRI reports “are intended to provide information to the Federal, State, and local governments and the public, including citizens of communities surrounding covered facilities . . . to inform persons about releases of toxic chemicals to the environment; to assist governmental agencies, researchers, and other persons in the conduct of research and data gathering; to aid in the development of appropriate regulations, guidelines, and standards; and for other similar purposes.” 42 U.S.C. § 11023(h). Although EPCRA is a reporting statute and does not impose any restrictions on the manufacture, processing, use or disposal of any toxic chemical, TRI reporting “has enabled the Federal government, State governments, industry, environmental groups, and the general public to participate in an informed dialogue about the environmental impact of toxic chemicals in order to assess the need to reduce and, where possible, eliminate chemical releases.” *Nat'l Oilseed Processors Ass'n*, 924 F. Supp. at 1198.

EPA's non-enforcement policy specifically lists TRI reporting as an example of reporting that may be delayed. Policy at 3 n.7. Although the Policy indicates that

facilities will be expected to submit late annual reports once the Policy is no longer in effect, the indefinite period of EPA's policy creates the risk that TRI reports may be delayed substantially. That risk unnecessarily threatens public health and emergency planning. Congress placed great importance on timely compliance with EPCRA's reporting requirements. *See* S. Rep. No. 99-11, at 14-15 (1985) (noting that the goal of EPCRA is to make "essential" information "available widely and in a timely fashion"); *accord* 132 Cong. Rec. 29747 (Oct. 8, 1986) (statement by Rep. Sikorski) ("Disclosure of hazardous waste emissions ... must be *swift and complete.* The requirements for disclosure ... must be *strictly and strenuously enforced.*" (emphasis added)).

Access to accurate, up-to-date TRI data is crucial for many reasons. TRI data are used to inform "organizations and individuals about the local environmental quality" in their communities. *Del. Valley Toxics Coal.*, 813 F. Supp. at 1135; *see Atl. States Legal Found., Inc.*, 823 F. Supp. at 1070 (describing how local residents use TRI data to understand chemical uses and releases in their communities and to "make informed decisions . . . including a decision about where to live"). Workers and unions use TRI data to help "prevent[ ] on-the-job excessive exposure to hazardous chemicals." *Del. Valley Toxics Coal.*, 813 F. Supp. at 1135. Local emergency managers use TRI data to help "prepar[e] response plans to address potential chemical accidents." *Atl. States Legal Found., Inc.*, 823 F. Supp. at 1070. Any failure to file timely TRI reports also "may inhibit the conduct of research and data gathering or the ability to aid in the development of appropriate regulations, guidelines, and standards." *Del. Valley Toxics Coal.*, 813 F. Supp. at 1139. Each of these uses of TRI data will be impaired if regulated facilities fail to submit, or delay the submission of, their TRI reports that are due on July 1.

If EPA's non-enforcement policy lasts more than a year, the effects on emergency preparedness may be even more severe. Section 312 of EPCRA requires regulated facilities to submit an Emergency and Hazardous Chemical Inventory Form to their local fire department, Local Emergency Planning Committee, and State or Tribal Emergency Response Commission annually by March 1. 42 U.S.C. § 11022.[31] Section 312 requires reporting on far more chemicals (approximately 800,000 chemicals) than section 313 (approximately 650 chemicals).[32] The timing of these disclosures is "crucial" to ensuring the public and emergency responders are prepared in the event of a chemical disaster. *See, e.g.*, H.R. Rep. No. 99-253, at 111 (1985) ("Once the material safety

---

[31] *See also* U.S. EPA Factsheet, The Emergency Planning and Community Right-to-Know Act (Nov. 2017), https://www.epa.gov/sites/production/files/2017-08/documents/epcra_fact_sheet_overview_8-2-17.pdf.
[32] *Id*.

data sheets are developed, it is crucial that they be made available to the public in the quickest, most efficient way possible."). If EPA's policy implicates the March 1, 2021, deadline for EPCRA section 312 reporting, any resulting reporting delays will undermine first responders' access to up-to-date information about the hazards they face when responding to emergencies in their communities. The resulting harm could be catastrophic.

