IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Natural Resources Defense Council, Environmental Justice Health Alliance, Public Citizen, Catskill Mountainkeeper, Center for Coalfield Justice, Clean Water Action, Coming Clean, Flint Rising, Indigenous Environmental Network, Just Transition Alliance, Los Jardines Institute, Southeast Environmental Task Force, Texas Environmental Justice Advocacy Services, Water You Fighting For, West Harlem Environmental Action, Inc., | ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | Case No. 20-cv-3058 (CM) |
| | ) | ECF Case |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Assistant Administrator Susan Parker Bodine, Administrator Andrew Wheeler, and the United States Environmental Protection Agency, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND FOR EXPEDITED CONSIDERATION PURSUANT TO 28 U.S.C. § 1657**

Michelle Wu
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
(646) 889-1489

Counsel for Plaintiffs

Allison Zieve, *pro hac vice* pending
Public Citizen
1600 20th Street, NW
Washington, DC 20009

Counsel for Plaintiff Public Citizen

Aaron Colangelo, *pro hac vice* pending
Jared E. Knicley, *pro hac vice* pending
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005

Counsel for Plaintiffs

# TABLE OF CONTENTS

BACKGROUND ................................................................................................ 2

I.    EPA's non-enforcement policy implicates environmental monitoring
      and reporting requirements that are essential to protect public health ...................... 2

      A.    The policy allows facilities to stop monitoring for air pollution .................... 4

      B.    The policy allows facilities to stop monitoring for water pollution
            and drinking water safety ........................................................... 5

      C.    The policy allows facilities to withhold chemical safety data and
            hazardous waste disclosures from the public ................................... 6

II.   Plaintiffs petitioned EPA for an emergency rule to mitigate the
      policy's harms ........................................................................... 7

III.  EPA has failed to respond to the petition ................................................ 9

ARGUMENT ................................................................................................... 9

I.    EPA has a legal duty to respond to Plaintiffs' petition ............................... 10

II.   EPA's failure to respond to Plaintiffs' petition is unreasonable and
      unlawful .................................................................................. 10

      A.    EPA's policy creates an urgent threat, and the agency's failure to
            respond to Plaintiffs' petition violates any rule of reason ........................... 11

            1.    EPA's delay is unreasonable in the context of the
                  health-protective statutes that authorize it to act ............................ 11

            2.    Timely disclosure of monitoring violations is crucial ........................ 13

            3.    The petition requests a straightforward rule, and EPA
                  has shown it can act quickly on this issue ......................................... 14

      B.    EPA's failure to respond to the petition may result in serious
            health harms ......................................................................... 15

            1.    EPA's delay threatens public health and safety .................................. 16

            2.    EPA's delay worsens existing racial inequities ................................. 19

            3.    EPA's delay threatens emergency preparedness ................................. 20

i

C.     Ordering EPA to answer the petition would not impede higher
       priorities ........................................................................................21

D.     EPA's delay prejudices Plaintiffs and the public interest ............................22

IV.   Plaintiffs have standing to challenge EPA's unreasonable delay ............................23

V.    There is good cause to expedite review ...................................................25

CONCLUSION ..........................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Air All. Hous. v. U.S. Chem. & Safety Hazard Investigation Bd.*,
    365 F. Supp. 3d 118 (D.D.C. 2019) ......................................................................25

*Am. Chemistry Council v. Johnson*,
    406 F.3d 738 (D.C. Cir. 2005) ..............................................................................20

*Atl. States Legal Found., Inc. v. Buffalo Envelope*,
    823 F. Supp. 1065 (W.D.N.Y. 1993) .....................................................................21

*Baur v. Veneman*,
    352 F.3d 625 (2d Cir. 2003)...................................................................................24

*Bennett v. Donovan*,
    703 F.3d 582 (D.C. Cir. 2013) ..............................................................................25

*Concerned Pastors for Social Action v. Khouri*,
    217 F. Supp. 3d 960 (E.D. Mich. 2016) ................................................................18

*Cutler v. Hayes*,
    818 F.2d 879 (D.C. Cir. 1987) ........................................................ 11-12, 13, 14, 16

*Del. Valley Toxics Coal. v. Kurz-Hastings, Inc.*,
    813 F. Supp. 1132 (E.D. Pa. 1993) .......................................................................21

*Families for Freedom v. Napolitano*,
    628 F. Supp. 2d 535 (S.D.N.Y. 2009) ...................................................... 10, 11, 16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ..............................................................................................17

*Hawaii's Thousand Friends v. City & Cty. of Honolulu*,
    821 F. Supp. 1368 (D. Haw. 1993) ...................................................................16-17

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ..............................................................................................23

*In re A Community Voice*,
    878 F.3d 779 (9th Cir. 2017)..................................................................................23

*In re American Rivers*,
    372 F.3d 413 (D.C. Cir. 2004) ........................................................................ 10, 11

iii

*In re Core Commc'ns,*
    531 F.3d 849 (D.C. Cir. 2008) ................................................................................11

*In re Int'l Chem. Workers Union,*
    958 F.2d 1144 (D.C. Cir. 1992) .............................................................................11

*In re People's Mojahedin Org. of Iran,*
    680 F.3d 832 (D.C. Cir. 2012) ...............................................................................23

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...............................................................................................25

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
    336 F.3d 1094 (D.C. Cir. 2003) .............................................................................10

*Midwest Gas Users Ass'n v. FERC,*
    833 F.2d 341 (D.C. Cir. 1987) ...............................................................................11

*Nat'l Ass'n of Mfrs. v. EPA,*
    750 F.3d 921 (D.C. Cir. 2014) ...............................................................................16

*Nat'l Oilseed Processors Ass'n v. Browner,*
    924 F. Supp. 1193 (D.D.C. 1996) ...................................................................6, 7, 12

*NRDC v. EPA,*
    808 F.3d 556 (2d Cir. 2015)...............................................................................12-13

*NRDC v. FDA,*
    710 F.3d 71 (2d Cir. 2013)....................................................................................10

*NRDC v. Texaco Ref. & Mktg.,*
    2 F.3d 493 (3rd Cir. 1993) ....................................................................................14

*N.Y. Pub. Interest Research Grp. v. Whitman,*
    312 F.3d 316 (2d Cir. 2003)...................................................................................24

*Pub. Citizen Health Research Grp. v. Auchter,*
    702 F.2d 1150 (D.C. Cir. 1983) .............................................................. 11, 12, 21

*Pub. Citizen Health Research Grp. v. FDA,*
    740 F.2d 21 (D.C. Cir. 1984) .................................................................................15

*Save Our Bays & Beaches v. City & Cty. of Honolulu,*
    904 F. Supp. 1098 (D. Haw. 1994) .......................................................................12

*Sierra Club v. Pub. Serv. Co. of Colorado,*
    894 F. Supp. 1455 (D. Colo. 1995) ........................................................................14

*Sierra Club v. Simkins Indus., Inc.,*
    847 F.2d 1109 (4th Cir. 1988)................................................................................16

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ................................................................................................12

*Telecommunications Research & Action Center v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984)......................................................10, 11, 15-16, 21, 22

