**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NATURAL RESOURCES DEFENSE COUNCIL,
ENVIRONMENTAL JUSTICE HEALTH ALLIANCE, PUBLIC
CITIZEN, CATSKILL MOUNTAINKEEPER, CENTER FOR
COALFIELD JUSTICE, CLEAN WATER ACTION, COMING
CLEAN, FLINT RISING, INDIGENOUS ENVIRONMENTAL
NETWORK, JUST TRANSITION ALLIANCE, LOS
JARDINES INSTITUTE, SOUTHEAST ENVIRONMENTAL
TASK FORCE, TEXAS ENVIRONMENTAL JUSTICE
ADVOCACY SERVICES, WATER YOU FIGHTING FOR,
WEST HARLEM ENVIRONMENTAL ACTION, INC.,

     Plaintiffs,

   v.

ASSISTANT ADMINISTRATOR SUSAN PARKER BODINE,
ADMINISTRATOR ANDREW WHEELER, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

     Defendants.

No. 20 Civ. 3058 (CM)

---

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-3274/2737
Fax: (212) 637-2702
Email: rachael.doud@usdoj.gov
Email: lucas.issacharoff@usdoj.gov

RACHAEL DOUD
LUCAS ISSACHAROFF
Assistant United States Attorneys
– Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

   I.  EPA's Commonsense Response to the COVID-19 Public Health Emergency ................. 3

   II.  The Petition Seeks Promulgation of a Broad and Unprecedented Public Reporting Requirement for COVID-19 Impacted Entities ................................................................. 7

   III.  Statutory and Regulatory Background ............................................................................... 8

      A.  Relevant Environmental Statutes ............................................................................... 8

      B.  General Rulemaking Requirements ............................................................................. 9

   IV.  Status of the Petition ......................................................................................................... 12

ARGUMENT ........................................................................................................................ 13

   I.  Plaintiffs Lack Standing .................................................................................................... 13

      A.  Legal Requirements for Standing ............................................................................... 14

      B.  Plaintiffs Cannot Establish Associational Standing ................................................... 15

      C.  Plaintiffs Cannot Establish Organizational Standing ................................................. 21

   II.  The Court Lacks Subject Matter Jurisdiction over the Bulk of the Petition ..................... 25

   III.  EPA Has Not Unreasonably Delayed in Acting on the Petition ........................................ 29

      A.  The TRAC Factors ..................................................................................................... 29

      B.  First *TRAC* Factor: The Rule of Reason Supports a Finding that EPA Has Not Unreasonably Delayed Action on the Petition ............................................................ 30

      C.  Second *TRAC* Factor: The Statutory Scheme Undermines Plaintiffs' Claims ........... 33

      D.  Third *TRAC* Factor: Plaintiffs Fail to Establish an Impact on Human Health ........... 35

      E.  Fourth *TRAC* Factor: Expediting EPA Action Would Adversely Affect Competing EPA Activities ............................................................................................................ 37

      F.  Fifth *TRAC* Factor: Plaintiffs' Asserted Interests Do Not Warrant a Finding of Unreasonable Delay ................................................................................................... 38

      G.  Sixth *TRAC* Factor: There Is No Impropriety to EPA's Lack of Decision on the Petition ........................................................................................................................ 38

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*,
458 F. Supp. 2d 160 (S.D.N.Y. 2006) .................................................................. 15

*Am. Soc. for Prevention of Cruelty to Animals [ASPCA] v. Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) ................................................................................ 23

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003) .................................................................................. 19

*Beyond Pesticides/Nat'l Coal. Against Misuse of Pesticides v. Whitman*,
360 F. Supp. 2d 69 (D.D.C. 2004) ........................................................................ 26

*Beyond Pesticides/Nat'l Coal. Against the Misuse of Pesticides v. Johnson*,
407 F. Supp. 2d 38 (D.D.C. 2005) .......................................................... 31, 34, 37

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) .............................................................................................. 19

*Ctr. for Sci. in the Pub. Interest v. U.S. Food & Drug Admin.*,
74 F. Supp. 3d 295 (D.D.C. 2014) ................................................................. 31, 36

*Cutler v. Hayes*,
818 F.2d 879 (D.C. Cir. 1987) .............................................................................. 30

*Dep't of Commerce v. U.S. House of Representatives*,
525 U.S. 316 (1999) .............................................................................................. 15

*Duke Power Co. v. Carolina Envtl. Study Grp.*,
438 U.S. 59 (1978) ................................................................................................ 17

*Envtl. Def. Fund v. U.S. Nuclear Regulatory Comm'n*,
902 F.2d 785 (10th Cir. 1990) .............................................................................. 26

*Families for Freedom v. Napolitano*,
628 F. Supp. 2d 535 (S.D.N.Y. 2009) .................................................................. 30

*FDIC v. Meyer*,
510 U.S. 471 (1994) .............................................................................................. 27

*FEC v. Akins*,
524 U.S. 11 (1998) ................................................................................................ 21

*Friends of Animals v. Jewell*,
115 F. Supp. 3d 107 (D.D.C. 2015) ...................................................................... 23

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) ........................................................................ 21, 23

*Friends of the Earth, Inc. v. Crown Central Petroleum Corp.*,
95 F.3d 358 (5th Cir. 1996) .................................................................................. 22

*George Kabeller, Inc. v. Busey*,
999 F.2d 1417 (11th Cir. 1993) ............................................................................ 26

*Hallstrom v. Tillamook County*,
493 U.S. 20 (1989) ................................................................................................ 28

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........................................................................................ 33, 38

*Humane Soc'y of the U.S. v. McCarthy,*
  209 F. Supp. 3d 280 (D.D.C. 2016) ............................................................ 28, 29
*Hunt v. Wash. State Apple Adver. Comm'n,*
  432 U.S. 333 (1977) .......................................................................................... 14
*Ill. Mun. Gas Agency v. F.E.R.C.,*
  258 F. App'x 336 (D.C. Cir. 2007) ................................................................... 15
*In re A Cmty. Voice,*
  878 F.3d 779 (9th Cir. 2017) ............................................................................ 31
*In re Am. Fed'n of Gov't Emps.,*
  837 F.2d 503 (D.C. Cir. 1988) .......................................................................... 39
*In re Am. Rivers & Idaho Rivers United,*
  372 F.3d 413 (D.C. Cir. 2004) ..................................................................... 30, 31
*In re Barr Labs. Inc.,*
  930 F.2d 72 (D.C. Cir. 1991) ............................................................................ 30
*In re Cal. Power Exch. Corp.,*
  245 F.3d 1110 (9th Cir. 2001) .......................................................................... 31
*In re Core Commc'ns, Inc.,*
  531 F.3d 849 (D.C. Cir. 2008) .......................................................................... 30
*In re Int'l Chem. Workers Union,*
  958 F.2d 1144 (D.C. Cir. 1992) ........................................................................ 30
*In re People's Mojahedin Org. of Iran,*
  680 F.3d 832 (D.C. Cir. 2012) .......................................................................... 31
*In re Pesticide Action Network N. Am.,*
  532 F. App'x 649 (9th Cir. 2013) ..................................................................... 36
*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) .......................................................................................... 27
*Liberty Fund, Inc. v. Chao,*
  394 F. Supp. 2d 105 (D.D.C. 2005) .................................................................. 38
*Lipkin v. S.E.C.,*
  468 F. Supp. 2d 614 (S.D.N.Y. 2006) .............................................................. 27
*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .......................................................................................... 14
*Mexichem Specialty Resins Inc. v. EPA,*
  787 F.3d 544 (D.C. Cir. 2015) .......................................................................... 28
*Midwest Gas Users Ass'n v. F.E.R.C.,*
  833 F.2d 341 (D.C. Cir. 1987) .......................................................................... 30
*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.,*
  684 F.3d 286 (2d Cir. 2012) .............................................................................. 14
*N.Y. Pub. Interest Research Grp. v. Whitman,*
  321 F.3d 316 (2d Cir. 2003) .............................................................................. 19
*Nat. Res. Def. Council v. Dep't of Interior,*
  410 F. Supp. 3d 582 (S.D.N.Y. 2019) .............................................................. 21
*NRDC v. FDA,*
  710 F.3d 71 (2d Cir. 2013) ................................................................................ 29
*NRDC v. Thomas,*
  689 F. Supp. 246 (S.D.N.Y. 1988) ................................................................... 26

*Oil, Chem. & Atomic Workers Int'l Union v. Zegeer,*
  768 F.2d 1480 (D.C. Cir. 1985) ........................................................................... 37
*Orion Reserves Ltd. P'ship v. Kempthorne,*
  516 F. Supp. 2d 8 (D.D.C. 2007) .......................................................................... 30
*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ............................................................................................... 16
*Overton Park v. Volpe,*
  401 U.S.  (1972) ..................................................................................................... 39
*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
  797 F.3d 1087 (D.C. Cir. 2015) ............................................................................ 23
*Pub. Citizen Health Research Grp. v. Auchter,*
  702 F.2d 1150 (D.C. Cir. 1983) ............................................................................ 30
*Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.,*
  740 F.2d 21 (D.C. Cir. 1984) ................................................................................ 31
*Pub. Util. Comm'r of Or. v. Bonneville Power Admin.,*
  767 F.2d 622 (9th Cir. 1985) ................................................................................. 26
*Sierra Club v. Thomas,*
  828 F.2d 783 (D.C. Cir. 1987) ........................................................... 27, 29, 36, 37
*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ........................................................................ 14, 15, 18, 19
*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ......................................................................................... 15, 18
*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ......................................................................................... 14, 18
*Telecomms. Research & Action Ctr. v. F.C.C.,*
  750 F.2d 70 (D.C. Cir. 1984) ......................................................................... passim
*United Steelworkers of Am. v. Rubber Mfrs. Ass'n,*
  783 F.2d 1117 (D.C. Cir. 1986) ............................................................................ 30
*W. Rangeland Conservation Ass'n v. Zinke,*
  265 F. Supp. 3d 1267 (D. Utah 2017) ................................................................... 39
*Warth v. Seldin,*
  422 U.S. 490 (1975) ............................................................................................... 14