### 4.  Relevant context provides further justification for the requested rule

The rule Petitioners seek is especially important during this pandemic because it will provide some measure of protection to people who are particularly vulnerable in the current health crisis. The people most burdened by environmental pollution are also among the people most vulnerable to COVID-19, because of underlying health concerns. People who live and work next to industrial facilities are more likely to suffer from chronic illnesses like diabetes and asthma.[33] Individuals with underlying health conditions like diabetes and asthma are at greater risk of serious illness or death from COVID-19.[34] The federal government should be providing greater protections to these at-risk individuals during the crisis. EPA's policy does the opposite. The rule Petitioners seek would help reduce the harm from the Policy by restoring communities' rights to know and to adapt their behavior to any increase in pollution that makes them more vulnerable to COVID-19.

Moreover, because of the many state-wide restrictions on public gatherings and use of indoor facilities in response to the coronavirus outbreak, many people are now recreating outdoors.[35] Without the notifications and public disclosure we seek in this Petition, EPA's policy could expose people unwittingly to pollution that could put them at risk. That includes, for example, someone fishing downstream of a pollution source that fails to report a pollution limit violation, or someone running outdoors near a facility with unreported air emissions.

---

[33] *See* Envtl. Justice Health All. et al., *Life at the Fenceline: Understanding Cumulative Health Hazards in Environmental Justice Communities* 2, 16-17 (Sept. 2018), https://new.comingcleaninc.org/assets/media/documents/Life%20at%20the%20Fenceline%20-%20English%20-%20Public.pdf.

[34] *See* Roni Caryn Rabin, *Coronavirus Threatens Americans with Underlying Conditions*, N.Y. Times (Mar. 12, 2020), https://www.nytimes.com/2020/03/12/health/coronavirus-midlife-conditions.html.

[35] Virginia's Temporary Stay at Home Order, for example, includes an exception for outdoor exercise if it complies with social distancing requirements. https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf

EPA's non-enforcement policy also presents heightened risks to the public in light of the agency's recent retreat from environmental enforcement generally. Over the past few years, EPA has relaxed its environmental enforcement in important and damaging ways. The agency has conducted fewer inspections of polluting industrial facilities.[36] It has filed fewer civil enforcement lawsuits against polluters and pursued lower civil penalties and less costly injunctive relief, such as new pollution controls.[37] It has charged fewer individuals with environmental crimes and obtained shorter sentences for those convicted.[38] And it has cut back on its civil and criminal enforcement work even as serious CWA and CAA violations by regulated polluters have increased.[39] Against that backdrop, the Policy is only more troublesome.

Finally, EPA's new policy of blanket non-enforcement stands in stark contrast with its past practices, even under exigent circumstances. In the wake of Hurricane Katrina, for example, EPA issued narrow "no action" assurances that focused specifically and exclusively on the task of demolishing structures left uninhabitable by the hurricane and subsequent flooding.[40] Similarly, following Hurricane Sandy, EPA issued targeted no action assurances to aid recovery efforts.[41] These targeted actions were more