*United States v. Alisal Water Corp.,*
    326 F. Supp. 2d 1010 (N.D. Cal. 2002) .................................................................12

*United Steelworkers of America v. Rubber Mfrs. Ass'n,*
    783 F.2d 1117 (D.C. Cir. 1986) ........................................................................14-15

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..............................................................................................23

*Waterkeeper All. v. EPA,*
    853 F.3d 527 (D.C. Cir. 2017) ...............................................................................25

**Statutes**

5 U.S.C. § 553(e) ...............................................................................................................10

5 U.S.C. § 555(b) ...............................................................................................................10

5 U.S.C. § 706(1) ...............................................................................................................10

33 U.S.C. § 1311(a) .............................................................................................................5

33 U.S.C. § 1318(a) .............................................................................................................8

33 U.S.C. § 1318(b) ...........................................................................................................24

33 U.S.C. § 1321(m)(2) ......................................................................................................24

33 U.S.C. § 1342(a) ...........................................................................................................18

33 U.S.C. § 1361(a) .............................................................................................................8

33 U.S.C. § 1365 ................................................................................................................13

42 U.S.C. § 300g-3 ..............................................................................................................5

42 U.S.C. § 300g-3(c) ...................................................................................11

42 U.S.C. § 300j-4 ......................................................................................... 5

42 U.S.C. § 300j-4(a)(1) ............................................................................... 8

42 U.S.C. § 300j-8 .......................................................................................13

42 U.S.C. § 300j-9(a)(1) ............................................................................... 8

42 U.S.C. § 6924(a) ....................................................................................... 7

42 U.S.C. § 6927(a) ....................................................................................... 8

42 U.S.C. § 6927(b)(1) .................................................................................24

42 U.S.C. § 6972 ..........................................................................................13

42 U.S.C. § 7412(b)(1) .................................................................................. 4

42 U.S.C. § 7414(a)(1) .................................................................................. 8

42 U.S.C. § 7414(c) ......................................................................................24

42 U.S.C. § 7601(a) ....................................................................................... 8

42 U.S.C. § 7604 ..........................................................................................13

42 U.S.C. § 11023(a) ....................................................................................21

42 U.S.C. § 11023(g) .............................................................................6-7, 21

42 U.S.C. § 11023(h) ..................................................................................... 7

42 U.S.C. § 11023(j) ...................................................................................... 7

42 U.S.C. § 11044(a) ..................................................................................... 7

42 U.S.C. § 11046 ........................................................................................13

42 U.S.C. § 11048 ......................................................................................... 8

**Regulations**

40 C.F.R. § 63.658(c) .................................................................................... 4

40 C.F.R. § 68.73(d) ...................................................................................... 7

40 C.F.R. § 75.1 ............................................................................................ 4

40 C.F.R. § 112.8(c)(6) ............................................................................ 7

40 C.F.R. § 122.23 .................................................................................... 6

40 C.F.R. § 122.23(d) ........................................................................... 6, 18

40 C.F.R. § 122.23(e) ........................................................................... 6, 18

40 C.F.R. §§ 141.21-29 ............................................................................. 5

40 C.F.R. § 141.31 .................................................................................... 5

40 C.F.R. § 141.33 .................................................................................... 5

40 C.F.R. § 141.35 .................................................................................... 5

40 C.F.R. § 141.211 .................................................................................. 5

40 C.F.R. pt. 264 ...................................................................................... 7

40 C.F.R. §§ 264.50-56 ........................................................................... 19

40 C.F.R. §§ 264.170-179 ....................................................................... 19

40 C.F.R. pts. 401-471 .............................................................................. 5

40 C.F.R. pt. 412 .................................................................................... 18

85 Fed. Reg. 15,337 (Mar. 13, 2020) ..................................................... 15

85 Fed. Reg. 20,838 (Apr. 15, 2020) ...................................................... 22

85 Fed. Reg. 22,250 (Apr. 21, 2020) ...................................................... 22

85 Fed. Reg. 22,362 (Apr. 22, 2020) ................................................... 9, 15

**Legislative History**

H.R. Rep. No. 98-985 (1984) ................................................................. 25

S. Rep. No. 92-414 (1972) ...................................................................... 16

S. Rep. No. 99-11 (1985) ........................................................................ 21

**Executive Orders**

N.Y. Exec. Order 202.8, 9 N.Y.C.C.R.R. § 8.202.8 .............................. 23

**Declarations**

Decl. of Lubna Ahmed ................................................................. 13, 19, 20, 22, 24

Decl. of José T. Bravo ............................................................. 13, 19, 20, 21, 24

Decl. of Craig Domin .........................................................................24

Decl. of Kristi Pullen Fedinick, Ph.D. ...............................................20

Decl. of Laura Feld ....................................................................23, 24

Decl. of Wes Gillingham ..........................................................13, 19

Decl. of Dallas Goldtooth.........................................................19, 24

Decl. of Melissa Mays ..............................................................18, 19

Decl. of Juan Parras ..............................................................13, 19, 24

Decl. of Michele Roberts ......................................................13, 18, 19, 20, 24

Decl. of Christina Swanson, Ph.D...............................................13, 24

Decl. of Michelle Wu ........................................2, 3, 4, 5, 6, 7, 9, 15, 17, 18, 19, 20, 22, 23

In response to the COVID-19 pandemic, the U.S. Environmental Protection Agency published a policy on "enforcement discretion" on March 26, 2020. EPA's policy allows regulated companies to stop monitoring and reporting their compliance with limits on air and water pollution if the company claims a pandemic-related constraint. It also excuses companies from disclosing information about hazardous waste storage and risks at chemical plants for the same reason. The policy permits a company to document its noncompliance and the reason for it "internally" and only tell EPA about it later, if asked. Under the policy, if a company stops monitoring for toxic pollution, fails to conduct chemical tank safety inspections, or ignores hazardous waste storage precautions, the public may never know.

EPA's policy applies to every industry in the country: chemical manufacturing, power plants, refineries, mining, factory farms, and every other federally regulated source of pollution. The policy creates an immediate risk that regulated entities will stop monitoring and reporting for compliance with pollution limits and will suspend environmental safety inspections, with no notice to EPA or the public.

EPA's policy threatens harm. The environmental monitoring and reporting covered by the non-enforcement policy provide vital protections for the public that are essential for workers and at-risk communities around the country. People cannot take steps to protect themselves from pollution without timely information about air and water emissions. Local emergency managers and first responders similarly depend on current, accurate information about chemical risks from industrial facilities to respond to chemical releases.

Moreover, by relaxing enforcement of monitoring and reporting requirements, EPA's policy exacerbates pollution and the toll from COVID-19 in communities that are already overburdened. People of color and low-income people are more likely to live near

1

industrial facilities and other pollution sources. New research shows that people in communities with more air pollution are more likely to die from COVID-19. EPA has long recognized that environmental monitoring and reporting requirements serve dual purposes: they provide key information to the public and simultaneously deter pollution.