## Statutes

5 U.S.C. § 552 ............................................................................................................. 8
5 U.S.C. § 553 ..................................................................................................... 10, 11
5 U.S.C. § 555 ..................................................................................................... 22, 33
5 U.S.C. § 601 ............................................................................................................. 9
5 U.S.C. § 603 ........................................................................................................... 10
5 U.S.C. § 604 ........................................................................................................... 10
5 U.S.C. § 702 ........................................................................................................... 27
5 U.S.C. § 704 ........................................................................................................... 29
33 U.S.C. § 1251 ......................................................................................................... 9
33 U.S.C. § 1318 ....................................................................................................... 22
33 U.S.C. § 1321 ....................................................................................................... 22
42 U.S.C. § 300f .......................................................................................................... 9

42 U.S.C. § 6901 .................................................................................................... 9

42 U.S.C. § 6924 .................................................................................................... 34

42 U.S.C. § 6927 .................................................................................................... 22

42 U.S.C. § 6976 .................................................................................................... 26

42 U.S.C. § 7401 .................................................................................................... 9

42 U.S.C. § 7414 .................................................................................................... 22

42 U.S.C. § 7604 .......................................................................................... 27, 28, 34

42 U.S.C. § 7607 .................................................................................................... 27

42 U.S.C. § 11001 .................................................................................................. 9

44 U.S.C. § 3501 ................................................................................................ 9, 35

44 U.S.C. § 3507 .............................................................................................. 10, 35

Pub. L. No. 110-161 .............................................................................................. 34

Pub. L. No. 101-549 .............................................................................................. 27

## Regulations

5 C.F.R. § 1320.11 ................................................................................................ 10

5 C.F.R. § 1320.13 ................................................................................................ 10

40 C.F.R. pt. 2, subpt. B ......................................................................................... 8

40 C.F.R. §§ 2.301-2.311 ...................................................................................... 11

40 C.F.R. §§ 745.86-754.87 .................................................................................. 5

85 Fed. Reg. 22,362 ......................................................................................... 11, 33

## Other Authorities

Executive Order 12866: Regulatory Planning and Review ...................................... 10

Executive Order 13563: Improving Regulation and Regulatory Review .................... 10

## PRELIMINARY STATEMENT

The COVID-19 pandemic has caused widespread suffering and disruption in American life over the past months.  COVID-19 has also posed unprecedented challenges for both regulators and regulated entities, including by creating worker shortages, impacting the availability of contractors to conduct sampling and testing for facilities, and requiring regulated entities to adapt to stay-at-home orders and other restrictions.  In response, on March 26, 2020, the Environmental Protection Agency ("EPA") issued a Temporary Enforcement Policy (the "Policy") that sets out certain factors and principles that EPA intends to use in exercising its enforcement discretion for certain regulatory violations caused by the COVID-19 public health emergency, including that EPA does not, "[i]n general" "expect to seek [civil] penalties" for routine monitoring and reporting violations "where EPA agrees that COVID-19 was the cause of the noncompliance" and other conditions are met. This commonsense response is consistent with the approach taken by regulators in Illinois, Oregon, Washington, and elsewhere.

Plaintiffs do not challenge this Policy.  Instead, Plaintiffs have demanded that EPA undertake, within seven days, a multi-statute rulemaking imposing an enforceable requirement that all regulated entities unable to comply with EPA's monitoring and reporting requirements because of COVID-19 file a public justification of their reasons and other information.  The disclosure Plaintiffs seek is not required by any existing statute or regulation.  Now, mere weeks after filing the Petition, Plaintiffs claim that EPA has unreasonably delayed in not *immediately* responding to a petition for rulemaking imposing these new public reporting burdens on regulated entities struggling to meet existing reporting requirements due to the COVID-19 crisis.

As a threshold matter, Plaintiffs lack Article III standing.  Plaintiffs' claimed injuries in fact—on behalf of their members and in their own right as organizations—rest upon the unfounded assertion that the Policy will *cause* environmental noncompliance, rather than addressing EPA's

response as what it is:  a response to circumstances where the *COVID-19 public health crisis itself* has in fact caused the noncompliance.  Moreover, Plaintiffs' claimed injury to their members rests not only upon the assumption that previously law-abiding entities will suddenly turn scofflaw in response to the Policy, but that they will do so in a way that will impact Plaintiffs' members specifically, something Plaintiffs have not even begun to demonstrate.  Plaintiffs also fail to demonstrate that any purported injuries are traceable to the alleged wrong—the failure to act on the Petition seeking a rule to require new reporting and a new public database—as opposed to the Policy itself, which Plaintiffs do not challenge in this case.  Plaintiffs' claim of injury to themselves as organizations, which is premised on a harm in terms of lost access to information, meanwhile, fails for the additional reason that Plaintiffs do not have a right to the information they seek.

Moreover, to the extent Plaintiffs have standing, they nonetheless run afoul of the jurisdictional provisions of three of the five statutes implicated by the Petition, which place exclusive jurisdiction for Plaintiffs' unreasonable delay claims in the Courts of Appeals (Resource Conservation and Recovery Act and Safe Drinking Water Act) or provide for suit exclusively in the United States District Court for the District of Columbia after a mandatory pre-suit notice that Plaintiffs have failed to provide (Clean Air Act).  Accordingly, at a minimum, the Court lacks jurisdiction over this suit to the extent that the Petition relates to rulemaking under at least three of the five implicated statutes.

Beyond these threshold issues, to the extent that the Court reaches the merits of Plaintiffs' claim, the passage of mere weeks since the filing of the Petition cannot amount to "unreasonable delay."  Plaintiffs have not identified any case in which courts applying a "rule of reason" have found less than a year to be "unreasonable delay," and courts have repeatedly found the passage of multiple years to be "reasonable."  Furthermore, courts have made clear that deference is owed

to EPA's good-faith determination of its own priorities, particularly where that determination implicates EPA's enforcement discretion, and that is particularly so here where EPA has continued to prioritize vigorous enforcement action on health and safety matters during the COVID-19 pandemic. Plaintiffs' claimed impact on human health, which relies on speculation at odds with the plain meaning of the Policy, fails to justify the relief Plaintiffs seek. The Court should reject Plaintiffs' contention that EPA is allowed mere weeks to act on their novel rulemaking Petition.

For the reasons set forth below, the Government respectfully asks that the Court deny Plaintiffs' motion for summary judgment and grant the Government's cross-motion for summary judgment on the grounds that Plaintiffs lack standing; the Court lacks subject-matter jurisdiction in part; and there has been no unreasonable delay.

## BACKGROUND

### I.   EPA's Commonsense Response to the COVID-19 Public Health Emergency

The COVID-19 pandemic has posed unprecedented challenges for regulators and regulated entities alike. *See generally* Declaration of Lawrence R. Starfield ("Starfield Decl.") ¶ 6 ("Beginning in early March, EPA began receiving inquires and questions from both state regulators and the regulated community about how to handle the current extraordinary situation where stay at home and social distancing orders imposed by state and local governments and the increasing numbers of people infected with COVID-19 has led to worker shortages, has impacted both the availability of contractors to conduct sampling and testing for facilities, and has impacted the ability of laboratories to timely analyze samples and provide results."); *see also id.* (noting extensive inquiries from trade associations and co-regulators).

In response to this extraordinary situation, on March 26, 2020, the Assistant Administrator of EPA's Office of Enforcement and Compliance Assurance ("OECA"), Susan Parker Bodine, issued the Policy, a memorandum entitled "COVID-19 Implications for EPA's Enforcement and

Compliance Assurance Program."  Declaration of Michelle Wu Ex. 1 (Dkt. No. 30-1).  The Policy recognizes that, due to worker shortages, social distancing, and other disruptions from the COVID-19 pandemic, "there may be constraints on the ability of a facility or laboratory to carry out certain activities required by our federal environmental permits, regulations, and statutes."  *Id.* at 2. Accordingly, the Policy sets forth guidance on how EPA plans to exercise its enforcement discretion in certain regulatory contexts during the pandemic, noting several areas in which the Policy does *not* apply as well as strict conditions on the Policy's application in areas in which it does apply.

As focused on here, the Policy applies to "[r]outine compliance monitoring and reporting by regulated entities," *id.* at 3, providing that "[i]n general" EPA "does not expect" to seek penalties for "routine compliance monitoring, integrity testing, sampling, laboratory analysis, training, and reporting or certification obligations" *if* "EPA agrees that COVID-19 was the cause of the noncompliance" *and* "the entity provides supporting documentation to the EPA upon request."  *Id.*  Even this limited statement of general policy is further limited:  It does not relieve regulated entities of obligations imposed by consent decrees, *id.* at 4, does not apply where there is "an acute risk or an imminent threat to human health or the environment," *id.* at 4, does not relieve public water systems of their "heightened responsibility to protect public health," *id.* at 6, does not "relieve[] any entity from the responsibility to prevent, respond to, or report accidental releases of oil, hazardous substances, hazardous chemicals, hazardous waste, and other pollutants, as required by federal law," *id.* at 7, and does not apply to criminal violations, *id.*  The Policy also does not change the fact that any failure to conduct required monitoring or reporting is a violation of the relevant requirement.  To the extent any entity is required to report violations, for example as part of an annual certification, the entity would be required to do so notwithstanding the Policy.

Moreover, the Policy is limited to circumstances in which regulated entities seeking enforcement discretion have fulfilled several conditions.  First, the Policy only applies where entities have made "every effort to comply with their environmental compliance obligations," and *COVID-19* has made compliance "not reasonably practicable."  *Id.* at 2-3.  Under such circumstances, entities should:

> a. Act responsibly under the circumstances in order to minimize the effects and duration of any noncompliance caused by COVID-19;
>
> b. Identify the specific nature and dates of the noncompliance;
>
> c. Identify how COVID-19 was the cause of the noncompliance, and the decisions and actions taken in response, including best efforts to comply and steps taken to come into compliance at the earliest opportunity;
>
> d. Return to compliance as soon as possible; and
>
> e. Document the information, action, or condition specified in a. through d.

*Id.* at 3.

In other words, contrary to Plaintiffs' assertions, the Policy does *not* "allow[] regulated companies to stop monitoring and reporting their compliance," Pl. Br. at 1—rather, it indicates how EPA expects in general to exercise its enforcement discretion where COVID-19 has already rendered compliance impracticable.  Nor does the Policy allow entities to claim impracticability in their "sole discretion," *id.* at 3—it is conditioned on entities documenting "how COVID-19 was the cause of the noncompliance," *id.* at 3, and explicitly states that EPA will exercise its discretion not to seek civil penalties only if it "agrees," *id.*[1]

---

[1] Contrary to Plaintiffs' suggestion, it is not uncommon in environmental law for regulated entities to have an obligation to maintain records of their conduct that are only provided to EPA upon request. *See, e.g.*, 40 C.F.R. §§ 745.86(a), (b), 745.87(b) (records of compliance with certain Toxic Substances Control Act requirement to be maintained by certified lead paint renovation firms).