[36] Juliet Eilperin & Brady Dennis, *Under Trump, EPA inspections fall to a 10-year low*, Wash. Post., Feb. 8, 2019, at A2, https://www.washingtonpost.com/climate-environment/2019/02/08/under-trump-epa-inspections-fall-year-low/ (citing EPA data showing agency did half as many inspections in 2018 as in 2010); Paul Gallay, *Doing Less With Less at EPA: Environmental Enforcement Has Plummeted in the Era of Trump*, 50 ABA Trends 14, July/August 2019 at *15 (citing EPA data showing declines in inspections of facilities regulated under the Clean Air Act and Clean Water Act).
[37] Eilperin & Dennis, *Under Trump, supra*, at A2 (citing EPA data showing that during fiscal year 2018, the agency filed half as many civil enforcement cases as in 2010; imposed just $69 million in civil penalties, the lowest level since 1994; and mandated only $4 billion in pollution control and compliance investments, the lowest annual total in a decade); Envtl. Integrity Project, *Paying Less to Pollute: A Year of Environmental Enforcement Under the Trump Administration* 1-2 (Feb. 15, 2018), https://environmentalintegrity.org/wp-content/uploads/2017/02/Enforcement-Report.pdf (citing EPA data showing the agency filed far fewer civil cases against violators and sought considerably less in civil penalties and injunctive relief during the first full year of the Trump administration, relative to the averages for the first full year of each of the three preceding administrations).
[38] Eilperin & Dennis, *Under Trump, supra*, at A2 (citing EPA data for fiscal year 2018).
[39] Gallay, *Doing Less, supra*, at *15 (citing EPA data showing that from 2015 to 2018, serious water pollution incidents increased by 10 percent as inspections of holders of large water pollution permits declined by 8 percent, and that high-profile violations at facilities regulated under the Clean Air Act increased 28 percent, while inspections at those facilities dropped).
[40] *See* U.S. Gov't Accountability Office, GAO-07-651, Hurricane Katrina: EPA's Current and Future Environmental Protection Efforts Could Be Enhanced by Addressing Issues and Challenges Faced on the Gulf Coast 24-27 (June 2007).
[41] *See, e.g.*, Letter from Cynthia Giles, Assistant Administrator, to Bob Martin, Commissioner, New Jersey Department of Environmental Protection, and Joseph Martens, Commissioner, New York State Department of Environmental Conservation (Nov. 19, 2012),

consistent with long-standing EPA policy, which recognizes the need for carefully tailored exemptions in times of emergency *if and only if* no other mechanism exists that can adequately address the problem.[42] That same policy makes clear that no-action policies undermine EPA's credibility and ability to take subsequent enforcement actions necessary to protect public health.[43] And in the past, EPA has explicitly disfavored the type of blanket non-enforcement policy the agency has adopted here.[44] EPA has created an unprecedented opportunity for noncompliance with minimal oversight, in a dramatic departure from past practice.

### C.  There is good cause to publish the requested rule promptly, concurrently with notice and an opportunity for comment, and to make the rule effective immediately

We petition EPA to publish the requested interim final rule within seven days, concurrently with public notice and comment, and to make the rule effective immediately.

Notice and comment may be waived "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The good cause exception "excuses notice and comment in emergency situations, where delay could result in serious harm." *Chamber of Commerce v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006) (citations omitted); *see also Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1484 & n.2 (9th Cir. 1992) ("Emergencies, though not the only situations constituting good cause, are the most common."). Notice and comment is "impractical" in those situations "when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required [by section 553]," such as when a rule "must be put in place immediately." *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (quoting U.S. Dep't of Justice, Attorney General's Manual on the Administrative Procedure Act 30-31 (1947)); *see also Nat'l Nutritional Foods Ass'n v. Kennedy*, 572 F.2d 377, 385 (2d Cir. 1978).

---

https://www.epa.gov/sites/production/files/documents/naa-secondextensionemergencygeneratorfueling111912_0.pdf.

[42] *See* Memo. from Steven A. Herman, Assistant Administrator, Processing Requests for Use of Enforcement Discretion (March 3, 1995); *see also* Memo. from Courtney M. Price, Assistant Administrator for Enforcement and Compliance Monitoring, Policy Against "No Action" Assurances 2 (Nov. 16, 1984).

[43] Herman Memo., *supra*, at 2.

[44] *Id.*

There is good cause to waive notice and comment here. EPA's policy has opened the door to widespread cessation of monitoring and reporting of environmental pollution in the midst of a pandemic. *See Schneider v. Chertoff*, 450 F.3d 944, 949 & n.4 (9th Cir. 2006) (observing that the court "do[es] not doubt the necessity of immediate implementation" of a rule serving an "immediate public health need"). The Policy has immediate consequences for public health. Pollution limits exist to protect people who live downwind, downstream, or across the fenceline from emission sources. If those sources are allowed to stop monitoring their compliance with pollution limits and stop reporting violations, vulnerable people will not know the levels of pollution they are exposed to, nor will they be able to take steps to protect themselves. Given the urgent need to provide public notice of these risks to threatened communities, it is impracticable to delay publishing the requested rule in order to solicit comment.