Plaintiffs are fifteen environmental justice, public health, and public interest organizations. Promptly after EPA announced its new policy, Plaintiffs petitioned EPA to publish a rule, on an emergency basis and effective immediately, requiring any entity that stops monitoring and reporting because of the pandemic to provide written notice to EPA, which EPA would then make available to the public. The requested rule is a simple, common-sense measure to provide vulnerable communities nationwide with timely and essential information about increased pollution risks.

To date, EPA has not responded to the petition. EPA's delay is unreasonable and unlawful. Every additional day of delay increases the risk of undisclosed violations of environmental laws by companies relying on EPA's policy. Plaintiffs ask the Court to compel EPA to respond to the petition within five days of the Court's order.

## BACKGROUND

### I.  EPA's non-enforcement policy implicates environmental monitoring and reporting requirements that are essential to protect public health

On March 26, 2020, EPA published a memorandum titled "COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program." Wu Decl. Ex. 1 (Policy). The memorandum announces the "policy regarding EPA enforcement of environmental legal obligations during this time." *Id.* at 1. The policy is retroactive to March 13, 2020, and is in place indefinitely. *Id.* EPA did not give advance public notice of the policy.

Among other things, the policy states that the COVID-19 pandemic may constrain

2

the ability of companies to perform monitoring, sampling, lab analysis, reporting, or certification for compliance with governing pollution limits (referred to collectively in this motion as "monitoring and reporting"). *Id.* at 3. The policy states that entities "should" use existing procedures under a governing statute, regulation, or permit to disclose violations of monitoring and reporting requirements. *Id.* But if, in the regulated entity's sole discretion, "reporting is not reasonably practicable due to COVID-19," the entity should simply "maintain this information internally and make it available to the EPA or an authorized state or tribe upon request." *Id.*

EPA announced that it "does not expect to seek penalties" for monitoring and reporting violations if it later agrees that COVID-19 was the cause and if the regulated entity provides a justification to EPA "upon request." *Id.* The policy does not explain how or when EPA will become aware of such violations, and thus be in a position to request a justification for them, if the entity only documents its noncompliance "internally."

EPA listed examples of the monitoring and reporting requirements covered by its non-enforcement policy, including stack tests, continuous emission monitoring systems, fenceline monitoring, leak detection and repair monitoring, tank and piping inspections, tank integrity testing, effluent sampling, and Toxics Release Inventory reporting. *Id.* at 3 nn.2-7. This list covers virtually every type of monitoring related to EPA's regulation of air and water pollution, chemical releases, oil spills, and hazardous waste storage. The data implicated by EPA's policy inform people about local environmental quality, help workers prevent exposure to hazardous chemicals, and help emergency managers prepare for and respond to chemical releases. This information is essential to protect public health and, in some instances, to prevent catastrophic harm.

### A.    The policy allows facilities to stop monitoring for air pollution

The policy applies to air quality monitoring that measures and discloses toxic and hazardous air pollutants from smokestacks, equipment leaks, and other sources. Stack testing, *see* Policy at 3 n.2, determines facilities' compliance with Clean Air Act standards for air pollutants like lead, mercury, and asbestos. *See* 42 U.S.C. § 7412(b)(1). A stack test measures the amount of a pollutant being emitted and demonstrates the efficacy of pollution controls. Wu Decl. Ex. 2, at 1 (EPA, *Clean Air Act National Stack Testing Guidance*).

A continuous emission monitoring system, or CEMS, *see* Policy at 3 n.2, monitors air emissions from a facility like a power plant or incinerator for compliance with limits for pollutants ranging from ammonia to particulate matter. *See* Wu Decl. Ex. 3 (EPA, *CEMS Information and Guidelines* webpage). CEMS are required under some of EPA's most important air-pollution programs, including the Acid Rain Program and cross-state sulfur dioxide and nitrogen oxides air pollution programs. *See id.*; 40 C.F.R. § 75.1.

Fenceline monitoring, *see* Policy at 3 n.2, documents air quality in the immediate vicinity of polluting facilities. "Fugitive emissions" that escape from refineries, energy production sites, and natural gas pipelines are a major source of harmful pollution to surrounding communities. Wu Decl. Ex. 4 (EPA, *Fenceline Monitoring* webpage). Fixing leaks that cause fugitive emissions protects workers and local communities and helps regulators implement air quality standards under the Clean Air Act. *Id.*; *see also* 40 C.F.R. § 63.658(c) (requiring fenceline monitoring for hazardous air pollutants from petroleum refineries and mandating that all identified leaks be repaired within fifteen days).

Leak detection and repair (or LDAR) monitoring, *see* Policy at 3 n.2, is required under more than two dozen EPA programs. Wu Decl. Ex. 5, at App. A (EPA, *Leak*

4

*Detection and Repair: A Best Practices Guide*). LDAR monitoring is important because leaking equipment is the largest source of emissions of volatile organic compounds and volatile hazardous air pollutants from refineries and chemical manufacturing facilities. *Id.* at 2. LDAR programs are a key way for facilities to "control emissions from equipment leaks" and to identify repairs necessary to prevent future releases. *Id.* at 3.

### B. The policy allows facilities to stop monitoring for water pollution and drinking water safety

EPA's policy also applies to monitoring programs necessary to ensure compliance with water pollution limits and drinking water protections. Effluent sampling and testing, *see* Policy at 3 n.4, is the backbone of the Clean Water Act's point-source pollution control regime, which prohibits the unpermitted discharge of pollutants into the nation's waters. 33 U.S.C. § 1311(a). Regular sampling is necessary to evaluate whether a facility is complying with effluent limits for pollutants, including heavy metals, bacteria, nutrients, and toxic chemicals. 40 C.F.R. pts. 401-471 (effluent guidelines and standards). Those limits are the "primary mechanism" to control the discharge of pollutants to waters in permits issued and enforced by states, tribes, and EPA. Wu Decl. Ex. 6 (EPA, *NPDES Permit Limits* webpage).

Safe drinking water regulations cover more than ninety contaminants that can cause serious health harms, including arsenic, lead, bacteria, nitrate, and disease-causing microorganisms like cryptosporidium. *Id.* Ex. 7 (EPA, *National Primary Drinking Water Regulations* webpage). These regulations require drinking water monitoring, reporting of violations of standards, and public notice of violations. *See* 40 C.F.R. §§ 141.21-29, 141.31, 141.33, 141.35, 141.201-211; 42 U.S.C. §§ 300g-3, 300j-4. EPA states in the policy that it has "heightened expectations" for public water systems and "expects" water systems to comply with monitoring requirements, Policy at 6, but nevertheless does not exempt

drinking water systems from the non-enforcement approach the policy announces, *id*. at 3-4.

The policy also creates a blanket waiver for one specific source of water pollution: industrial livestock facilities that, "due to disruptions caused by the COVID-19 pandemic," have so many animals onsite that they meet the regulatory definition of a "concentrated animal feeding operation" (CAFO). *Id*. at 6; *see also* 40 C.F.R. § 122.23 (definition of "CAFO" depends in part on the number of animals onsite). The policy states that EPA will not treat any such facility as a CAFO. Policy at 6. That allows those facilities, which otherwise would be subject to pollution controls in a Clean Water Act permit, 40 C.F.R. § 122.23(d)-(e), to discharge manure or litter into waterways without a federal permit, harming water quality and posing a risk to downstream communities without public notice.