Plaintiffs' assertions that the Policy will "cause[]" noncompliance, Pl. Br. at 25, thus rests upon the unsupported assumption that regulated entities that would otherwise comply with the law, and for which compliance is reasonably practicable despite the COVID-19 public health emergency, will use the Policy as an excuse to stop following the law. Further, Plaintiffs make this assumption notwithstanding that the Policy is merely a statement of EPA's intent "[i]n general" not to pursue civil penalties from parties where EPA agrees that the COVID-19 crisis has made compliance with routine monitoring and reporting requirements "not reasonably practicable," if those entities make "every effort to comply," document the cause of the noncompliance, and "return to compliance as soon as possible." Policy at 2-3.

This carefully circumscribed application of EPA's enforcement discretion, far from being the abdication of responsibility that Plaintiffs portray, is a commonsense response to the COVID-19 pandemic that is consistent with the approach adopted by state regulators. *See, e.g.*, Oregon Department of Environmental Quality (DEQ), "DEQ response to COVID-19," https://www.oregon.gov/deq/Pages/covid-19.aspx (last visited May 23, 2020) (recognizing that COVID-19 "may affect some regulated entities' ability to comply with certain DEQ requirements in rules, permit conditions, and orders," stating that "DEQ will continue to exercise reasonable enforcement discretion," requiring entities to make every effort to comply, and requiring documentation almost identical to that of EPA's Policy); State of Washington Department of Ecology, "Compliance assistance," https://ecology.wa.gov/About-us/Get-to-know-us/Coronavirus-Updates/Compliance-assistance (last visited May 29, 2020) ("We recognize the public health crisis and economic disruptions related to the COVID-19 outbreak may temporarily affect some of the regulated entities' ability to comply with all state requirements. Ecology will exercise reasonable discretion within our authority when deciding whether to pursue potential

violations that may be linked to the current COVID-19 pandemic."); State of Washington Department of Ecology, "COVID-19 dangerous waste compliance," https://ecology.wa.gov/Waste-Toxics/Business-waste/Manage-your-waste/covid-19-dw-compliance (last visited May 29, 2020) (imposing almost verbatim the same compliance effort and documentation requirements as EPA Policy). Other states have announced the exercise of enforcement discretion even without the safeguards set forth in EPA's Policy. *See, e.g.*, Illinois Environmental Protection Agency, "Compliance Expectations Statement," https://www2.illinois.gov/epa/topics/Documents/Agency_Compliance_Expectations_Statement.pdf (last visited May 29, 2020) ("Should those current health and safety restrictions also result in an inability to comply with environmental requirements, the Agency will exercise enforcement discretion when appropriate.").

## II.  The Petition Seeks Promulgation of a Broad and Unprecedented Public Reporting Requirement for COVID-19 Impacted Entities

In response to EPA's carefully calibrated statement about exercise of its enforcement discretion, on April 1, 2020, Plaintiffs submitted a petition seeking a sweeping new disclosure regime feeding into a nearly real-time publicly accessible database. *See* Dkt. No. 1-1 (the "Petition"). While the Petition did *not* seek alteration or revocation of the Policy itself, it demanded that within *seven days* "EPA publish a final, enforceable rule" requiring that entities prevented from compliance with routine monitoring and reporting by COVID-19 submit extensive documentation and that EPA create an online database identifying each such entity and providing the complete documentation submitted within one day of submission. *Id.* at 1, 6. The Petition also demands that EPA require additional extensive documentation to be submitted when facilities return to compliance, also to be published publicly within one day of receipt. *Id.* at 6-7. The Petition does not consider either the burdens imposed by the COVID-19 pandemic on regulated

entities or the additional burdens that would be created by imposition of the reporting requirements it seeks.  Nor does the Petition consider the possibility that confidential business information might be implicated by public disclosure of the information sought.  *Compare* Petition at 9 (asserting that "any regulated entity's notice that it was availing itself of EPA's non-enforcement policy would become an agency record subject to disclosure under the Freedom of Information Act"), *with* 5 U.S.C. § 552(b)(4) (exempting from FOIA disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential"), *and* 40 C.F.R. part 2, subpart B (detailed EPA regulations on the submission and handling of confidential business information).

Further, while the Petition asserts that "Existing provisions in the Clean Water Act (CWA), Clean Air Act (CAA), Safe Drinking Water Act (SDWA), Resource Conservation and Recovery Act (RCRA), and EPCRA [Emergency Planning and Community Right-to-Know Act] provide EPA with all necessary legal authority" for the proposed rule, Petition at 8, nowhere does it grapple with the fact that these statutes each have their own disclosure regimes, implementation regimes (in terms of whether the states or EPA implements the program in the first instance, which varies within programs in the same statute, *e.g.,* the Clean Water Act), review provisions, and in some cases rulemaking requirements, which Plaintiffs have ignored, *see* Declaration of Anne Idsal ("Idsal Decl.") ¶¶ 8-9.

## III.    Statutory and Regulatory Background

### A.    Relevant Environmental Statutes

EPA does not have a single organic statute, but instead derives authority to issue substantive rules from the individual statutes it implements.  Idsal Decl. ¶ 9.  In order to impose regulatory requirements, EPA must act through these individual statutes, some of which include their own rulemaking requirements and/or judicial review provisions.  *Id.*

As Plaintiffs recognize, the rule they request implicates at least five statutes:  the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*; the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*; the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f *et seq.*; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*; and the Emergency Planning and Community Right-To-Know Act ("EPCRA"), 42 U.S.C. § 11001 *et seq. See* Pl. Br. at 8.  In order to promulgate the requested rule, EPA would have to act through each of these statutes.  Idsal Decl. ¶¶ 8-9.  In fact, the procedural requirements applicable to rulemaking under the individual statutes may mean that EPA would have to issue one or more rules under the separate statutes, as opposed to a single uniform rule.  *Id.* ¶¶ 9-10.  Further, certain of the statutes contain provisions that would channel review of a rule if promulgated (or, as applicable, a decision declining to promulgate such a rule) to specific courts and/or impose specific prerequisites to suit.  *See infra* at 25-29.

### B.      General Rulemaking Requirements

In contrast to the Policy, which was implemented by EPA's OECA in the exercise of its enforcement discretion and does not impose any new burdens on regulated entities, the Petition requests that EPA promulgate a rule that would impose novel reporting requirements on regulated entities and require the creation of a new searchable public database.  In order to promulgate such a rule, EPA would be required to engage in a rulemaking under the applicable statutes and subject to the Administrative Procedure Act ("APA"), which would trigger various internal procedures and regulatory requirements.

When promulgating a rule like the one requested by the Petition, EPA must comply with requirements imposed by various cross-cutting statutes, including the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq.*, and the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*, as well as Executive Orders.  Idsal Decl. ¶ 12.  The PRA requires that, before imposing new reporting obligations on regulated entities, an agency obtain approval from the Office of Management and

Budget ("OMB").  *Id.*; *see* 44 U.S.C. § 3507(a).  While an agency can seek emergency approval of the request, OMB has sole discretion as to whether to grant the emergency processing request. Idsal Decl. ¶ 12; *see* 5 C.F.R. § 1320.13.  If OMB denies an emergency processing request, the agency has to seek public comment for a minimum of thirty days on the request for the new reporting requirement.  Idsal Decl. ¶ 12; *see* 5 C.F.R. § 1320.11.  The Regulatory Flexibility Act requires that an agency determine whether a proposed rule would impose a significant economic impact on a substantial number of small entities and, if it would, convene a small business panel. Idsal Decl. ¶ 12; 5 U.S.C. §§ 603-604.

The proposed rule requested by Plaintiffs also implicates Executive Order 12866: Regulatory Planning and Review, and Executive Order 13563: Improving Regulation and Regulatory Review.  These Executive Orders apply to significant regulatory actions, which are defined as meeting one of four criteria, including that the proposed rule "has an annual effect on the economy of $100 million or more or adversely affects in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities," or "raises novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order."  Idsal Decl. ¶ 12.  In order to promulgate the requested rule, EPA would have to assess the economic impact of the rule and consult with OMB as to its potential significance.  *Id.*  If such a rule were deemed significant, OMB would then have 90 days to conduct its formal review of the rule.  *Id.*

In addition to the foregoing statutes and Executive Orders, when engaging in a rulemaking EPA must also comply with the APA or other applicable procedural requirements, which generally require notice and opportunity for public comment prior to issuance of a final, enforceable rule. Idsal Decl. ¶¶ 13-14; *see* 5 U.S.C. § 553; CAA § 307(d).  In order to issue a rule without prior

notice and comment, EPA must make—and adequately document in the administrative record—a sufficient finding of good cause under 5 U.S.C. § 553(b)(B). Idsal Decl. ¶ 13.

The rule requested by Plaintiffs may also implicate concerns regarding confidential business information. Idsal Decl. ¶ 15. Accordingly, if EPA were to engage in a rulemaking with respect to the requested rule, it would need to assess what, if any, information required under the rule would implicate the treatment of certain categories of business information under 40 CFR Subpart B and any special rules governing information obtained under the various statutes. Idsal Decl. ¶ 15; *see* 40 C.F.R. §§ 2.301-2.311.

Internally, EPA has an Action Development Process ("ADP") that sets forth the internal, recommended practices for the development of regulatory actions. Idsal Decl. ¶ 11. These practices generally include the creation of a cross-agency workgroup, the gathering of relevant information (scientific, economic, legal, and stakeholder input), development of and selection from various options, drafting, and various stages of intra-agency consultation. *Id.* These practices are designed to ensure the kind of considerable coordination that would be necessary for the type of rule sought in the Petition—one that would be promulgated under the authority of several statutes that are implemented by separate offices. *Id.* ¶¶ 7-20.