Instead, EPA should solicit public comment at the same time as it publishes the requested final rule and then amend the rule as appropriate in response to comment. Providing advance notice and comment serves an important purpose, but given the extraordinary circumstances here, delaying issuance of the rule would be harmful. Public comment may generate additional suggestions that EPA can incorporate into an amended rule to better protect people and communities against the risk of environmental noncompliance.

EPA also has good cause to make this rule effective immediately upon publication. *See* 5 U.S.C. § 553(d)(3). While the standards for good cause under section 553(b) and 553(d) are not identical, *see Block*, 655 F.2d at 1156, they are related inquiries. *See United States v. Gavrilovic*, 551 F.2d 1099, 1104 (8th Cir. 1977) (surveying the APA's legislative history and finding "[l]egitimate grounds" for an immediate effective date to include "urgency of conditions coupled with demonstrated and unavoidable limitations of time," and that an agency's primary consideration is the "convenience or necessity of the people affected") (citations and internal quotation marks omitted); *see also Schneider*, 450 F.3d at 949 & n.4. Because EPA's non-enforcement policy immediately (and retroactively) changed how regulated entities may monitor and report their compliance with various environmental laws, a rule clarifying the conditions for that change can become effective immediately without disrupting their operations.

Petitioners' requested rule would not be burdensome to industry. EPA's policy already *suggests* but does not require that regulated entities should document the specific nature and dates of noncompliance, the COVID-related reason for the noncompliance, and the best efforts to return to compliance. Policy at 3. Petitioners request that regulated entities be *required* to share that information directly with states and the EPA, and that EPA quickly make that information available to the public. Even assuming a facility's

employees are unable to safely conduct monitoring or reporting, an employee can notify EPA of that fact from a safe location. Notification would be a minimal burden for regulated entities wishing to fit within EPA's capacious new non-enforcement policy. The benefits—public knowledge about the risks at hand—directly further both EPA's mission and the goals of the environmental statutes the agency is charged to enforce.

Finally, we request that EPA respond to this Petition promptly. As 5 U.S.C. § 555(b) provides: "With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." The requested rule would impose a trivial burden or inconvenience on regulated entities that violate monitoring or reporting requirements. The rule is necessary in response to EPA's open invitation to companies to disregard monitoring and reporting, based only on the honor system. And the requested rule is straightforward and uncomplicated. Under the circumstances, seven days is a reasonable amount of time for EPA to resolve this Petition.

In sum, the requested rule is straightforward for EPA to promulgate, minimally burdensome on any regulated entity, and necessary to protect the public in response to EPA's new policy. EPA can and should act quickly.

In filing this Petition, Petitioners do not concede the legality of EPA's non-enforcement policy. The Petition instead is intended to mitigate quickly the most pernicious and immediately foreseeable consequences of the Policy.

## IV. STATEMENT OF INTEREST

This Petition is joined by the parties listed below. Petitioners represent millions of people across the country who benefit from environmental protections and will be harmed by their non-enforcement. The rule we request will provide some protection to Petitioners' members and communities by mandating prompt public disclosure of which facilities are not monitoring or reporting their discharges and emissions of pollution.

The **Natural Resources Defense Council** is a nonprofit environmental organization that works to protect the world's natural resources, public health, and the environment.

**Public Citizen** is a nonprofit consumer advocacy organization that champions the public interest in the halls of power. Founded in 1971, Public Citizen defends democracy, resists corporate power, and works to ensure that government works for the people.

21

The **Environmental Justice Health Alliance** is a national collective of approximately thirty community-based environmental justice organizations located in more than a dozen states. EJHA and its member organizations work to hold the chemical industry accountable for the disproportionate burdens and harms it places on communities living on the fenceline of chemical facilities.