### C.    The policy allows facilities to withhold chemical safety data and hazardous waste disclosures from the public

The policy also applies to monitoring essential to detect, prevent, and disclose risks from chemical leaks, hazardous waste storage, and oil spills. For example, the Toxics Release Inventory (TRI), *see* Policy at 3 n.7, "tracks the management of certain toxic chemicals that may pose a threat to human health and the environment." Wu Decl. Ex. 8 (EPA, *TRI Program* webpage). TRI data provide "a way for citizens to better understand possible sources of pollution in their communities." *Id*. TRI reporting is required under the Emergency Planning and Community Right-to-Know Act (EPCRA), which mandates that a facility manufacturing, processing, or using certain toxic chemicals "report annually on the presence of those chemicals at the facility, the uses of the chemicals, an estimate of the maximum amounts of the chemicals present at any time, methods of disposal and treatment of waste, and the extent to which those chemicals are being released into the environment." *Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1197 (D.D.C. 1996); *see* 42 U.S.C.

6

§ 11023(g). EPA makes this information available "to local governments and citizens in the community, who may then develop appropriate emergency response plans," as required by law. *Nat'l Oilseed Processors*, 924 F. Supp. at 1197; *see* 42 U.S.C. §§ 11023(h), (j), 11044(a).

In addition, tank-integrity testing, *see* Policy at 3 n.3, is intended to "detect oil leaks, spills, or other potential integrity or structural issues before they can result in a discharge of oil" to rivers or shorelines. Wu Decl. Ex. 9, at 1 (EPA, *Spill Prevention, Control and Countermeasure Plan Program* Factsheet); *see also* 40 C.F.R. § 112.8(c)(6). These tests are also a critical component of the Clean Air Act's Risk Management Program, *see, e.g.*, 40 C.F.R. § 68.73(d), which aims to prevent chemical disasters at the most dangerous industrial facilities in the country, Wu Decl. Ex. 10, at 1 (EPA, *Risk Management Plan Rule* Factsheet).

Finally, the policy creates a special rule for hazardous waste generators that, because of disruptions caused by the pandemic, are storing large volumes of hazardous waste onsite rather than transferring it to properly regulated storage and disposal facilities. Policy at 5. The policy announces that EPA will not treat those hazardous waste generators as "treatment, storage, and disposal" facilities under the Resource Conservation and Recovery Act (RCRA). *Id*. The policy thus allows those companies to ignore the disaster prevention, preparedness, and response requirements that otherwise strictly govern storage and disposal of hazardous waste. 42 U.S.C. § 6924(a); *see generally* 40 C.F.R. pt. 264.

## II.     Plaintiffs petitioned EPA for an emergency rule to mitigate the policy's harms

In response to EPA's policy and the risks it creates, Plaintiffs petitioned the agency for an emergency rule on April 1, 2020. *See* ECF No. 1-1 (Petition). The petition asked EPA to publish an interim final rule, within seven days and effective immediately, to ensure prompt public notice of any regulated entity's failure to conduct required monitoring or

reporting in reliance on EPA's policy. *Id*. at 1, 6-7.

Specifically, the petition asked for a rule requiring any entity that stops complying with monitoring or reporting requirements for reasons related to COVID-19 to notify EPA and the relevant state immediately, disclosing: (1) the pollution limit or standard involved, (2) the relevant statute, regulation, or permit provision that compels the monitoring or reporting at issue, (3) whether and to what extent the entity's operations are continuing in other respects, (4) a justification for the failure to monitor or report, and (5) a description of the efforts being made to return to compliance as soon as possible. *Id*. at 6. The petition asked that the rule require EPA to publish all such notifications online within a day of receipt, including the name and location of the facility. *Id*. The petition further asked that the rule require facilities to report when they return to compliance and for EPA to publish those submissions online. *Id*. at 6-7. EPA has statutory authority under at least five different environmental laws to publish the requested rule. *Id*. at 8-9; 33 U.S.C. §§ 1318(a), 1361(a) (Clean Water Act); 42 U.S.C. §§ 7414(a)(1), 7601(a) (Clean Air Act); *id*. § 6927(a) (RCRA); *id*. § 11048 (EPCRA); *id*. §§ 300j-4(a)(1)(A), 300j-9(a)(1) (Safe Drinking Water Act).

The petition requested an interim final rule, effective immediately, because EPA's policy—which was itself effective immediately and retroactive to March 13—creates an urgent need for facilities to disclose publicly if and when they fail to monitor or report. Petition at 19-21. The petition asked EPA to solicit public comment at the same time as the interim final rule and then, if appropriate, amend the rule in the future. *Id*. at 20.

The petition describes the enormous health consequences at stake. *Id*. at 9-17, 20. Pollution limits, leak detection, hazardous waste reporting rules, and other compliance obligations exist to protect people who work in or live near regulated facilities. *Id*. at 2-6. If

facilities stop monitoring for compliance with those requirements and stop reporting violations, without notice, people will not know the levels of pollution they are exposed to and will not be able to take steps to protect themselves. *Id*. at 7-8. The harm will be borne disproportionately by people of color and low-income communities. *Id*. at 3, 4.

After Plaintiffs filed the complaint in this case, EPA published an interim final rule addressing one narrow category of monitoring and reporting affected by the policy: quality-assurance tests for continuous emission monitoring under the Clean Air Act. *See* 85 Fed. Reg. 22,362 (Apr. 22, 2020). These quality-assurance tests must be conducted periodically to confirm the accuracy of hourly emissions data for air pollutants from certain facilities. *Id.* at 22,363-64. Under EPA's new rule, any company that misses one of the listed reporting requirements must notify EPA and explain why the failure was related to COVID-19. *Id.* at 22,367-68. EPA will post a list online of each company that provides such a notice, along with a summary of the delayed test. *Id.* at 22,371. The rule is limited to quality-assurance requirements for continuous emission monitoring; it does not address any other monitoring or reporting implicated by EPA's non-enforcement policy or raised in Plaintiffs' petition.

## III.    EPA has failed to respond to the petition

Plaintiffs submitted the petition more than four weeks ago, on April 1, 2020. Because EPA's policy was retroactive to March 13, undisclosed monitoring and reporting violations may now date back more than six weeks. Despite the petition's request for and showing of need for prompt action, EPA has not responded. Wu Decl. ¶ 3.

## ARGUMENT

The Court should direct EPA to respond promptly to Plaintiffs' petition. EPA has a clear duty to act, and the agency's refusal to do so perpetuates health risks created by its

policy. EPA's delay is unreasonable in the extraordinary circumstances here.

## I.     EPA has a legal duty to respond to Plaintiffs' petition

The Administrative Procedure Act (APA) requires agencies to provide "an interested person the right to petition for the issuance . . . of a rule." 5 U.S.C. § 553(e). The APA further requires that an agency "shall" "conclude a matter presented to it" "within a reasonable time." *Id*. § 555(b). This "general but nondiscretionary duty," *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003), extends to petitions that request discretionary action. *In re American Rivers*, 372 F.3d 413, 418 (D.C. Cir. 2004). Thus, an agency is "obligated *under the APA*" to resolve petitions presented to it, even if the agency has discretion regarding the final action it ultimately takes. *Id.* at 419.