As Plaintiffs note, on April 22, 2020, EPA published an interim final rule amending the emissions reporting regulations applicable to sources that monitor and report emissions under the Acid Rain Program, the Cross-State Air Pollution Rule (CSAPR), and/or the NOX SIP Call. 85 Fed. Reg. 22,362 (the "Interim Rule"). In contrast to the rule Plaintiffs seek, the Interim Rule applies only to a "small subset" of regulated entities. Pl. Br. at 15. Further, the Interim Rule had the effect of modifying certain pre-existing reporting requirements so that sources could comply with the public health restrictions put in place to address the current national emergency

concerning the COVID-19 outbreak.  Idsal Decl. ¶ 13.  The rule contemplated by the Petition, by contrast, would instead impose new reporting requirements and require the creation of a new public-facing database.  *Id.*  Even the narrow Interim Rule, however, required EPA to address numerous executive orders and statutory hurdles.  *See* 85 Fed. Reg. at 22371-72 (discussing application of, *inter alia*, Paperwork Reduction Act, Regulatory Flexibility Act, Congressional Review Act, and various executive orders).  Further, while EPA included in that interim final rule a finding that good cause excused prior notice and opportunity to comment, that finding relied on the urgent need to modify the relevant reporting requirements so that sources could abide by the public health restrictions put in place to address the COVID-19 crisis.  Idsal Decl. ¶ 13.  The rationale for that finding would not apply to the rule contemplated by the Petition, which would instead require additional reporting at a time when such reporting is becoming more difficult due to the impact of the COVID-19 public health emergency.  *Id.*

## IV.     Status of the Petition

EPA received the Petition on April 1, 2020.  Starfield Decl. ¶ 23.  Because the Petition pertains to the Policy, it was assigned to OECA for initial review.  *Id.* ¶ 24.  While EPA's response to the Petition itself is distinct from any rulemaking it may actually elect to undertake, in order to respond to the Petition, and decide whether or not to engage in one or more rulemakings, EPA anticipates considering the potential impact of the requested rulemaking on existing programs (including its impact on the Agency's enforcement discretion) and the resources such an effort would require in light of the potential benefits of such action and competing Agency priorities.  Idsal Decl. ¶ 10.  While EPA has discretion to design an appropriate procedure for doing so, such an evaluation is anticipated to involve consideration of some or all of the same factors that might ultimately be addressed if EPA were to undertake one or more rulemakings.  *Id.*  Based on the broad scope of the rulemaking requested in the Petition and the various statutes implicated by such

rulemaking, OECA thus circulated the petition to the Offices of Water; Air and Radiation; Land and Emergency Management; and Chemical Safety and Pollution Prevention for review.  Starfield Decl. ¶ 24.  The Administrator subsequently designated the Office of Air and Radiation to lead EPA's assessment of the effort that would be needed to undertake the requested rulemaking as part of EPA's review of the Petition.  *Id.* ¶ 25.  In parallel with that effort, OECA is assessing the potential impact of the Petition on its enforcement discretion and whether the Petition seeks to impermissibly limit such discretion.  *Id.* ¶ 26.

## ARGUMENT

## I.     Plaintiffs Lack Standing

Plaintiffs' claim to standing is based upon unfounded speculation.  They ask the Court to assume that regulated entities that ordinarily would comply with the law, and that are not prevented from doing so by the COVID-19 public health emergency, will seize on the Policy as an excuse to stop following the law—notwithstanding that the Policy is merely a statement of EPA's intent "[i]n general" not to pursue civil penalties from parties where EPA agrees that the COVID-19 crisis has made compliance with routine monitoring and reporting requirements "not reasonably practicable," if those entities make "every effort to comply," document the cause of the noncompliance, and "return to compliance as soon as possible."  Policy at 2-3.  They then ask the Court to assume that these new lawbreakers—whoever and wherever they are—will act in a way that directly impacts Plaintiffs or their members, and that the rule requested by their Petition would redress their alleged harms.  They offer no evidence to support these extraordinary assumptions, notwithstanding that this case is at the summary judgment stage and evidentiary proof is therefore required.  Accordingly, Plaintiffs cannot establish Article III standing.

13

### A.      Legal Requirements for Standing

Standing requires that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  At its "irreducible constitutional minimum," this requires a plaintiff to demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  To establish injury in fact, a plaintiff must show that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 1548.  "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

An organizational plaintiff can establish standing on behalf of itself or its members.  First, an organizational plaintiff may establish "associational standing" based on injury to its members by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  Alternatively, to show standing on its own behalf, "the organization itself must meet the same standing test that applies to individuals."  *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (alterations and internal quotation marks omitted).

"The party invoking federal jurisdiction bears the burden of establishing these elements," with the degree of proof required varying depending on the stage of the case. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  On a motion for summary judgment, "mere allegations of injury are insufficient.  Rather, a plaintiff must establish that there exists no genuine issue of

material fact as to justiciability or the merits." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999). To defeat a defendant's motion for summary judgment, a plaintiff must establish "that there is a genuine question of material fact as to the standing elements." *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 167 (S.D.N.Y. 2006).

### B. Plaintiffs Cannot Establish Associational Standing

Plaintiffs argue that they have standing on behalf of their members because "absent the requested disclosure . . . [their members] may be exposed to more pollution and a greater risk of chemical disasters without knowing it." Pl. Br. at 24. This argument fails.[2]

### 1. Plaintiffs Do Not Satisfy the Injury-in-Fact Requirement for Associational Standing

Plaintiffs' claim that their members are threatened with injury starts with a false premise and then relies on multiple layers of speculation. This does not suffice to establish an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548.

First, Plaintiffs' standing argument is premised on the assertion that the Policy "lets facilities stop monitoring and reporting pollution and chemical safety hazards." Pl. Br. at 23. This premise is false: the Policy does not "let" regulated entities do anything. As discussed above, the

---

[2] Plaintiffs appear to recognize that the fact that EPA has not yet responded to the Petition does not, in itself, suffice to establish standing. Instead, in addition to this alleged "procedural violation," Plaintiffs must show "some concrete interest that is affected by the deprivation." *Spokeo*, 136 S. Ct. at 1549 (plaintiff "could not . . . allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009))); *see also Ill. Mun. Gas Agency v. F.E.R.C.*, 258 F. App'x 336, 337 (D.C. Cir. 2007) ("Denial of a petition for rulemaking . . . does not necessarily confer standing.").

Policy simply states that EPA, as an exercise of its enforcement discretion, does not "[i]n general" expect to seek civil penalties for violations of routine monitoring and reporting obligations where EPA agrees that COVID-19 made compliance not reasonably practicable and the entity maintains appropriate documentation.  *See supra* at 4-6.  The Policy does not change regulated entities' monitoring and reporting obligations, or authorize entities to stop complying with them.  Nor does the Policy limit the ability of states and citizens to enforce such obligations.

Instead, the Policy recognizes that the COVID-19 crisis and associated public health measures may cause noncompliance with routine monitoring and reporting obligations, despite the best efforts of the regulated entity.[3]  But, as Plaintiffs appear to recognize, they cannot base their injury on increased noncompliance that is *caused by COVID-19* and merely *responded to* by the Policy; nor can they base standing on noncompliance by malicious actors that would have happened even absent both the Policy and COVID-19.  Instead, Plaintiffs' claim must assume that otherwise law-abiding entities for whom the COVID-19 crisis does *not* cause noncompliance with their legal obligations will nonetheless respond to the Policy by suspending monitoring and reporting, at the risk of enforcement action by EPA, states, and citizens.  Plaintiffs provide nothing but speculation on this point.  But courts do not speculate that people will violate the law for purposes of establishing standing.  *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (assuming, for purposes of assessing likelihood of future injury, that "respondents will conduct their activities within the law" and refusing to credit "general assertions or inferences that in the course of their activities respondents will be prosecuted for violating valid criminal laws").

---

[3] As the Policy explains, such noncompliance may result from factors such as worker shortages due to the pandemic itself or travel and social distancing restrictions and impacts on the availability of key staff and contractors and the ability of laboratories to timely analyze samples and provide results.  Policy at 1-2.

Moreover, Plaintiffs assume not only that the Policy will cause otherwise law-abiding entities to stop monitoring and reporting, but that this behavior will in turn cause those entities to increase pollution and create chemical safety hazards—despite the fact that the Policy does not change any requirements, let alone substantive emissions or discharge limits, or alter the ability of EPA, states, and citizens to sue where there are such environmental law violations.  In support of this supposition, Plaintiffs make generalized claims that monitoring and reporting can lead to the detection of, or deter, substantive violations or other issues.  Pl. Br. at 12-13, 16-17.  Such generalized evidence does not demonstrate a "substantial likelihood" that the Policy—which merely sets forth EPA's intent regarding the collection of penalties for routine monitoring and reporting violations actually caused by the COVID-19 pandemic—will be the "but for" cause of entities not only violating routine monitoring or reporting obligations that remain reasonably practicable to achieve despite the public health crisis, *but also* increasing pollution and the risk of chemical disasters.  *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 74-75 (1978).  Indeed, the risk of enforcement by an authorized state, or citizen suits, as well as the potential for EPA to seek civil penalties for violations of non-routine monitoring and reporting requirements, or violations of routine monitoring and reporting not caused by COVID-19—none of which the Policy limits—will continue to function to deter such misconduct.[4]

---

[4] In addition to expressing an intent to exercise enforcement discretion with respect to penalties for violations of routine monitoring and reporting requirements in certain circumstances, the Policy indicates that, as an exercise of EPA's enforcement discretion, if the facility follows the steps set out in Part I.A of the Policy: (i) if a facility is a generator of hazardous waste and due to COVID-19 is unable to transfer waste off-site within the time periods required under RCRA to maintain its generator status, EPA will continue to treat the facility as a hazardous waste generator rather than storage and disposal facility; and (ii) if a facility is an animal feeding operation, and due to COVID-19 is unable to transfer animals off-site and therefore meets the regulatory definition of a

Even if Plaintiffs had shown that there would be some increase in pollution as a result of the Policy—which their speculation fails to do—they must also demonstrate that such pollution "affect[s them] in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. Plaintiffs fail to proffer evidence that any member has actually been harmed by excess pollution caused by the Policy or even suffers a "substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158. Instead, Plaintiffs simply allege that the Policy "may" cause Plaintiffs' members to "be exposed to more pollution and a greater risk of chemical disasters." Pl. Br. at 24.[5] This would not suffice even at the pleading stage, let alone to demonstrate at summary judgment that no genuine dispute of material facts exist as to standing.