**Asian Pacific Environmental Network (APEN)** is an environmental justice organization with deep roots in California's Asian American and immigrant and refugee communities, working to make our communities healthier, just places where people can thrive.

**Catskill Mountainkeeper** works to protect the Catskill region's wild lands and natural resources, support smart development to sustainably grow our economy, nurture healthy communities, and accelerate the transition to a 100% clean energy future in New York and beyond.

**Center for Coalfield Justice** is a non-profit membership organization dedicated to protecting public and environmental health in southwestern Pennsylvania.

**Clean Water Action** is a national, not-for-profit environmental membership organization that has worked to win strong health and environmental protections by bringing issue expertise, solution-oriented thinking, and people power to the table since its founding during the campaign to pass the landmark Clean Water Act in 1972.

**Climate Justice Alliance** is a national member alliance of 70 urban and rural frontline communities, organizations and supporting networks in the climate justice movement, building a Just Transition away from extractive systems of production, consumption and political oppression, and towards resilient, regenerative and equitable economies.

**Coming Clean** is a national environmental public health collaborative of 175 diverse organizations representing communities and constituencies directly impacted by chemical hazards, and works to reduce and eliminate these harms.

**Flint Rising** is a non-profit community organization working to ensure that directly impacted people are building the organizing infrastructure and leadership necessary for this long-haul fight for justice Flint families need and deserve.

**Indigenous Environmental Network** is an alliance of Indigenous peoples whose mission it is to protect the sacredness of Earth Mother from contamination and

exploitation by strengthening, maintaining and respecting Indigenous teachings and natural laws.

The **Just Transition Alliance** is a coalition of environmental justice organizations and labor unions that works alongside frontline workers and community members who live along the fenceline of polluting industries to create healthy workplaces and communities.

**Little Village Environmental Justice Organization** is committed to organizing with Chicago's Little Village community to accomplish environmental justice, and to achieve the self-determination of immigrant, low-income, and working-class families.

**Los Jardines Institute** is a nonprofit organization based in the South Valley of Albuquerque, New Mexico that builds and supports healthy and sustainable communities and workplaces by creating opportunities that promote multigenerational learning, sharing, and movement building.

**Michigan Environmental Justice Coalition** is a statewide coalition that works to reduce and eliminate the disproportionate impact of environmental injustice on vulnerable communities in alignment with environmental justice principles.

The **New York City Environmental Justice Alliance (NYC-EJA)** is a nonprofit citywide network linking grassroots organizations from low-income neighborhoods and communities of color in their struggle for environmental justice.

**Sane Energy Project** is a New York State-based organization committed to replacing fracked gas infrastructure with community-led, sustainable energy.

The **Southeast Environmental Task Force** and the **Southeast Side Coalition to Ban Petcoke** are active Chicago community groups dedicated to improving the Calumet neighborhood's environment.

**Texas Environmental Justice Advocacy Service (t.e.j.a.s.)** is dedicated to providing community members with the tools necessary to create sustainable, environmentally healthy communities by educating individuals on health concerns and implications arising from environmental pollution, empowering individuals with an understanding of applicable environmental laws and regulations and promoting their enforcement.

**Water You Fighting For** is a community-led, grassroots group in Flint, MI focused on ensuring everyone has access to CLEAN, SAFE, AFFORDABLE water!

**West Harlem Environmental Action, Inc. (WE ACT for Environmental Justice)** works to build healthy communities by ensuring that people of color and/or low income residents participate meaningfully in the creation of sound and fair environmental health and protection policies and practices.

Respectfully submitted,

/s/ Aaron Colangelo                                          /s/ Robert Weissman
Aaron Colangelo                                              Robert Weissman
Jared Knicley                                                Allison Zieve
Jared Thompson                                               Public Citizen
Thomas Zimpleman                                             Washington, DC
Natural Resources Defense Council
Washington, DC

Gabriel Daly
Daniel Hessel
Margaret Hsieh
Kaitlin Morrison
Natural Resources Defense Council
New York, NY

Selena Kyle
Jolie McLaughlin
Sarah Tallman
Natural Resources Defense Council
Chicago, IL