## II.    EPA's failure to respond to Plaintiffs' petition is unreasonable and unlawful

The APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Courts in this circuit generally evaluate unreasonable delay under the six factors articulated in *Telecommunications Research & Action Center (TRAC) v. FCC*, 750 F.2d 70 (D.C. Cir. 1984), referred to as the "*TRAC* factors." *See, e.g.*, *Families for Freedom v. Napolitano*, 628 F. Supp. 2d 535, 540 (S.D.N.Y. 2009); *cf. NRDC v. FDA*, 710 F.3d 71, 84 (2d Cir. 2013) (citing *TRAC*, in dicta, as setting forth the test for assessing agency delay). These factors are: (1) the time an agency takes to make decisions is governed by a "rule of reason"; (2) whether Congress provided a timetable for the agency to act; (3) whether human health is at stake; (4) the effect of expediting agency action on competing priorities; (5) the interests prejudiced by the delay; and (6) any impropriety by the agency. *TRAC*, 750 F.2d at 80. Because there is no statutory timetable and no suggestion of impropriety here, the second and sixth factors are neutral in this case. *See Families for*

10

*Freedom*, 628 F. Supp. 2d at 541. The remaining four factors weigh heavily in favor of an order directing EPA to respond now.

### A.   EPA's policy creates an urgent threat, and the agency's failure to respond to Plaintiffs' petition violates any rule of reason

The "first and most important factor" is that the time an agency takes to make a decision must be governed by a "rule of reason." *In re Core Commc'ns*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *TRAC*, 750 F.2d at 80). Reasonableness "necessarily turns on the facts of each particular case." *Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir. 1987). There is no per se rule for "how long is too long." *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992). But "a reasonable time for agency action is typically counted in weeks or months, not years." *American Rivers*, 372 F.3d at 419.

EPA's policy creates an immediate risk that companies will stop monitoring and reporting pollution and chemical hazards, without disclosure. This raises serious health and safety concerns that the underlying environmental laws were intended to prevent. The rule Plaintiffs seek would mitigate those threats, if published soon. The requested rulemaking would require minimal effort by EPA, and the agency has demonstrated that it can publish such a rule quickly. In these circumstances, EPA's delay defies any rule of reason.

### 1.   EPA's delay is unreasonable in the context of the health-protective statutes that authorize it to act

The reasonableness of agency delay "must be judged 'in the context of the statute' which authorizes the agency's action." *Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1158 n.30 (D.C. Cir. 1983) (citation omitted). That includes assessing how "delay may be undermining the statutory scheme, either by frustrating the statutory goal or by creating a situation in which the agency is 'losing its ability to effectively regulate at all.'"

*Cutler v. Hayes*, 818 F.2d 879, 897-98 (D.C. Cir. 1987) (citation omitted).

The monitoring and reporting at issue here are central to the effective functioning of environmental law. The relevant statutes emphasize the importance of timely public access to information on pollution. The Clean Water Act's monitoring and reporting requirements "serve the particularly important purpose of ensuring that regulatory agencies and the public are immediately notified of any permit noncompliance." *Save Our Bays & Beaches v. City & Cty. of Honolulu*, 904 F. Supp. 1098, 1141 (D. Haw. 1994). The Safe Drinking Water Act requires public notice within a day for drinking water violations that may cause "serious adverse effects on human health." 42 U.S.C §§ 300g-3(c), (c)(2)(C); *see also United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1015 n.3 (N.D. Cal. 2002) (collecting cases stressing "[t]he critical importance of timely and accurate self reporting" of drinking water quality). The "central premise" of EPCRA is that "[s]tate and local governments, as well as the public at large, are entitled to access information concerning potential chemical hazards in their communities." *Nat'l Oilseed Processors*, 924 F. Supp. at 1197; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86-87 (1998) (EPCRA's reporting requirements are "[c]entral to its operation"). EPA's delay in responding to Plaintiffs' petition curtails public access to information, frustrating these laws. *See Auchter*, 702 F.2d at 1158 & n.30.

Monitoring and reporting are also critical to EPA's ability to effectively regulate because they enable EPA to ascertain compliance with—and, when necessary, to enforce—governing pollution limits. A facility "is not likely to know it has a discharge violation if . . . there are no monitoring requirements." *NRDC v. EPA*, 808 F.3d 556, 580 (2d Cir. 2015). Without information from self-monitoring, EPA will not be able to assure facilities' compliance with their pollution limits and fulfill its mandate. *See id.* at 583 (holding that

EPA's failure to require monitoring for certain effluent limits in a Clean Water Act permit was arbitrary). EPA's delay here prolongs "a situation in which the agency is 'losing its ability to effectively regulate at all,'" *Cutler*, 818 F.2d at 898 (citation omitted), because EPA itself may lack information about dangerous and unlawful pollution.

### 2.    Timely disclosure of monitoring violations is crucial

Plaintiffs' petition seeks to compel public disclosure of monitoring and reporting violations when they occur, not after the fact, so that people—including Plaintiffs' members—can take steps to protect themselves and their communities in response to noncompliance. Once informed, people can warn others of potential risks. Roberts Decl. ¶ 25. They can take extra precautions, like not exercising outdoors near facilities that have suspended pollution monitoring. Ahmed Decl. ¶ 27. People can engage with facilities directly to understand why companies have suspended monitoring and try to help them come back into compliance. Bravo Decl. ¶ 25; Roberts Decl. ¶ 25. They can pressure companies to return to compliance. Ahmed Decl. ¶ 27; Gillingham Decl. ¶ 21; Roberts Decl. ¶ 25. People can also conduct their own monitoring or other citizen science efforts to fill in missing information. *See* Swanson Decl. ¶ 20. Plaintiffs have done all of these things in the past. *See, e.g.*, Ahmed Decl. ¶ 4; Bravo Decl. ¶¶ 12, 23; Parras Decl. ¶¶ 8-12.

Prompt disclosure also allows Plaintiffs or others to pursue private enforcement of environmental laws when appropriate. The statutes implicated by EPA's policy allow private parties to sue to enforce those laws, when federal or state agencies fail to do so. 33 U.S.C. § 1365 (Clean Water Act); 42 U.S.C. § 7604 (Clean Air Act); *id*. § 300j-8 (Safe Drinking Water Act); *id*. § 6972 (RCRA); *id*. § 11046 (EPCRA). Congress imposed monitoring and reporting requirements in part to encourage and facilitate such enforcement.

*See Sierra Club v. Pub. Serv. Co. of Colorado*, 894 F. Supp. 1455, 1459 (D. Colo. 1995) ("To aid citizen enforcement," the Clean Air Act provides for public "access to information necessary to prove that an entity is violating the Act."). Private enforcement helps redress serious environmental problems when government agencies fail to act. *See NRDC v. Texaco Ref. & Mktg.*, 2 F.3d 493, 503 (3rd Cir. 1993) ("As private attorneys general, citizens constitute a special category of plaintiffs who ensure that companies comply" with environmental laws "even when the government's limited resources prevent it from bringing an enforcement action").