In sum, Plaintiffs' claim to impending injury relies on the assumed occurrence of a multi-step chain of possibilities, without evidentiary support. Particularly at the summary judgment stage, this chain of conjecture is inconsistent with the requirement to show an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," *Spokeo*,

---

concentrated animal feeding operation (CAFO), EPA will not treat the animal feeding operation as a CAFO. Policy at 5-6. These provisions—like the remainder of the Policy—pertain solely to the exercise of EPA's enforcement discretion and do not "allow[]" facilities to violate any regulations, Pl. Br. at 6, 7. At any rate, Plaintiffs do not make any showing that these limited provisions will result in increased pollution—much less that any such pollution would harm Plaintiffs' members—and therefore lack standing to challenge those elements of the Policy.

[5] While Plaintiffs have submitted declarations from certain members stating that they live in the general vicinity of areas they believe are adversely impacted by pollution (*see, e.g.*, Domin Decl., Dkt. No. 21; Feld Decl., Dkt. No. 23), Plaintiffs have presented no evidence that the Policy has caused any facility near these members to actually emit pollution in violation of substantive environmental laws, or that the Policy has created a substantial risk of such violations. Article III of the Constitution requires that Plaintiffs make a specific showing of personal harm, which cannot be replaced by "statistical probability that some of [plaintiff's] members are threatened with concrete injury,"—let alone by the generalized allegations here. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

136 S. Ct. at 1548.  *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 (2013) ("speculative chain of possibilities" does not suffice to establish injury in fact).  Accordingly, Plaintiffs have not shown the injury in fact required for associational standing.[6]

      **2.**        **Plaintiffs Cannot Show that Any Injury to Their Members Is Fairly Traceable to the Alleged Legal Violation and Would Be Redressed by a Favorable Result**

Even if they could show that their members have suffered or are imminently threatened with an injury—which Plaintiffs cannot—Plaintiffs' associational standing argument would still fail because they cannot show that this injury is traceable to the only legal violation they allege— the purported failure to address their Petition within a reasonable time—and would be redressed by a favorable decision.  Plaintiffs do not challenge the Policy in this lawsuit.  Accordingly, to show that their alleged injury "is fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision," *Spokeo*, 136 S. Ct. at 1547, Plaintiffs must

---

[6] This case is not similar to *N.Y. Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 325 (2d Cir. 2003), or *Baur v. Veneman*, 352 F.3d 625, 636-37 (2d Cir. 2003), which Plaintiffs cite.  Pl. Br. at 24.  In *Whitman*, each of NYPIRG's members claimed to reside within a few miles of a facility required to obtain a permit under Title V of the CAA, and NYPIRG asserted that there were deficiencies in New York State's permitting procedures that led to certain of those facilities' permits failing to comply with the CAA.  NYPIRG's members alleged that they suffered personal and economic injury arising from the uncertainty as to whether the facilities were complying with the CAA.  321 F.3d at 325-26.  In contrast to this case, the plaintiffs in *Whitman* thus pointed to specific violations at specific facilities in proximity to specific members of the organization.  In *Baur*, the plaintiff alleged that downed cattle could transmit a deadly disease and challenged Department of Agriculture regulations that permitted downed livestock to be used for human consumption.  The court held that the plaintiff had sufficiently alleged standing, where the government recognized that downed cattle have an increased incidence of the disease and the increased risk of contracting the disease was directly attributable to USDA's policy.  *Id.* at 637- 41.  Here, by contrast, it is speculative to assume that the Policy will result in any increase in pollution, much less one that would affect one of Plaintiffs' members, particularly since the Policy does *not* state that EPA will not seek penalties for pollution increases or accidental releases.  *See id.* at 640-41 (distinguishing cases in which "the occurrence of the alleged future injury rested on the independent actions of third-parties not before the court, rendering the asserted injury too speculative for standing purposes").

be able to trace their claimed injury for associational standing (the alleged increase in pollution harming Plaintiffs' members) to EPA's purported "unreasonable delay" in responding to the petition for rulemaking establishing a novel reporting obligation and public database of entities unable to comply with routine monitoring and reporting obligations because of COVID-19.

Plaintiffs cannot make this showing.  Plaintiffs claim that, in the absence of the reporting required by the requested rule, their members would not know that they are being exposed to "more pollution and a greater risk of chemical disasters."  Pl. Br. at 24.  They likewise contend that their requested rule would allow their members to "take steps to protect themselves."  *Id.* at 23-24.  However, Plaintiffs provide no evidence to suggest that, even if the Policy did result in an increase in pollution and risk of chemical disasters, the database sought by the Petition would have the effect of reducing pollution or risk in the specific circumstances of this case, let alone in the case of a member on whom standing is based.  Plaintiffs also fail to grapple with the provision of the Policy that expressly states that regulated entities should contact EPA or an authorized state agency if their facility operations impacted by the COVID-19 pandemic "may create an acute risk or an imminent threat to human health or the environment," or if a facility "suffers from failure of air emission control or wastewater or waste treatment systems or other facility equipment that may result in exceedances of enforceable limitations on emissions to air or discharges to water, or land disposal, or other unauthorized releases," Policy at 4—which indicate that information regarding any such risks or exceedances should be available absent Plaintiffs' proposed rule.  To the extent Plaintiffs mean to suggest that there may be a subset of environmental risk that falls outside of these provisions but nonetheless poses a harm to their members, they have provided no evidence that their requested database would address those specific cases.

### C.      Plaintiffs Cannot Establish Organizational Standing

In addition to their associational standing argument, Plaintiffs argue that they have "standing in their own right because they suffer an informational injury." Pl. Br. at 23-24. Specifically, Plaintiffs argue that "EPA's policy threatens the integrity of environmental monitoring data, which Plaintiffs rely on to educate their members, the public and elected officials about environmental harms and health risks from pollution." *Id.* at 24. This argument—like Plaintiffs' associational standing argument—fails.

To establish an injury in fact based on an injury to informational interests, a plaintiff must demonstrate that (1) the law entitles the plaintiff to that information, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure. *See FEC v. Akins*, 524 U.S. 11, 21 (1998); *Nat. Res. Def. Council v. Dep't of Interior*, 410 F. Supp. 3d 582, 597 (S.D.N.Y. 2019) (citing *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)). From there, the plaintiff must satisfy the traceability and redressability requirements with respect to this informational injury. *Akins*, 524 U.S. at 25. Again, Plaintiffs' argument fails on all three counts.

### 1.      Plaintiffs Do Not Satisfy the Injury-in-Fact Requirement for Organizational Standing

As an initial matter, Plaintiffs fail to establish an injury in fact based on an informational injury for the same reason they fail to establish an injury in fact for purposes of associational standing: their theory again relies on the premise that the Policy "lets" regulated entities stop complying with their monitoring and reporting obligations, and again requires the Court to assume that previously law-abiding regulated entities will fail to conduct required monitoring and reporting, even when the COVID-19 epidemic has not caused them to do so, despite the fact that the Policy says no such thing. As discussed above, the premise is false, and the assumption that

the Policy will cause such noncompliance is highly speculative.  Accordingly, Plaintiffs have failed

to show an injury in fact to support their organizational standing argument.

> **2.      Plaintiffs Cannot Show that Their Purported Informational Injury Is
> Fairly Traceable to the Challenged Conduct and Would Be Redressed
> by a Favorable Result**

Even if Plaintiffs could show an injury in fact based on the Policy's purported "threat[] [to]

the integrity" of environmental data on which they rely, Pl. Br. at 24, they cannot show that this

injury is traceable to the challenged conduct—EPA's alleged delay in responding to their Petition.

Instead, there is a fundamental mismatch between the information to which Plaintiffs claim an

entitlement and the information the requested rule would provide.

Plaintiffs are correct that environmental statutes require EPA to make certain information

that it receives available to the public.  *See, e.g.*, 33 U.S.C. §§ 1318(b), 1321(m)(2)(D) (CWA)

(providing that "[a]ny records, reports, or information" EPA obtains under the relevant sections

"shall . . . be available to the public."); 42 U.S.C. § 7414(c) (CAA) (similar); 42 U.S.C.

§ 6927(b)(1) (RCRA) (similar).[7]  However, Plaintiffs do not allege in this lawsuit that EPA has

violated any of the above-cited environmental statutes, or any other statute that requires the

disclosure of information.  Instead, Plaintiffs merely allege that EPA has not responded to their

Petition "within a reasonable time."  Compl. ¶¶ 73, 74, 76 (citing 5 U.S.C. § 555(b)).  While the

requested rule itself seeks information, namely, disclosure of any entity's failure to comply with a

routine monitoring or reporting requirement as a result of the COVID-19 pandemic, along with

_____

[7] It is not clear that standing to vindicate compliance with these statutory provisions could be
obtained based on informational injury alone.  *See, e.g.*, *Friends of the Earth, Inc. v. Crown Cent.
Petroleum Corp.*, 95 F.3d 358, 362 (5th Cir. 1996) ("Because [plaintiffs] do not have standing to
sue for [defendant's] discharge violations, they do not have standing to sue for the reporting
violations.").  But the Court need not resolve this issue since the Plaintiffs seek a rule requiring an
entirely different set of information.

various other details, Pl. Br. at 8, this does not suffice to establish informational standing because Plaintiffs have no legal entitlement to that information.   It is not enough that Plaintiffs' unreasonable delay claim is somehow related to a right to information conferred by other statutory provisions; Plaintiffs must actually identify an entitlement to the specific information sought.   *See Friends of Animals*, 828 F.3d at 990-95 (holding that plaintiff could not establish informational standing where the statutory deadline it sought to enforce did "not itself mandate the disclosure of any information," even though a related statutory provision did require disclosure); *Am. Soc. for Prevention of Cruelty to Animals [ASPCA] v. Feld Entm't, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011) (although plaintiff may have a right to information in other stages of the regulatory process, informational standing is not available where "the plaintiff's view of the statute would not *directly* entitle it to the information it seeks" (emphasis added)); *see also Friends of Animals v. Jewell*, 115 F. Supp. 3d 107, 112-13 (D.D.C. 2015) (plaintiff failed to plausibly allege standing based on informational injury because it did not allege that the Department of the Interior "withheld any specific, concrete information," but instead sought information that did not yet exist).[8]   Plaintiffs have not done so, and thus do not assert an informational injury traceable to the purported delay in responding to their Petition.