Timely public notification is therefore vitally important. Local advocacy, problem-solving, and enforcement suits that help a facility return to compliance are only meaningful at the time. Self-protective measures, like avoiding certain areas or activities, are only effective if undertaken while the risk is present. All these measures depend on timely access to information. *See Cutler*, 818 F.2d at 898 ("Lack of alternative means of eliminating or reducing the hazard necessarily adds to unreasonableness of a delay.").

EPA opened the door for polluting industries to cease monitoring and reporting immediately, but it has delayed responding to Plaintiffs' request for a rule to lessen the resulting risks. Because timely notice is crucial to the public, further delay is unjustifiable.

### 3.   The petition requests a straightforward rule, and EPA has shown it can act quickly on this issue

The petition asks for straightforward public disclosure of basic information people need to protect themselves. Petition at 6-9. The requested rule does not require complex scientific or technical analysis, or risk disrupting an ongoing scientific review. *Cf. United Steelworkers of America v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (noting difficulty of assessing a proposed schedule when agency must "deal with a host of complex

14

scientific and technical issues" to resolve the matter).

EPA has also proven it can move quickly on this issue. The President declared a national emergency concerning COVID-19 on March 13. *See* 85 Fed. Reg. 15,337 (Mar. 13, 2020). EPA issued its non-enforcement policy thirteen days later, only three days after receiving a letter from an industry trade group requesting such a policy. *See* Wu Decl. Ex. 11. Yet Plaintiffs' petition has now been pending for more than four weeks with no answer.

Notably, on April 22, EPA published an interim final rule that amends certain air emission monitoring quality assurance requirements for facilities unable to meet normal testing or certification rules during the pandemic. 85 Fed. Reg. at 22,362. That rule requires—for a small subset of monitoring and reporting—almost exactly what Plaintiffs' petition seeks: It mandates that if a facility cannot comply with certain testing requirements, it must document the failure, timely report to EPA, and explain how that failure is caused by the COVID pandemic. *Id.* at 22,367-68. That rule also requires facilities to report when they return to compliance. *Id.* And "[t]o provide transparency," it commits EPA to making summaries of these reports available online. *Id.* at 22,371. EPA has therefore shown it can do what the petition requests, and quickly. But it did so only for a small subset of air pollution certifications, not for any other type of monitoring affected by the policy.

For the reasons above—statutory purpose, the importance of timely disclosure, and the modest scope of the petition—EPA's delay violates any rule of reason.

**B.      EPA's failure to respond to the petition may result in serious health harms**

"When the public health may be at stake, the agency must move expeditiously to consider and resolve the issues before it." *Pub. Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 34 (D.C. Cir. 1984); *see also TRAC*, 750 F.2d at 80 ("[D]elays that might be reasonable in

the sphere of economic regulation are less tolerable when human health and welfare" are involved); *Families for Freedom*, 628 F. Supp. 2d at 541 (agency delay was "that much more egregious" because "concerns of human health and welfare are undeniably at stake"). Here, EPA's non-enforcement policy may have enormous health consequences. The requested rule would lessen the risks created by EPA's policy and reduce the harm by providing prompt public notice of monitoring and reporting lapses and deterring noncompliance. EPA's delay is unreasonable in the face of serious health and safety threats. *Cutler*, 818 F.2d at 898 ("The deference traditionally accorded an agency to develop its own schedule is sharply reduced when injury likely will result from avoidable delay.").

### 1.   EPA's delay threatens public health and safety

By allowing companies to stop monitoring and reporting without notifying the public, EPA's policy endangers the health and safety of people living downstream, downwind, and across the fenceline from polluting facilities. Although EPA downplays the relevant monitoring and reporting requirements as "routine," Policy at 3, failing to meet these requirements can cause catastrophic harm.

"Monitoring obligations were not designed to be a mere academic exercise." *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1115 (4th Cir. 1988). Rather, they "are central to adequate administration and enforcement of limits on substantive discharges." *Id.*; *see also* S. Rep. No. 92-414, at 3728 (1972) (monitoring and reporting is a "necessary adjunct to the establishment of effective water pollution requirements and the enforcement of such requirements"). Monitoring and reporting can disclose risks and trigger additional measures to control pollution or protect public health. *See Nat'l Ass'n of Mfrs. v. EPA*, 750 F.3d 921, 926 (D.C. Cir. 2014) (upholding EPA's requirement for particulate matter monitoring near high-

traffic areas to provide "requisite protection to the [local] populations, among them at-risk populations" (citation omitted)); *Hawaii's Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368, 1384 (D. Haw. 1993) (failure to report Clean Water Act violations deprived state agency of opportunity to investigate, demand mitigation, or warn the public).

Monitoring and reporting also deter pollution. Companies pollute less, and less often, when they have to monitor and report their pollution publicly. *See* Petition at 11 & nn.17-19 (collecting literature showing that monitoring and reporting lead to significant reductions in pollution); Wu Decl. Ex. 12, at 3 (Shimshack, *Monitoring, Enforcement, & Environmental Compliance*) (concluding, in report prepared for EPA, that monitoring and enforcement are "critical determinants of environmental behavior" and "generate substantial specific deterrence" and "general deterrence"). Monitoring failures are correlated with violations of pollution limits. Wu Decl. Ex. 13, at 16 (U.S. GAO, *Unreliable State Data Limit EPA's Ability to Target Enforcement Priorities*) (finding "that having a monitoring violation was a strong and statistically significant predictor of whether a system had a health-based violation"). In addition, without monitoring and reporting, facilities can more easily escape detection when they violate pollution limits and thereby avoid the additional deterrents of civil penalties and injunctive relief. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A]ll civil penalties have some deterrent effect" (citation omitted)). By thwarting public scrutiny of monitoring violations, EPA's delay not only deprives communities of information, but will expose them to more pollution.

Indeed, a failure to perform monitoring and reporting caused or exacerbated many of the worst environmental and public health disasters of the past decade. Monitoring failures by Flint, Michigan's water system masked the seriousness of elevated lead levels in the city's

tap water and delayed the government's response to the water crisis. *Concerned Pastors for Social Action v. Khouri*, 217 F. Supp. 3d 960, 966-67 (E.D. Mich. 2016); Mays Decl. ¶¶ 35-40. A chemical facility's failure to regularly inspect its aboveground chemical storage tanks and secondary containment system, and the lack of an onsite leak detection system, caused a chemical spill into the Elk River in 2014 that left more than 300,000 people in West Virginia without water for a week. *See* Roberts Decl. ¶ 8. An August 2012 explosion at a Richmond, California refinery was caused in part by the refinery's failure to comply with Clean Air Act training and integrity-testing requirements. Wu Decl. Ex. 14, at ¶¶ I.B.1, I.C (*United States v. Chevron*, Consent Decree). The gas release from that explosion required a shelter-in-place order and caused more than 15,000 people to seek hospital treatment. *Id*. Ex. 15, at 32-33 (Chemical Safety Board, *Chevron Refinery Fire* report).