While this alone prevents Plaintiffs from establishing informational standing, Plaintiffs' informational standing argument also relies on the premise that, in the absence of the rule Plaintiffs have requested, they will not know whether regulated entities have decided, based on the Policy, to stop complying with their routine monitoring or reporting obligations.  Pl. Br. at 23-24.  As an

---

[8] Although Plaintiffs may cite *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087 (D.C. Cir. 2015), in that case standing was found under the lower burden presented at the motion to dismiss stage and the alleged informational injury flowed from the alleged violation—a connection that is absent here.  *Id.* at 1095.

initial matter, while Plaintiffs identify various monitoring obligations they allege the Policy permits entities to avoid, *see id.* at 4-7, in the absence of a corresponding *reporting* obligation, a monitoring obligation would not give rise to any entitlement to information and thus could not form the basis for an informational injury.  The only reporting obligations Plaintiffs discuss in their brief are obligations to report (i) violations of drinking water standards under the SDWA; and (ii) data made available in the Toxics Release Inventory ("TRI").  *Id.* at 5-6.  With respect to the SDWA, however, even their false premise that the Policy, as opposed to COVID-19, may result in the failure to comply with monitoring and reporting requirements does not support their claim, because the Policy does not extend enforcement discretion to public water systems.  *See* Policy at 6 ("EPA expects operators of [public water] systems to continue normal operations and maintenance as well as required sampling to ensure the safety of our drinking water supplies"); *see also* May 6, 2020 FAQ, *available at* https://www.epa.gov/enforcement/frequent-questions-about-temporary-covid-19-enforcement-policy#26 (last visited May 29, 2020) (explaining that the Policy does not extend enforcement discretion to public water system).  At any rate, the Safe Drinking Water Information System—the data source on which Plaintiffs purportedly rely—already reflects any instances in which an entity fails to submit required data.  *See* Safe Drinking Water Information System (SDWIS) Federal Reporting Services, https://www.epa.gov/ground-water-and-drinking-water/safe-drinking-water-information-system-sdwis-federal-reporting (last visited May 29, 2020).  Accordingly, it is not the case, as Plaintiffs claim, that in the absence of their requested rule information regarding the fact of noncompliance would be "unavailable" to them.  With respect to the TRI, Plaintiffs' standing argument again relies on the assumption that not only will the Policy cause entities to stop reporting, but Plaintiffs will have no way—absent their requested rule—to know that reporting has stopped.  In the event an entity fails to submit a

report by the upcoming July 1, 2020 reporting deadline, however, Plaintiffs themselves could determine that noncompliance by looking at the data available in the TRI by mid-July. *See* Basics of TRI Reporting, https://www.epa.gov/toxics-release-inventory-tri-program/basics-tri-reporting (last visited May 29, 2020).

As with their associational standing argument, Plaintiffs have failed to establish an informational injury that is fairly traceable to the purported delay in responding to their Petition and would be redressed by a favorable result. Accordingly, Plaintiffs lack standing, and their case should be dismissed.

## II.    The Court Lacks Subject Matter Jurisdiction over the Bulk of the Petition

In addition to Plaintiffs' lack of standing, Plaintiffs' complaint faces another threshold impediment: the Court lacks subject matter jurisdiction over the bulk of the Petition.

As recognized by Plaintiffs and as described above, EPA lacks general authority to impose regulatory requirements on the public separate from the authority granted by Congress under each of EPA's substantive statutes. *Supra* at 8; Pl. Br. at 8. Thus, the rulemaking sought by the Petition would necessarily require action under at least each of the five substantive statutes Plaintiffs identify: RCRA, the SDWA, the CAA, the CWA, and EPCRA. In light of the judicial review provisions of three of those statutes—RCRA, the SDWA, and the CAA—exclusive jurisdiction to hear unreasonable delay claims lies in courts other than the Southern District of New York.

With respect to RCRA and the SDWA, this jurisdictional bar is described in the seminal case *Telecommunications Research & Action Center v. F.C.C.* ("*TRAC*"), 750 F.2d 70 (D.C. Cir. 1984). In *TRAC*, the D.C. Circuit established that where Congress has placed exclusive jurisdiction to review final agency action in a court of appeals, it will also be deemed to have given that court exclusive jurisdiction to review a claim of unreasonable delay in taking the final action. *See id*. at 77-79 (holding that D.C. Circuit had exclusive jurisdiction over case alleging

unreasonably delay by Federal Communications Commission because that court was vested with exclusive jurisdiction over challenges to FCC actions and announcing general rule that "[w]here a statute commits review of agency action to [a particular court], any suit seeking relief that might affect the [court's] future jurisdiction is subject to the exclusive review of [that court]").  This rule, stated by the D.C. Circuit as a general proposition, has been consistently applied to unreasonable delay claims, except where Congress has expressly provided to the contrary.  *See, e.g.*, *George Kabeller, Inc. v. Busey*, 999 F.2d 1417, 1421 (11th Cir. 1993); *Envtl. Def. Fund v. U.S. Nuclear Regulatory Comm'n*, 902 F.2d 785, 789 (10th Cir. 1990); *Pub. Util. Comm'r of Or. v. Bonneville Power Admin.*, 767 F.2d 622, 626-29 (9th Cir. 1985); *NRDC v. Thomas*, 689 F. Supp. 246, 260-61 (S.D.N.Y. 1988).

RCRA and the SDWA both place exclusive jurisdiction over rulemakings in the courts of appeals.  *See* 42 U.S.C. § 6976(a)(1) (vesting exclusive jurisdiction over "a petition for review of action of the Administrator in promulgating any regulation, or requirement under [RCRA] or denying any petition for the promulgation, amendment or repeal of any regulation" in the United States Court of Appeals for the District of Columbia); *id.* § 300j-7(a) (vesting jurisdiction over suits challenging "any . . . final action of the Administrator" under the SDWA, other than those pertaining to the establishment of national primary drinking water regulations, "in the circuit in which the petitioner resides or transacts business which is directly affected by the action").  Accordingly, unreasonable delay claims regarding rules that would be promulgated pursuant to these statutes must be brought in those courts as well, and this Court lacks jurisdiction over Plaintiffs' claim insofar as it corresponds to a requested rulemaking under RCRA or the SDWA.  *See TRAC*, 750 F.2d at 77-78; *Beyond Pesticides/Nat'l Coal. Against Misuse of Pesticides v. Whitman*, 360 F. Supp. 2d 69, 71 (D.D.C. 2004) (holding that D.C. Circuit had exclusive

jurisdiction over RCRA unreasonable delay claim); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (federal courts are courts of limited jurisdiction and may hear cases only to the extent expressly provided by statute); *Lipkin v. S.E.C.*, 468 F. Supp. 2d 614, 621 (S.D.N.Y. 2006) (Congress "may define the terms and conditions of" any waiver of the United States' sovereign immunity and "the terms of [the] consent to be sued in any court define that court's jurisdiction to entertain the suit" (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994))).[9]

With respect to the CAA, before 1990, one provision of the statute placed jurisdiction in the district courts for claims that EPA had a nondiscretionary duty to take action by a specific deadline; a separate provision provided exclusive jurisdiction for review of final agency actions in the courts of appeals. *See Sierra Club v. Thomas*, 828 F.2d 783, 791-92 (D.C. Cir. 1987) (citing then-current versions of 42 U.S.C. §§ 7604 & 7607(b)). In *Sierra Club*, the D.C. Circuit concluded that CAA unreasonable delay claims could not be brought pursuant to the non-discretionary duty provision, and therefore those claims, pursuant to *TRAC*, could only be brought in the court of appeals. *Id.* at 787-92. In 1990, three years after *Sierra Club*, Congress amended the CAA to provide expressly that claims of unreasonable delay of agency action under the CAA must be brought in the district courts. *See* 42 U.S.C. § 7604(a); Pub. L. No. 101-549, § 707(f), 104 Stat.

---

[9] Because the relevant statutes provide for review and define the bounds of the Court's jurisdiction, Plaintiffs cannot rely on the APA to bypass these statutory schemes. *See* 5 U.S.C. § 702 (waiving sovereign immunity for "action[s] . . . stating a claim that an agency or an officer or an employee thereof acted or failed to act in an official capacity or under color of legal authority" but specifying that "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought"); *id.* § 704 (providing for review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court"); *see also TRAC*, 750 F.2d at 78 (holding that APA's waiver of sovereign immunity does not provide for district court review of unreasonable delay claims because APA's waiver applies only when other statutory review is inadequate).

2399, 2683 (1990); *see also Mexichem Specialty Resins Inc. v. EPA*, 787 F.3d 544, 553 n.6 (D.C. Cir. 2015).

As a prerequisite to such a CAA unreasonable delay claim, Congress required a prospective plaintiff to provide EPA with written notice 180 days "before commencing such action." 42 U.S.C. § 7604(a). Plaintiffs have not (and do not claim to have) provided such notice here. Because Plaintiffs have failed to comply with this mandatory prerequisite to suit, their unreasonable delay claim is barred. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989) (notice requirements in citizen suit provisions are a "mandatory, not optional, condition precedent for suit" and "a plaintiff may not file suit before fulfilling the . . . notice requirement"); *Humane Soc'y of the U.S. v. McCarthy*, 209 F. Supp. 3d 280, 287-88 (D.D.C. 2016) ("Since the [CAA Citizen Suit] Provision also provides an adequate remedy for Plaintiffs' alleged harms—they may bring an unreasonable delay suit—the appropriate waiver of sovereign immunity also comes from the CAA. But that waiver of immunity requires that a prospective plaintiff give the EPA notice 180 days before filing suit, and, since Plaintiffs concede that they did not do so here, they cannot proceed.").

Further, Congress provided that such an unreasonable delay claim could only be brought in a district court within the circuit where the final action would be reviewable. 42 U.S.C. § 7604(a). The Petition seeks a rulemaking of national applicability. Under the CAA, jurisdiction to review that rulemaking would exist only in the D.C. Circuit. 42 U.S.C. §§ 7604(a), 7607(b). Plaintiffs' unreasonable delay claim may therefore only be brought in the District Court for the District of Columbia. *See id.* Accordingly, even if Plaintiffs had complied with the notice requirement, this Court would still be the incorrect forum to adjudicate the claim.