In the drinking water context, EPA's non-enforcement policy presents a threat that, unknown to the public, water sources may be contaminated by the dangerous pollutants nitrate and nitrite. Infants exposed to high levels of nitrate or nitrite in drinking water used for baby formula can suffer serious illness, including blue baby syndrome, which can be fatal. Wu Decl. Ex. 16, at 1 (EPA, *Nitrates and Nitrites Chemical Summary*). Nitrate and nitrite are found in animal waste, among other sources, and, according to EPA, "[o]f particular concern is proximity of animal feed lots to some groundwater sources of drinking water, which may lead to groundwater contamination with nitrates from run-off from these feed lots." *Id*. at 1, 4. Yet EPA's policy waives federal permitting requirements for certain industrial livestock operations, Policy at 6, which excuses them from enforceable limits on the discharge of animal waste, along with related monitoring and reporting, *see* 40 C.F.R. § 122.23(d)-(e) & pt. 412; 33 U.S.C. § 1342(a). The policy thus increases the risk of

unregulated and undisclosed factory farm runoff, including potentially dangerous levels of nitrate and nitrite.

EPA's delay also heightens risks related to hazardous waste. The policy lets certain facilities store hazardous waste without following normal treatment, storage, and disposal rules if they face pandemic-related constraints. Policy at 5. Those rules require things like contingency planning and emergency preparedness measures to respond to hazardous waste releases, 40 C.F.R. §§ 264.50-56, and storage container requirements, weekly safety inspections, and an adequate backup containment system, *id*. §§ 264.170-179. The rule requested in the petition would require public disclosure when waste facilities take advantage of this exception. EPA's delay in responding means both that communities near these facilities are less safe from a hazardous waste disaster, and that those communities will have no notice if otherwise-unlawful volumes of hazardous waste are stored nearby.

## 2.      EPA's delay worsens existing racial inequities

Monitoring and reporting failures will cause harm across the country. *See, e.g.*, Ahmed Decl. ¶¶ 20-26 (north Manhattan); Bravo Decl. ¶¶ 7-17 (industrial workers); Gillingham Decl. ¶¶ 18-19 (Catskills); Goldtooth Decl. ¶¶ 4-8 (Indigenous Peoples); Mays Decl. ¶¶ 35-42 (public drinking water); Parras Decl. ¶¶ 15-21 (Houston). Those harms will be borne disproportionately by communities of color and low-income communities.

Decades of research have shown that polluting facilities are disproportionately located in or near those communities. Roberts Decl. ¶¶ 10, 16-17. EPA scientists recently confirmed that air pollution from particulate matter disproportionately burdens people of color. Wu Decl. Ex. 17, at 484 (*Particulate Matter* study). This unequal burden is "even more pronounced" when considering the "worst-of-the-worst" polluters who generate "the

19

majority of exposure risk" from airborne toxic pollutants. *Id.* Ex. 18, at 1, 2 (*Toxic Outliers* study). These inequities extend to drinking water. Drinking water safety violations increase, and enforcement decreases, in minority and lower-income communities. Fedinick Decl. ¶ 6. Increased noncompliance with monitoring and reporting obligations, and associated increases in pollution, are thus likely to harm disproportionately burdened communities the most. *See id.* ¶¶ 6-7; Bravo Decl. ¶¶ 18-20; Roberts Decl. ¶¶ 10, 16-17.

The COVID-19 pandemic exacerbates these pre-existing environmental injustices. In many parts of the country, the COVID-19 death rate is higher for black, Latinx, and indigenous people than for white people. Roberts Decl. ¶ 21. Pollution plays a role in that. *See* Fedinick Decl. ¶¶ 9-18 (showing relationships between density of certain Clean Air Act-regulated facilities and COVID-19 death rates). People who live and work near industrial facilities or in urban areas are more likely to suffer from chronic illnesses like asthma or diabetes—underlying conditions that put them at a greater risk of serious illness or death from COVID-19. Roberts Decl. ¶ 21; Ahmed Decl. ¶ 15. A recent study from scientists at the Harvard School of Public Health found that even a "small increase" in long-term exposure to particulate matter pollution "leads to a large increase in the COVID-19 death rate." Fedinick Decl. Ex. 1, at 2. The Harvard study's authors concluded that these "results underscore the importance of continuing to enforce existing air pollution regulations to protect human health both during and after the COVID-19 crisis." *Id.* at 2-3.

### 3.   EPA's delay threatens emergency preparedness

The emergency planning requirements in EPCRA are intended to give communities information on potential chemical hazards and facilitate planning for chemical accidents. *Am. Chemistry Council v. Johnson*, 406 F.3d 738, 739 (D.C. Cir. 2005). The goal of EPCRA is

to make this "essential" information "available widely and in a timely fashion." S. Rep. No. 99-11, at 14-15 (1985).

EPCRA fulfills its purpose in part through TRI reporting, which requires facilities to disclose key information about their manufacturing, use, storage, disposal, and releases to the environment of toxic chemicals. 42 U.S.C. § 11023(g). TRI reports are due annually on July 1. *Id.* § 11023(a). Local emergency managers use TRI data to help "prepar[e] response plans to address potential chemical accidents." *Atl. States Legal Found., Inc. v. Buffalo Envelope*, 823 F. Supp. 1065, 1070 (W.D.N.Y. 1993). Workers use TRI data to help "prevent[ ] on-the-job excessive exposure to hazardous chemicals." *Del. Valley Toxics Coal. v. Kurz-Hastings, Inc.*, 813 F. Supp. 1132, 1135 (E.D. Pa. 1993). And TRI data are used to inform "organizations and individuals about the local environmental quality" in their communities. *Id.*; *see* Bravo Decl. ¶ 23. Failure to meet TRI reporting requirements threatens emergency planning and community preparedness for chemical disasters. The requested rule would let people know when and where important chemical safety data are out of date.

*     *     *

A "significant risk of grave danger necessitates expedited rulemaking." *Auchter*, 702 F.2d at 1157. EPA's policy creates such a risk, which demands a response to the petition.

## C.   Ordering EPA to answer the petition would not impede higher priorities

Acting on the petition would not infringe on competing agency priorities. *See TRAC*, 750 F.2d at 80. As noted above, the petition should be easy to grant or deny, and EPA has already demonstrated it can quickly publish something like the requested rule. It is also hard to imagine there are many higher priorities facing the agency, because its non-enforcement policy implicates virtually every environmental testing, reporting, monitoring, and safety

inspection requirement that the agency oversees. If the policy prompts undisclosed violations of those requirements, communities and regulators will be in the dark.

There is no indication that EPA staff or decisionmakers are hampered in their ability to respond to the petition. EPA Assistant Administrator Bodine recently said publicly that the agency is "fully functioning" and "100% teleworking." Wu Decl. ¶ 22. EPA's recent actions confirm as much. Since the President declared a national emergency, EPA has finalized major deregulatory rules that will increase pollution. *See* 85 Fed. Reg. 20,838 (Apr. 15, 2020) (relaxing hazardous air pollutant standards for acid gases from certain coal-fired power plants); 85 Fed. Reg. 22,250 (Apr. 21, 2020) (rolling back protections for streams and wetlands, including those that impact drinking water sources); Wu Decl. Ex 19 (announcing rule to weaken vehicle emission and fuel economy standards).