While Plaintiffs have attempted to plead around the CAA's citizen suit provision, and to assert this claim under the APA instead, they may not do so. Specifically, because the CAA's

citizen suit provision provides an adequate remedy, with specific limitations on the waiver of sovereign immunity intended by Congress, Plaintiffs may not bring an "unreasonable delay" case outside of the citizen suit provision.  *See* 5 U.S.C. § 704; *see also Humane Soc'y*, 209 F. Supp. 3d at 287-88.  But even if Plaintiffs could somehow avoid the CAA's citizen suit provision and bring a CAA unreasonable delay claim solely under the APA, this Court would *still* lack jurisdiction under *TRAC*, as held by the D.C. Circuit in *Sierra Club* prior to the creation of the CAA-specific unreasonable delay provision.  *See Sierra Club*, 828 F.2d at 787-92.

Accordingly, this Court lacks jurisdiction over the portion of Plaintiffs' claim pertaining to at least three of the five environmental statutes at issue—RCRA, the SDWA, and the CAA.

## III.    EPA Has Not Unreasonably Delayed in Acting on the Petition

Plaintiffs ask the Court to accept the extraordinary proposition that EPA should have acted in *fifteen days* on a petition for a multi-statute rulemaking imposing new reporting burdens on regulated entities already struggling to meet existing regulatory requirements due to the COVID-19 crisis.  Just to state this proposition demonstrates that it is not reasonable.  Applying the factors typically looked to by courts to analyze "unreasonable delay" cases simply underscores, at every turn, that there has been no unreasonable delay.

### A.  The TRAC Factors

Courts apply the six-factor test articulated in *TRAC*, 750 F.2d 70 (D.C. Cir. 1984), to assess whether an agency has "unreasonably delayed" action.  *See NRDC v. FDA*, 710 F.3d 71, 84 (2d Cir. 2013) (citing *TRAC* as test for reasonableness of agency delay).  The six factors are:

> (1) the time agencies take to make decisions must be governed by a "rule of reason";
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take

into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

*TRAC*, 750 F.2d at 80 (internal quotation marks and citations omitted).  Courts have further noted that because only "egregious" agency delays "warrant a court to order agency action with[in] a specific time frame," "courts rarely compel an agency to render an immediate decision on an issue."  *Orion Reserves Ltd. P'ship v. Kempthorne*, 516 F. Supp. 2d 8, 11 (D.D.C. 2007) (citing *In re Barr Labs. Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991)).

##### B.      First *TRAC* Factor: The Rule of Reason Supports a Finding that EPA Has Not Unreasonably Delayed Action on the Petition

Considering the first *TRAC* factor, the "rule of reason," the delay at issue here—only *fifteen days* between the filing of the Petition and the Complaint, and less than twelve weeks between the filing of the Petition and the completion of briefing on the instant motions—is vastly shorter than in any case Plaintiffs cite in which agency delay has been found to be unreasonable.  *See* Pl. Br. at 10-22 (citing *TRAC*, 750 F.2d 70 (five- and two-year delays not unreasonable); *Families for Freedom v. Napolitano*, 628 F. Supp. 2d 535 (S.D.N.Y. 2009) (two-and-a-half-year delay unreasonable); *In re Core Commc'ns, Inc.*, 531 F.3d 849 (D.C. Cir. 2008) (seven-year delay unreasonable); *Midwest Gas Users Ass'n v. F.E.R.C.*, 833 F.2d 341 (D.C. Cir. 1987) (four-year delay, plus additional unspecified delay, unreasonable); *In re Int'l Chem. Workers Union*, 958 F.2d 1144 (D.C. Cir. 1992) (delay longer six-plus total years in schedule proposed by agency would be unreasonable); *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004) (six-year-plus delay unreasonable); *Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150 (D.C. Cir. 1983) ("[t]hree years from announced intent to regulate to final rule" would be "too long"); *Cutler v. Hayes*, 818 F.2d 879 (D.C. Cir. 1987) (remanding to consider whether 15-year delay unreasonable); *United Steelworkers of Am. v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1119-20 (D.C.

Cir. 1986) (proposed 14-month schedule, after two-and-a-half-year delay, not unreasonable); *Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 23 (D.C. Cir. 1984) (remanding to determine whether two-plus-year delay in acting on petition was unreasonable); *In re A Cmty. Voice*, 878 F.3d 779 (9th Cir. 2017) (eight-year delay unreasonable); *In re People's Mojahedin Org. of Iran*, 680 F.3d 832 (D.C. Cir. 2012) (twenty-month delay after remand and in violation of statutory timeframe unreasonable)).

Indeed, courts have routinely found years-long responses to petitions to be reasonable. For example, the Ninth Circuit, surveying the nationwide case law, noted that "[t]he cases in which courts have afforded relief have involved delays of years, not months. *A fortiori*, FERC's four-month delay does not run afoul of any 'rule of reason.'" *In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1125 (9th Cir. 2001) (emphasis added) (collecting cases comparing delays of four, eight, and ten years found unreasonable with delays of five years, two years, and fourteen months found reasonable). Numerous cases confirm that a delay measured in anything less than years will seldom if ever run afoul of the rule of reason. *See, e.g.*, *Ctr. for Sci. in the Pub. Interest v. U.S. Food & Drug Admin.*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014) (three-year delay reasonable); *Beyond Pesticides/Nat'l Coal. Against the Misuse of Pesticides v. Johnson*, 407 F. Supp. 2d 38, 40 (D.D.C. 2005) (more than three-year delay reasonable).[10]

Absent any precedent to support a finding of unreasonable delay after such a brief time, Plaintiffs present two arguments. First, they argue that the brief delay is unreasonable because "EPA's policy creates an immediate risk that companies will stop monitoring and reporting

---

[10] Plaintiffs rely heavily on dicta from *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004), stating that "a reasonable time for agency action is typically counted in weeks or months, not years," *id.* at 419, but fail to cite a single case in which "weeks" was in fact the measure of delay. *See id.* (finding "more than six-year delay" unreasonable).

pollution and chemical hazards, without disclosure." Pl. Br. at 11.  This seriously mischaracterizes not only the Policy, but the Petition that is actually at issue in this litigation.  As an initial matter, the Policy covers only how EPA will, in general, exercise its enforcement discretion where COVID-19 *has already caused* noncompliance.  *See* Policy at 3.  And as described above, Plaintiffs' contention that otherwise law-abiding third parties for whom compliance remains reasonably practicable despite COVID-19 will suddenly cease their compliance in response to the Policy is speculative at best.  *See generally supra* at 15-16.

Moreover, the Petition on which Plaintiffs claim EPA has "unreasonably delayed" action does not request modification of the Policy.[11]  Instead, it seeks the establishment of a new, enforceable reporting regime that would make publicly available information not currently publicly available.  Specifically, the Petition asks EPA to require regulated entities who are unable to comply with existing reporting requirements to report the reasons they are unable to comply. The rule of reason does not trigger an obligation to impose a novel reporting requirement at the drop of a hat.

Second, Plaintiffs argue that the rule sought by the Petition is "straightforward."  Pl. Br. at 14.  Yet this breezy assertion is based upon Plaintiffs' mischaracterization of both the rulemaking the Petition would require and of EPA's statutory authority.  As explained in the Rulemaking Declaration, "[t]he Agency's substantive rulemaking authority comes from the individual statutes that it implements.  Many of these statutes have their own rulemaking requirements and judicial review provisions."  Idsal Decl. ¶ 9.  The imposition of new reporting requirements—on entities

---

[11] Accordingly, whether EPA's Policy is consistent with EPA's pre-existing policies regarding no-action assurances, Amici Br. (Dkt. No. 36-1) at 7-11, is irrelevant to the question of whether EPA has unreasonably delayed acting on the Petition.

already impacted by COVID-19—would require complex rulemaking across EPA's statutes and consideration of whether, for example, "Confidential Business Information" of regulated entities might be implicated.  *See id.* ¶¶ 10-13, 15.  Plaintiffs point to the Interim Rule establishing similar reporting requirements relating to the Acid Rain Program, the Cross-State Air Pollution Rule (CSAPR), and/or the NOX SIP Call.  *See* Pl. Br. at 15 (citing 85 Fed. Reg. 22,362).  Yet this narrow Interim Rule proves quite the opposite of what Plaintiffs suggest: first, that EPA takes seriously its responsibility to implement the Policy in specific contexts; and second, that to implement a reporting regime tailored to only a small portion of pre-existing CAA requirements demands a significant administrative effort, as reflected in the Federal Register.

Finally, resolving the petition will require consideration of matters within EPA's enforcement discretion.  *See generally Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion").  The intersection between Plaintiffs' novel reporting scheme and EPA's exercise of enforcement discretion as described in the Policy— an exercise of discretion not directly challenged in this case—demonstrates the significant issues presented by the Petition.  Where the underlying subject matter is one of agency discretion, the rule of reason cannot support a conclusion that action must happen with the extraordinary speed sought by Plaintiffs.

### C.     Second *TRAC* Factor: The Statutory Scheme Undermines Plaintiffs' Claims

Plaintiffs assert that "[b]ecause there is no statutory timetable" for consideration of their Petition, other than the general requirement for an agency, "within a reasonable time, [to] conclude a matter presented to it," 5 U.S.C. § 555(b), the second *TRAC* factor is "neutral in this case."  Pl. Br. at 10.  Yet far from being neutral, this absence of statutory support for the immediate action Plaintiffs seek strongly supports deference to EPA's determination of the appropriate pace of

action.  *See Beyond Pesticides*, 407 F. Supp. 2d at 40 ("[A]bsent a statutory timetable in the enabling statute, an agency is entitled to considerable deference in how expeditiously it proceeds with agency action.").

Moreover, although Congress has not provided an explicit time for EPA to act—a factor that weighs in EPA's favor—there are "other indication[s] of the speed with which [Congress] expects the agency to proceed in the enabling statute[s]."  *TRAC*, 750 F.2d at 80.  Plaintiffs' petition implicates reporting requirements across at least five statutes, *see* Pl. Br. at 8, and these statutes *do* provide some guidance on the timeframes Congress considered generally reasonable. For starters, as noted above, the CAA contains an express requirement that a plaintiff provide 180 days' notice to the agency before bringing an unreasonable delay suit.  *See* 42 U.S.C. § 7604(a). As argued above, because Plaintiffs have failed to provide that notice, the CAA portion of this case should be dismissed.  *See supra* at 28.  But in any event, it surely is an indication of Congress's expectation that 180 days is *not* an unreasonable time for an agency to act in the absence of an express statutory deadline.   And in the context of other rulemakings relating to reporting requirements, Congress has provided express statutory deadlines allowing far longer than what Plaintiffs demand here.  *See, e.g.*, Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844, 2128 (2008) (setting deadlines of nine months for proposed rule and eighteen months for final CAA rule "to require mandatory reporting of greenhouse gas emissions above appropriate thresholds in all sectors of the economy"); 42 U.S.C. § 6924(s) (setting deadline of fifteen months for regulations providing that certain persons required to file notifications under RCRA "shall maintain such records regarding fuel blending, distribution, or use as may be necessary to protect human health and the environment").