At the same time, EPA has released other guidance documents related to the pandemic. *See* Wu Decl. Ex. 20 (advisory on how non-enforcement policy applies to Clean Water Act permit holders whose compliance is tracked in an online database); *id.* Ex. 21 (guidance for EPA staff on when to forego cleanup field work for COVID-19-related reasons). Compelling an agency response to the petition will not take needed resources away from pressing matters that serve the public interest.

**D.     EPA's delay prejudices Plaintiffs and the public interest**

Finally, delay prejudices Plaintiffs and the public interest. *See TRAC*, 750 F.2d at 80. The requested rule is especially important now because it would provide some measure of protection to people who are particularly vulnerable in the current health crisis. *E.g.*, Ahmed Decl. ¶ 15. Moreover, because of state-wide restrictions on public gatherings and use of indoor facilities, many people are now recreating outdoors. The "New York State on

PAUSE" executive order, for example, allows outdoor exercise if it complies with social distancing requirements. *See* N.Y. Exec. Order 202.8, 9 N.Y.C.C.R.R. § 8.202.8; Wu Decl. Ex. 22 (*New York State on PAUSE*, 10 Point Plan). Without the public notification Plaintiffs seek, EPA's policy could expose people to pollution that puts them at risk. That includes someone fishing downstream of a pollution source that fails to report a discharge violation, or someone walking or running outdoors near a facility with unreported air emissions. *E.g.*, Feld Decl. ¶¶ 8-9, 13. People at risk of being exposed to more pollution "are severely prejudiced" by agency delay. *In re A Community Voice*, 878 F.3d 779, 787 (9th Cir. 2017).

The delay also prejudices Plaintiffs because EPA's inaction leaves us "stuck in administrative limbo"; Plaintiffs have "neither a favorable ruling on [the] petition nor the opportunity to challenge an unfavorable one." *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012) (per curiam). EPA's failure to act deprives Plaintiffs of either the benefits of the requested rule or of the right to seek judicial review of any formal denial.

## IV.    Plaintiffs have standing to challenge EPA's unreasonable delay

An organization can have standing on behalf of its members or in its own right. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Plaintiffs have both types of standing here.

An organization has standing on behalf of its members if an individual member would have standing, the interests at stake are germane to its organizational purposes, and the requested relief does not require the participation of individual members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). EPA's failure to respond to the petition lets facilities stop monitoring and reporting pollution and chemical safety hazards without notice to EPA or the public, which presents a risk to Plaintiffs' members who live and work near those facilities. Those members will not be able to take steps to protect

23

themselves absent the requested disclosure, and they may be exposed to more pollution and a greater risk of chemical disasters without knowing it. *See* Domin Decl. ¶¶ 8-23; Feld Decl. ¶¶ 4-13; *see also* Ahmed Decl. ¶¶ 26-27; Goldtooth Decl. ¶¶ 5-7. This increased risk of harm is a cognizable injury. *N.Y. Pub. Interest Research Grp. v. Whitman*, 312 F.3d 316, 325-26 (2d Cir. 2003); *Baur v. Veneman*, 352 F.3d 625, 636-37 (2d Cir. 2003). The interests at stake are also germane to Plaintiffs' purposes, Swanson Decl. ¶¶ 7-9; Ahmed Decl. ¶ 3; Goldtooth Decl. ¶ 3, and the relief sought does not require individual members' participation.

Plaintiffs also have standing in their own right because they suffer an informational injury. *See FEC v. Akins*, 524 U.S. 11, 21 (1998). EPA's policy threatens the integrity of environmental monitoring data, which Plaintiffs rely on to educate their members, the public, and elected officials about environmental harms and health risks from pollution. Roberts Decl. ¶¶ 14-19; Swanson Decl. ¶¶ 10-16; *see also* Ahmed Decl. ¶¶ 20-21; Bravo Decl. ¶ 23; Parras Decl. ¶ 22. EPA's failure to respond to the petition exacerbates these harms by depriving Plaintiffs of timely information about which facilities are not complying with monitoring and reporting requirements during the pandemic, and why. *See* Roberts Decl. ¶¶ 22-24; Swanson Decl. ¶¶ 17-21; *see also* Ahmed Decl. ¶ 26; Bravo Decl. ¶ 25. The requested rule would mandate that this information be reported to EPA and made public, Petition at 6-7, as would various statutes that require a general right of public access to reports that regulated facilities submit to the agency, 33 U.S.C. §§ 1318(b), 1321(m)(2)(D) (Clean Water Act); 42 U.S.C. § 7414(c) (Clean Air Act); 42 U.S.C. § 6927(b)(1) (RCRA). Until EPA responds to the petition, this basic noncompliance information will remain unavailable to Plaintiffs, prejudicing their educational and advocacy efforts. Roberts Decl. ¶¶ 25-26; Swanson Decl. ¶ 21; Bravo Decl. ¶¶ 25-26; *see also* Ahmed Decl. ¶ 27. This is

sufficient for standing. *Waterkeeper All. v. EPA*, 853 F.3d 527, 533-34 (D.C. Cir. 2017)

(informational injury when EPA rule would decrease reporting that EPCRA mandates be

public); *Air All. Hous. v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118,

124-25 (D.D.C. 2019) (informational injury when agency delay meant facilities were not

reporting chemical releases, and Clean Air Act made such reports publicly available).

Plaintiffs' and their members' injuries are caused by EPA and redressable by this

Court. Plaintiffs need not prove that EPA will grant the petition; it is enough that EPA

could do so if ordered to respond. *Bennett v. Donovan*, 703 F.3d 582, 589-90 (D.C. Cir. 2013);

*see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). An order directing EPA to

respond promptly to the petition could reduce both the informational injury and increased

risk of harm from undisclosed pollution and chemical threats.

## V.    There is good cause to expedite review

This case warrants expedited resolution under 28 U.S.C. § 1657(a), which directs

courts to "expedite the consideration of any action" on a showing of "good cause." Good

cause exists when a failure to expedite would "deprive the relief requested of much of its

value." H.R. Rep. No. 98-985, at 6 (1984). That is true here. A timely response is crucial to

protect the public, as explained above. Good cause also exists when the "public interest in

enforcement" of a statute is "particularly strong." *Id*. There is a compelling public interest in

enforcing the Clean Air Act, Clean Water Act, and other environmental laws, all of which

depend on timely monitoring and reporting.

## CONCLUSION

The Court should order EPA to grant or deny the petition by a date certain, no later

than five days from entry of the Court's order.

Dated: April 29, 2020                    Respectfully submitted,

_/s/ Michelle Wu_
Michelle Wu
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
(646) 889-1489
michellewu@nrdc.org

Aaron Colangelo, *pro hac vice* pending
Jared E. Knicley, *pro hac vice* pending
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-2376
acolangelo@nrdc.org
jknicley@nrdc.org

*Counsel for Plaintiffs*

Allison Zieve, *pro hac vice* pending
Public Citizen
1600 20th Street, NW
Washington, DC 20009
(202) 588-1000
azieve@citizen.org

*Counsel for Plaintiff Public Citizen*