In addition, Congress has set various important procedural requirements for the rulemaking ultimately sought by Plaintiffs, making clear the complexity of the request and the need for close consideration even at the petition stage.  For example, the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, requires that agencies receive approval from the Office of Management and Budget before imposing new information collection burdens.  *See* Idsal Decl. ¶ 12(a) (citing 44 U.S.C. § 3507(a) (establishing multi-step process for any new collection of information from regulated entities under the Paperwork Reduction Act)).

Overall, nothing in the statutory scheme suggests that Congress expects EPA to act on a petition for this novel and sweeping rulemaking in a matter of weeks.  Accordingly, the second *TRAC* factor favors EPA as well.

### D.      Third *TRAC* Factor: Plaintiffs Fail to Establish an Impact on Human Health

The third *TRAC* factor does not favor Plaintiffs.  Plaintiffs' claim is that the rulemaking sought by the Petition will mitigate alleged human health harms caused by the Policy.  Yet Plaintiffs fail to establish either these alleged harms or that the Petition will have any remedial impact.  As already discussed, the Policy does not change regulated entities' reporting obligations.  Rather, the Policy indicates that, in general, EPA will not seek penalties where EPA agrees that COVID-19 rendered compliance with routine monitoring or reporting "not reasonably practicable" *and* a regulated entity has taken "every effort to comply," documented the cause of the noncompliance, and "return[ed] to compliance as soon as possible."  Policy at 2-3.  The Policy does not authorize any exceedance of emissions limitations and calls for immediate notification of situations that may create an "acute risk or an imminent threat to human health or the environment," or where a facility suffers from emission control failure "that may result in exceedances of enforceable limitations on emissions to air or discharges to water, or land disposal, or other unauthorized releases."  *Id.* at 4-5.

35

Moreover, because Plaintiffs do not challenge the Policy itself, but rather seek a new disclosure regime, Plaintiffs' claim of human health impact requires them to demonstrate not only that the Policy will cause otherwise law-abiding entities not impacted by COVID-19 to stop complying with routine monitoring and reporting (despite the contrary position of the Policy), *and* that any such reduction in routine monitoring and reporting would cause greater pollution, *but also* that this pollution or its health effects would be prevented by the broad, novel reporting system sought by the Petition.  As described above with regard to standing, Plaintiffs' assertions on this point are built on speculation.  *Cf., e.g.*, *Ctr. for Sci. in the Pub. Interest*, 74 F. Supp. 3d at 304 (finding that uncertainty as to alleged health risks weighed in favor of finding EPA's three-year delay reasonable).

Although in a broad sense the Petition touches generally upon the arena of human health and welfare, the D.C. Circuit has explained that a generalized connection to "human health" is insufficient, and the third *TRAC* "factor alone can hardly be considered dispositive when . . . virtually the entire [EPA] docket . . . involves issues of this type."  *Sierra Club*, 828 F.2d at 798 (discussing competing interests at EPA and finding that "whether the public health and welfare will benefit or suffer from accelerating this particular rulemaking depends crucially upon the competing priorities that consume EPA's time, since any acceleration here may come at the expense of delay of EPA action elsewhere"); *cf. also Ctr. for Sci. in the Pub. Interest*, 74 F. Supp. 3d at 304 ("Because everything the [Food and Drug] Administration does involves health and welfare, it contends, the fact that Plaintiffs' petition also implicates these concerns is far less significant than it might otherwise be.  This is correct.").  For this reason, even where actions do directly impact human health, courts have routinely allowed far more time to pass before finding an "unreasonable delay" by agencies whose dockets are full of public health matters.  *See In re*

*Pesticide Action Network N. Am.*, 532 F. App'x 649, 651 (9th Cir. 2013) (six-year delay on petition

to ban pesticide reasonable given that "EPA, by its nature, regulates almost entirely in the realm

of human health and welfare"); *Oil, Chem. & Atomic Workers Int'l Union v. Zegeer*, 768 F.2d

1480, 1481 (D.C. Cir. 1985) (Ginsburg, J.) (five-year delay in regulating miners' exposure to radon

gas did not warrant mandamus); *Beyond Pesticides*, 407 F. Supp. 2d at 41 (more than three year

delay in evaluating reregistration of wood preservative pesticides reasonable).

### E.     Fourth *TRAC* Factor: Expediting EPA Action Would Adversely Affect Competing EPA Activities

The fourth *TRAC* favor decidedly favors EPA.  As EPA attests, "[b]eginning in early

March, [it] began receiving inquiries and questions from both state regulators and the regulated

community about how to handle the current extraordinary situation," Starfield Decl. ¶ 6, and

Plaintiffs themselves note that EPA has been actively involved in issuing guidance relating to the

COVID-19 pandemic, Pl. Br. at 22.  *See also* Idsal Decl. ¶¶ 18-19.  Notwithstanding this vigorous

agency action, Plaintiffs argue that their Petition demands immediate action because (1) it "should

be easy to grant or deny," and (2) Plaintiffs believe that it should be EPA's highest priority.  Pl.

Br. at 21.

As noted *supra*, Plaintiffs' first argument is simply incorrect, as demonstrated by the

complexity of the requested rulemaking.  *See generally* Idsal Decl. ¶¶ 8-17.  And Plaintiffs' second

argument advocates precisely the sort of judicial interference in administrative agencies'

determination of their own priorities that the D.C. Circuit has rejected:

> [W]e must remember that Congress has assigned EPA a very broad mandate, not
> only under the Clean Air Act but also under a handful of other equally complex
> environmental statutes.  Given that Congress provides EPA with finite resources to
> satisfy these various responsibilities, the agency cannot avoid setting priorities
> among them.  As we have said, we can perceive no statutory command that EPA
> assign this rulemaking a higher priority than any of its other activities.

*Sierra Club*, 828 F.2d at 798.  The fact that EPA continues to take other significant actions to address the COVID-19 public health emergency is precisely why the Court should *not* order immediate action—even if those other priorities at times are contrary to Plaintiffs' preferences, *see* Pl. Br. at 22.

Moreover, deference to EPA's determination of its own priorities should be particularly pronounced where, as here, the Petition implicates EPA's enforcement discretion.  The Supreme Court has held that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Heckler*, 470 U.S. at 831.  The significant deference owed to EPA's enforcement discretion should lead to similar deference to EPA's prioritization of administrative actions and assessment of the appropriate timeframes for addressing them.  *See* Starfield Decl. ¶¶ 18-22 (EPA enforcement activities during COVID-19 epidemic).

### F.    Fifth *TRAC* Factor: Plaintiffs' Asserted Interests Do Not Warrant a Finding of Unreasonable Delay

Plaintiffs' claim of prejudiced interests does not support their unreasonable delay claim. First, Plaintiffs point to the alleged risks to human health from the Policy.  Yet as already discussed, Plaintiffs' claims in this regard are highly speculative, and in any event do not distinguish the Petition from EPA's other health-related enforcement activities.  Meanwhile, Plaintiffs' additional argument—that they are stuck in "limbo" until a determination is made on the Petition—at most puts them in precisely the same situation as every petitioner or regulated entity awaiting agency action.

### G.    Sixth *TRAC* Factor: There Is No Impropriety to EPA's Lack of Decision on the Petition

Plaintiffs acknowledge that "there is . . . no suggestion of impropriety here," and suggest this renders the sixth *TRAC* factor "neutral."  Pl. Br. at 10.  Yet the D.C. Circuit has held that "the

good faith of the agency in addressing the delay weighs against mandamus." *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 120 (D.D.C. 2005) (applying "unreasonable delay" standard applicable to actions under APA § 706(1)) (citing *In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503, 507 (D.C. Cir. 1988)).  Here, EPA received the Petition, which was initially reviewed by EPA's Office of Enforcement and Compliance Assurance, and has circulated it for review among the offices responsible for rulemaking under the various authorities cited by Petitioners.  Because of the Petition's scope, spanning multiple statutes and environmental media (air, water, and others), EPA designated its Office of Air and Radiation to coordinate and lead the review of the petition. Starfield Decl. ¶¶ 25-26.  Moreover, EPA has also been working diligently to implement and apply the Policy, *see, e.g.*, *id.* ¶ 17 (noting responses to FAQs and promulgation of additional interim guidance).  *Cf. W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1294 (D. Utah 2017) (finding that "the agency's good faith efforts to mitigate harm," even where "legally insufficient" (which is not the case here), "also weigh against a finding of unreasonable delay").  Here, the Agency's actions thus far are entitled to a presumption of regularity, *Overton Park v. Volpe*, 401 U.S. 415 (1972), and under this sixth factor there is no unreasonable delay.

 In sum, under the D.C. Circuit's *TRAC* analysis, there is no basis to find unreasonable delay here.[12]

---

[12] Plaintiffs provide no argument in support of their proposed order requiring EPA to act on the Petition within a mere five days of a decision by the Court, Dkt. No. 18, other than to say that "every additional day" matters, Pl. Br. at 2.  In the event that the Court concludes that EPA has unreasonably delayed acting on the petition—which, for the reasons described above, it should not—the Government respectfully requests that the Court allow the parties an opportunity to submit a letter brief on the issue of remedy.

## CONCLUSION

For the reasons set forth herein, the Government respectfully asks that the Court deny

Plaintiffs' motion for summary judgment and grant the Government's cross-motion for summary

judgment.

Dated:  May 29, 2020
          New York, New York

                          Respectfully Submitted,

                          GEOFFREY S. BERMAN
                          United States Attorney of the
                          Southern District of New York

By:   /s/ *Lucas Issacharoff*_____
                          RACHAEL DOUD
                          LUCAS ESTLUND ISSACHAROFF
                          Assistant United States Attorney
                          86 Chambers Street, Third Floor
                          New York, New York 10007
                          Tel.: (212) 637-3274/2737
                          Fax: (212) 637-2702
                          Email: rachael.doud@usdoj.gov
                          E-mail: lucas.issacharoff@usdoj.gov