**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
─────────────────────────────────────────────x

NATURAL RESOURCES DEFENSE COUNCIL,
ENVIRONMENTAL JUSTICE HEALTH ALLIANCE, PUBLIC
CITIZEN, CATSKILL MOUNTAINKEEPER, CENTER FOR
COALFIELD JUSTICE, CLEAN WATER ACTION, COMING
CLEAN, FLINT RISING, INDIGENOUS ENVIRONMENTAL
NETWORK, JUST TRANSITION ALLIANCE, LOS
JARDINES INSTITUTE, SOUTHEAST ENVIRONMENTAL
TASK FORCE, TEXAS ENVIRONMENTAL JUSTICE
ADVOCACY SERVICES, WATER YOU FIGHTING FOR,
WEST HARLEM ENVIRONMENTAL ACTION, INC.

No. 20 Civ. 3058 (CM)

        Plaintiffs,

    v.

ASSISTANT ADMINISTRATOR SUSAN PARKER BODINE,
ADMINISTRATOR ANDREW WHEELER, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

        Defendants.

─────────────────────────────────────────────x

**MEMORANDUM DECISION AND ORDER**

McMahon, CJ:

On March 26, 2020, the Environmental Protection Agency ("EPA") issued a Temporary

Enforcement Policy (the "Policy") that describes EPA's intention to exercise "enforcement

discretion" during the COVID-19 public health emergency for violations of certain routine

monitoring and reporting obligations. In pertinent part, the Policy advises that, "In general," EPA

does not "expect to seek [civil] penalties" for such violations (1) "where EPA agrees that

COVID-19 is the cause of the noncompliance," and (2) the regulated entity takes steps outlined

in the Policy to document its noncompliance and return to compliance with its monitoring and

1

reporting obligations as soon as possible. The Policy applies to nearly every industry in the country: chemical manufacturing, power plants, refineries, mining, factory farms, and every other federally regulated source of pollution.

The Administrative Procedures Act ("APA"), which applies to EPA as well as other government agencies, permits "interested person[s]….to petition for the issuance… of a rule." 5 U.S.C. § 553(e). Plaintiffs – fifteen environmental justice, public health, and public interest organizations – sought to exercise that right. On April 1 – just five days after EPA announced the Policy – Plaintiffs petitioned EPA to publish a rule, on an emergency basis and effective immediately, that would require any entity that suspends monitoring and reporting because of the COVID-19 pandemic to provide written notice to EPA, which EPA would then make available to the public (the "Petition").

The APA requires an agency to "conclude a matter presented to it" "within a reasonable time," *id*. § 555(b). Plaintiffs filed suit on April 16, 2020, just fifteen days after submitting the Petition, and filed a motion for summary judgment thirteen days thereafter. The complaint does not challenge the lawfulness of the Policy; presently pending before this court is a different lawsuit, brought by nine State Attorneys General, that does precisely that. *See State of New York et al v. EPA*, 20-cv-3714-CM. Rather, it seeks a declaration that EPA has delayed unreasonably in responding to Plaintiffs' petition for emergency rulemaking, in violation of the APA, *see id*. § 706(1) (stating that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed"), and petitions for a writ of mandamus directing EPA to respond.

EPA cross moved for summary judgment, challenging Plaintiffs' standing, raising various jurisdictional defenses, and denying that it has unreasonably delayed in responding to the Petition.

It is perfectly obvious that, at the time Plaintiffs brought this lawsuit, the EPA had not "unreasonably" delayed its response to the Petition. Whether the passage of three months since the commencement of this lawsuit constitutes unreasonable delay would present an interesting question if Plaintiffs had standing to pursue it. However, because Plaintiffs have not established that they satisfy Article III's arcane standing requirements where they seek to vindicate a purely procedural right, Defendants' cross-motion for summary judgment must be GRANTED.

Meanwhile, the real litigation – over the legality of the Policy itself – is presently being briefed in an action brought by nine State Attorneys General. That is where the action will – and should – take place.

## FACTUAL BACKGROUND

### I.  EPA's COVID-19 Enforcement Policy

On March 26, 2020, EPA published a memorandum titled "COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program." (Dkt. No. 16, Wu Decl. Ex. 1 ("the Policy").) The memorandum announces a "temporary policy regarding EPA enforcement of environmental legal obligations during this time." (*Id.* at 1.) The Policy, issued without advance notice to the public, was retroactive to March 13, 2020. As originally promulgated, no end date was specified. (*Id.*)

The Policy was the outgrowth of EPA's receipt of numerous inquiries from regulated entities and co-regulators concerning whether they would risk civil penalties if they were unable, due to the shutdowns occasioned by COVID-19, to comply with certain otherwise required activities. The Policy recognizes that, due to potential worker shortages, social distancing, and other disruptions from the COVID-19 pandemic, "there may be constraints on the ability of a facility or laboratory to carry out certain activities required by our federal environmental permits,

regulations and statutes." (*Id.* at 2.) Those required activities include monitoring, sampling, lab analysis, reporting, and certifying compliance with governing pollution limits (referred to collectively herein as "monitoring and reporting"). (*Id.* at 3.)

The Policy states that entities should use existing procedures under a governing statute, regulation, or permit to disclose violations of monitoring and reporting requirements. (*Id.*) But if the regulated entity determines that "reporting is not reasonably practicable due to COVID-19," the entity should "maintain this information internally and make it available to the EPA or an authorized state or tribe upon request." (*Id.*)

The Policy also advised regulated entities that, "In general," EPA "does not expect" to seek penalties if regulated entities are unable to comply with "routine compliance monitoring, integrity testing, sampling, laboratory analysis, training, and reporting for certification obligations" if (1) "EPA agrees that COVID-19 was the cause of the noncompliance" and (2) the entity provides supporting documentation to the EPA upon request." (*Id.*) But the Policy does not give such entities a free pass. Instead, where entities have made "every effort to comply with their environmental compliance obligations," and COVID-19 has made compliance "not reasonably practicable," *id.* at 2-3, Part I.A of the Policy directs entities to:

a. Act responsibly under the circumstances in order to minimize the effects and duration of any noncompliance caused by COVID-19;

b. Identify the specific nature and dates of the noncompliance;

c. Identify how COVID-19 was the cause of the noncompliance, and the decisions and actions taken in response, including best efforts to comply and steps taken to come into compliance at the earliest opportunity;

d. Return to compliance as soon as possible; and

e. Document the information, action, or condition specified in a. through d.

*Id.* at 3.

4

The Policy does not excuse all reporting of noncompliance; it specifically states that, COVID-19 notwithstanding, companies "should" disclose if a facility "suffers from failure of air emission control or wastewater or waste treatment systems or other facility equipment that may result in exceedances of enforceable limitations on emissions to air or discharges to water, or land disposal, or other unauthorized releases" and should also disclose any noncompliance that "may create an acute risk or an imminent threat." (*Id.* at 4.)

The Policy does not relieve regulated entities of obligations imposed by consent decrees (*id.*); does not relieve public water systems of their "heightened responsibility to protect public health" (*id.* at 6); does not "relieve[] any entity from the responsibility to prevent, respond to, or report accidental releases of oil, hazardous substances, hazardous chemicals, hazardous waste, and other pollutants, as required by federal law" (*id.* at 7); and does not apply to criminal violations (*id.*). For example, to the extent that any entity is required to report violations as part of an annual certification, the entity would be required to do so notwithstanding the Policy.

EPA listed examples of the routine monitoring and reporting requirements covered by the Policy, including stack tests,[1] continuous emission monitoring systems,[2] fenceline monitoring,[3]

---

[1] Stack testing determines facilities' compliance with Clean Air Act standards for air pollutants like lead, mercury, and asbestos. *See* 42 U.S.C. § 7412(b)(1). A stack test measures the amount of a regulated pollutant being emitted at facilities subject to the requirements of the Clean Air Act and determines the destruction or removal efficiency of a control device in reducing emissions. (Wu Decl. Ex. 2, at 1 (EPA, *Clean Air Act National Stack Testing Guidance*)).

[2] A continuous emission monitoring system, or CEMS, monitors air emissions from a facility like a power plant or incinerator for compliance with limits for pollutants ranging from ammonia to particulate matter. (*See* Wu Decl. Ex. 3 (EPA, *CEMS Information and Guidelines* webpage.) CEMS are required under some of EPA's most important air-pollution programs, including the Acid Rain Program and cross-state sulfur dioxide and nitrogen oxides air pollution programs. (*See id.*; 40 C.F.R. § 75.1.)

[3] Fenceline monitoring documents air quality in the vicinity of polluting facilities. "Fugitive emissions" that escape from refineries, energy production sites, and natural gas pipelines can harm surrounding communities. (Wu Decl. Ex. 4 (EPA, *Fenceline Monitoring* webpage.) Fixing

leak detection and repair monitoring,[4] tank integrity testing,[5] effluent sampling,[6] and Toxics

Release Inventory reporting.[7] (*Id*. at 3 nn. 2-7.) This list covers virtually every type of

monitoring related to EPA's regulation of air and water pollution, chemical releases, oil spills,

and hazardous waste storage. The data that are reported to EPA after monitoring informs

_____

leaks that lead to fugitive emissions protects workers and local communities and helps regulators implement air quality standards under the Clean Air Act. (*Id*.) *See also* 40 C.F.R. § 63.658(c) (requiring Fenceline monitoring for hazardous air pollutants from petroleum refineries and mandating that all identified leaks be repaired within fifteen days).

[4] Leak detection and repair ("LDAR") monitoring is required under more than two dozen EPA programs. (Wu Decl. Ex. 5, at App. A (EPA, *Leak Detection and Repair: A Best Practices Guide*.) LDAR monitoring is important because leaking equipment is the largest source of emissions of volatile organic compounds and volatile hazardous air pollutants from refineries and chemical manufacturing facilities. (*Id*. at 2.) LDAR programs are a way for facilities to "control emissions from equipment leaks" and to identify repairs necessary to prevent future releases. (*Id*. at 3.)

[5] Tank integrity testing is intended to "detect oil leaks, spills, or other potential integrity or structural issues before they can result in a discharge of oil" to rivers or shorelines. (Wu Decl. Ex. 9, at 1 (EPA, *Spill Prevention, Control and Countermeasure Plan Program* Factsheet).

[6] Safe drinking water regulations require drinking water monitoring, reporting of violations of standards, and public notice of violations. *See* 40 CFR §§ 141.21.29, 141.31, 141.33, 141.35, 141.201-211; 42 U.S.C. §§ 300g-3, 300j-4. Effluent sampling and testing is a key component of the Clean Water Act's point-source pollution control regime, which prohibits the unpermitted discharge of pollutants into the nation's waters. 33 U.S.C. § 1311(a). Regular sampling is necessary to evaluate whether a facility is complying with effluent limits for pollutants, including heavy metals, bacteria, nutrients, and toxic chemicals. 40 C.F.R. pts. 401-471 (effluent guidelines and standards). Those limits are the "primary mechanism" to control the discharge of pollutants to waters in permits issued and enforced by states, tribes, and EPA. (Wu Decl. Ex. 6 (EPA, *NPDES Permit Limits* webpage).

[7] The Toxics Release Inventory ("TRI") "tracks the management of certain toxic chemicals that may pose a threat to human health and the environment." (Wu Decl. Ex. 8 (EPA, *TRI Program* webpage.) TRI reporting is required under the Emergency Planning and Community Right-to-Know Act (EPCRA), which mandates that a facility manufacturing, processing, or using certain toxic chemicals "report annually on the presence of those chemicals at the facility, the uses of chemicals, an estimate of the maximum amounts of the chemicals present at any time, methods of disposal and treatment of waste, and the extent to which those chemicals are being released into the environment." *Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1197 (D.D.C. 1996); *see* 42 U.S.C. § 11023(g).

members of the public about local environmental quality, help workers prevent exposure to hazardous chemicals, and help emergency managers prepare for and respond to chemical releases.

In addition to expressing EPA's intent to exercise enforcement discretion subject to the above, the Policy also indicates that, if a facility (1) is a generator of hazardous waste, and (2) due to COVID-19 is unable to transfer waste off-site within the time period required under the Resource Conservation and Recovery Act ("RCRA"), EPA will not treat those hazardous waste generators as "treatment, storage, and disposal" facilities under the RCRA "as an exercise of enforcement discretion," as long as the facility "continue[s] to properly label and store such waste and take the steps identified under Part I.A." (Policy at 5.) For the period of time during which the Policy is in effect, such facilities will not be subject to the disaster prevention, preparedness, and response requirements that otherwise govern storage and disposal of hazardous waste. 42 U.S.C. § 6924(a).

Finally, if a facility (1) is an animal feeding operation, and (2) due to COVID-19 is unable to transfer animals off-site, and (3) has so many animals on-site that it would otherwise meet the regulatory definition of a concentrated animal feeding operation ("CAFO"), EPA will not treat the animal feeding operation as a CAFO. (Policy at 5-6.) As a result, such entities would not be subject to pollution controls contemplated by the Clean Water Act permit program, 40 C.F.R. § 122.23(d)-(e), as long as the Policy remained in effect.

On June 29, 2020, after the cross motions were fully briefed, EPA amended the Policy to announce that it would terminate on August 31, 2020. (Dkt. No. 56, Ex. A, "Policy Amendment.") In the announcement, EPA explained that "the EPA will not base any exercise of enforcement discretion on this temporary policy for any noncompliance that occurs after August

31, 2020." (Policy Amendment at 2.) The Amendment further states that "EPA may terminate this temporary policy … on a state or national basis, in whole or in part, at any earlier time … including as appropriate the expiration or lifting of 'stay at home' order in a state, the status of federal and/or state COVID-19 public health emergency guidelines, and/or other relevant factors or considerations." (*Id.*)

## II.     Plaintiffs' Petition for an Emergency Rule

On April 1, 2020, just five days after the Policy was announced, Plaintiffs petitioned the agency under the APA for the issuance of an emergency rule. (*See* Dkt. No. 1-1 (Petition).) The rule they proposed would require any entity that stops complying with monitoring or reporting requirements for reasons related to COVID-19 to notify EPA and the relevant state immediately, disclosing: (1) the pollution limit or standard involved, (2) the relevant statute, regulation, or permit provision that compels the monitoring or reporting at issue, (3) whether and to what extent the entity's operations are continuing in other respects, (4) a justification for the monitoring or reporting lapses, and (5) a description of the efforts being made to return to compliance as soon as possible. (*Id.* at 6.)

To ensure prompt public notice of any regulated entity's failure to conduct required monitoring or reporting in reliance on the Policy, (*id.* at 1, 6-7), the Petition asked that the rule require EPA to publish all such notifications online within a day of receipt, including the name and location of the facility. (*Id.*) The Petition further asked that EPA require facilities to report when they return to compliance, and for EPA to publish those submissions online as well. (*Id.* at 6-7.)

EPA derives its authority to issue substantive rules from the various individual statutes it is responsible for implementing. (Dkt. No. 44, Declaration of Anne Idsal ¶ 9.) The Petition asserted

that EPA would have statutory authority to issue the proposed rule under at least five different environmental laws: the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*.; the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq*; the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §300f *et seq*; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq*.; and the Emergency Planning and Community Right-to-Know Act ("ECPRA"), 42 U.S.C. § 1101 *et seq*. (*See* Dkt. No. 16, Plaintiffs' Memorandum in Support of Motion for Summary Judgment and for Expedited Consideration Pursuant to 28 U.S.C. § 1657 ("Pl. Br.") at 8.) However, the Petition, like this lawsuit, was not brought pursuant to any of those substantive laws, but was filed in accordance with the right Congress conferred on members of the public by the APA.

The Petition, while requesting that Plaintiffs' interim final rule issue within seven days and become effective immediately, asked EPA to solicit public comment on the interim rule while it issues and amends the rule in the future as appropriate. *Id.* at 20.

### III.    Plaintiffs' Justifications for the Emergency Rule

Plaintiffs have submitted articles and reports tending to show that environmental monitoring and reporting requirements deter pollution, and that companies pollute less, and less often, when they are required to monitor and report their polluting activities publicly. (Dkt. No. 1-1 at 11 & nn. 17-19; Wu Decl. Ex. 12, at 3.) EPA does not dispute that environmental monitoring and reporting, in general, have the effect of deterring pollution, though it argues that this "general proposition" does not apply to the particular circumstances of the Policy (which issued in response to a national emergency that greatly impacted the ability of workers to do their jobs and radically limited movement around the nation) or to the resulting Petition. (*See* Dkt. No. 43, Defendants' Response and Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1(b) ("Defs. 56.1(b)) at 9.)

Plaintiffs have also submitted declarations tending to show that environmental crises and public health disasters of the past decade were caused or exacerbated by a failure to perform monitoring and reporting, including the Elk River chemical spill in West Virginia, and a refinery explosion and gas release in Richmond, California. (Dkt. No. 26, Decl. of Melissa Mays ¶¶ 35-40; Dkt. No. 28, Decl. of Michele Roberts ¶ 8; Wu Decl. Ex. 14. At ¶¶I.B.1, I.C; Wu Decl. Ex. 15, at 32-33.) They also point out that considerable research shows that polluting facilities are disproportionately located in or near low-income communities and communities populated by persons of color. (*See* Roberts Decl. ¶¶ 10, 16-17.) Again, EPA does not challenge the veracity of these statements, but "disputes whether this reality applies to the particular circumstances of the Policy and Petition." (*See* Defs. 56.1(b) at 10).

Of course, it is precisely because neither party knows whether this "general proposition" – that lapses in reporting and monitoring systems will lead to environmental hooliganism that will disproportionately impact the poor and members of minority groups – will be borne out during the present national emergency that Plaintiffs sought promulgation of an emergency rule and brought this lawsuit to compel its issuance.

For example, Houston and Baton Rouge, where Plaintiff NRDC members Mr. Domin and Ms. Feld reside, have dense concentrations of EPA-regulated facilities. (*See* Dkt. No. 22, Decl. of Kristi Pullen Fedinick, Ph.D. ¶¶ 22-23; Dkt. No. 50, Second Decl. of Kristi Pullen Fedinick. Ph.D. tbls. 1-2 & maps 1, 3.) By affidavit, Ms. Feld has stated that she feels "less safe knowing that now, under EPA's new policy, chemical facilities may be ignoring their monitoring or reporting obligations without notice to the public." (Feld Decl. ¶ 13.) And Mr. Domin, also by affidavit, reports that he is "worried that many of the hazardous waste generators near [him] and [his] family may now be stockpiling hazardous waste onsite in reliance on [EPA's] policy,

without proper precautions." (*See* Dkt. No. 49, Second Decl. of Craig Domin ¶ 4.) It should be noted that nothing in the Policy permits hazardous waste generators to pollute when storing such waste; indeed, the Policy does not "relieve[] any entity from the responsibility to prevent, respond to, or report accidental releases of oil, hazardous substances, hazardous chemicals, hazardous waste, and other pollutants, as required by federal law." (Policy at 7.)

Plaintiffs contend, and EPA vigorously disputes, that without the rule requested in Plaintiffs' petition, Plaintiffs' members will not be able to take adequate steps to protect themselves against the risk of exposure to more pollution and the greater chance of chemical disaster caused by the Policy. (Ahmed Decl. ¶¶ 26-27; Dkt. No. 21, Decl. of Craig Domin ¶¶ 8-23; Dkt. No. 23, Decl. of Laura Feld ¶¶ 4-13; Dkt. No. 25, Decl. of Dallas Goldtooth ¶¶ 5-7.) Such measures include warning others of potential risks, (Roberts Decl. ¶ 25); taking precautions to minimize potential exposure to pollution, (Dkt. No. 19, Decl. of Lubna Ahmed ¶ 27); engaging with facilities directly to help them return to compliance, (*id.*; Dkt. No. 20, Decl. of Jose T. Bravo ¶ 25; Dkt. No. 24, Decl. of Wes Gillingham ¶ 2; Roberts Decl. ¶ 25); and conducting their own monitoring or other research to try to fill in missing information, (Dkt. No. 29, Decl. of Christina Swanson, Ph.D. ¶ 20). Plaintiffs have done all these things in the past. (Ahmed Decl. ¶ 4; Bravo Decl. ¶¶ 12, 23; Dkt. No. 27, Decl. of Juan Parras ¶¶ 8-12.) There is no indication in the record that Plaintiffs have attempted to engage with any potential polluting facilities, or that they have conducted any of their own monitoring or studies since the Policy was promulgated.

## IV.    Procedural Background

On April 16, 2020, two weeks after filing the Petition, Plaintiffs filed their Complaint for

Declaratory and Injunctive Relief. (*See* Dkt. No. 1, Complaint for Declaratory and Injunctive

Relief ("Compl.").) The Complaint asks this Court to find that EPA has delayed unreasonably in

responding to Plaintiffs' petition for emergency rulemaking in violation of the APA, (*id*. ¶ 76),

and "to order EPA to respond to the emergency rulemaking petition as soon as possible, and no

later than five days from the Court's entry of judgment," (*id*. ¶ 14).

On April 29, 2020, Plaintiffs filed a motion for summary judgment. (Dkt. No. 15, Motion for

Summary Judgment and for Expedited Consideration Pursuant to 28 U.S.C. § 1657.)

On May 5, 2020, Defendants requested an extension of time to respond to Plaintiffs' pre-

answer motion for summary judgment from May 13, 2020, to May 29, 2020. (Dkt. No. 32.)

Plaintiffs contested the letter motion citing their core contention that EPA's policy creates an

"immediate risk of serious harm." (Dkt. No. 33 at 3.)

On May 6, 2020, this Court held a telephone conference, during which it granted Defendants'

request for an extension.

On May 29, 2020, Defendants filed their Cross Motion for Summary Judgment. (Dkt. No. 41,

Cross Motion for Summary Judgment.) Plaintiffs responded on June 5, 2020. (Dkt. No. 48.)

## DISCUSSION

## I.    Standing

We must first address Plaintiffs' standing. *See United States v. $557,933.89, More or Less, in*

*U.S. Funds,*287 F.3d 66, 78 (2d Cir. 2002) ("Standing is a question that determines whether the

claimant may properly invoke the jurisdiction of the federal courts to determine the merits of the

underlying dispute, and it therefore logically *precedes,* not follows, that determination.").

To satisfy the "irreducible constitutional minimum" of Article III standing, a plaintiff must demonstrate (1) "injury in fact," (2) a "causal connection" between the injury and the complained-of conduct, and (3) a likelihood "that the injury will be redressed by a favorable decision." *Strubel v. Comenity Bank*, 842 F.3d 181, 187–88 (2d Cir. 2016) (*citing Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

At first blush, it would appear that Plaintiffs have standing to pursue the remedy they seek. The organizations filed the Petition with the EPA. The APA requires the agency to respond to the Petition within a "reasonable" period of time. Plaintiffs allege that a reasonable period of time has passed, and they have not yet received a response. Their injury in fact is the EPA's failure to comply with its statutory obligation to respond to the Petition. The causal connection between the injury (the failure to respond) and EPA's conduct is not simply clear; it is tautological. And an order directing the EPA to respond to the Petition within five days, which is the relief sought, would redress their injury: the lack of response. Ergo, it would seem easy enough to conclude that these Plaintiffs have standing to pursue the only claim they assert – a claim seeking an order directing EPA to respond to their Petition.

However, "the cause of action does not affect the Article III standing analysis." *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1620 (2020). The Supreme Court has long held that "a bare procedural violation, divorced from any concrete harm" cannot "satisfy the injury-in-fact requirement of Article III." *Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016) (internal quotations omitted). "Article III standing requires a concrete injury even in the context of a statutory violation." *Id*; s*ee also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."); *Ill. Mun. Gas Agency*

*v. F.E.R.C.*, 28 F. App'x 336, 337 (D.C. Cir. 2007) ("Denial of a petition for rulemaking … does not necessarily confer standing.) Plaintiffs must show "some concrete interest that is affected by the deprivation." *Spokeo*, 136 S. Ct. at 1549.

Plaintiffs therefore "bear the burden of alleging facts that demonstrate their standing because it is they who seek to invoke the jurisdiction of this Court." *LaFleur v. Whitman*, 300 F.3d 256, 268 (2d Cir. 2002) (citing *Thompson v. Cty. of Franklin,*15 F.3d 245, 249 (2d Cir. 1994)). And here, where we have cross motions for summary judgment, "mere allegations of injury are insufficient. Rather, a plaintiff must establish that there exists no genuine issue of material fact as to justiciability or the merits." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999). To defeat a defendant's motion for summary judgment, a plaintiff must establish "that there is a genuine question of material fact as to the standing elements." *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 167 (S.D.N.Y. 2006).

And so I turn to an analysis of the elements of standing applicable in this lawsuit: first addressing whether Plaintiffs – 15 membership organizations – have standing in their own right, or whether, in the alternative, they may invoke associational standing on behalf of their members.

## A.  *Plaintiffs Lack Standing in Their Own Right*

To establish standing on its own behalf, "the organization itself must meet the same standing test that applies to individuals." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (alterations and internal quotation marks omitted).

Plaintiffs argue that they have standing in their own right because they suffer an "informational injury." (Pl. Br. at 24) (*citing FEC v. Akins*, 524 U.S. 11, 21 (1998)). At its core, Plaintiffs' informational injury argument rests on the contention that the Policy degrades the

integrity of environmental monitoring data, thereby harming Plaintiffs in their educational and advocacy efforts. (Pl. Br. at 23-24.)

To establish an injury in fact based on an injury to informational interests, a plaintiff must demonstrate that (1) the law entitles the plaintiff to that information, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure. *See Akins*, 524 U.S. at 21; *Nat. Res. Def. Council v. Dep't of Interior*, 410 F. Supp. 3d 582, 597 (S.D.N.Y. 2019) (citing *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)).

Plaintiffs' standing argument falls apart at the very first step. They have not established that they are legally entitled to the information they seek.

Plaintiffs are correct that certain environmental statues require EPA to make certain information available to the public. *See e.g.*, 33 U.S.C. §§ 1318(b), 1321(m)(2)(D) (CWA) (providing that "Any records, reports, or information" that EPA obtains under the relevant sections "shall … be available to the public."); 42 U.S.C. §7414(c) (CAA) (similar); 42 U.S.C. § 6927(b)(1) (RCRA) (similar). However, the gravamen of the Policy is not that EPA will withhold information it is statutorily required to disclosed, but rather that EPA will exercise enforcement discretion – i.e., that it may choose not to seek civil penalties – during an unprecedented national emergency, for violations of routine monitoring and reporting obligations where EPA agrees that COVID-19 made compliance not reasonably practicable. That policy does not give rise to an informational injury.

Moreover, in order to establish that they have suffered an informational injury sufficient to confer standing, Plaintiff must have been "deprived of information that … a statute requires the government or a third party to disclose to it." *NRDC v. Dept' of the Interior*, 410 F. Supp. 3d

582, 597 (S.D.N.Y. 2019). Plaintiffs have not identified any "record, report or information" that EPA is statutorily obligated to disclose that it will not disclose under the Policy. Instead, they argue that if EPA granted the Petition and promulgated the rule, they would be entitled to information about persons who were not reporting this information to the public if EPA granted the Petition and promulgated the rule Plaintiffs advocate. (Pl. Opp. at 8.) But that is a bootstrap argument. No rule requiring EPA to report the information of which Plaintiff are being deprived is presently on the books. Plaintiffs do not even ask this court to direct EPA to issue the order they advocate. All I am asked to do – and all I could do – is tell the EPA to give Plaintiffs some sort of response, which response might not entitle them to the information they do not have at present.

## B.  Plaintiffs Have Not Established Associational Standing

Nonetheless, even if an organizational plaintiff does not have standing on its own right, an organizational plaintiff may establish "associational standing" based on injury to its members by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

EPA does not controvert Plaintiffs' showing that the second and third factors are met; it argues only that Plaintiffs' members would not have standing to sue in their own right. (*See* Dkt. No. 42, Def.'s Opp. to Pl. Motion for Summary Judgment and In Support of Defendants' Cross-Motion for Summary Judgment ("EPA Opp. Br.") at 15-20.) Specifically, EPA argues that

Plaintiffs' injuries are based entirely on speculation, because they have not established that any of its members have been harmed, or imminently will be harmed, by environmental pollution that is traceable to the Policy. (EPA Opp. Br. at 18.) In other words, EPA contests whether Plaintiffs' members have suffered a sufficiently concrete injury to confer standing, and further whether Plaintiffs' alleged injuries are traceable to EPA's conduct in not yet responding to the Petition.

EPA is correct. For the reasons set forth below, Plaintiffs lack associational standing as well.

### 1.  **Injury in Fact**

EPA challenges whether Plaintiffs have satisfied the injury in fact requirement for associational standing and vigorously contests Plaintiffs' characterization of the Policy as one that "lets" regulated entities skirt their monitoring and compliance obligations thereby causing noncompliance. Instead, EPA urges, the Policy is merely an expression of its intent not to pursue civil penalties when COVID-19 has *already* led to noncompliance. Moreover, the Policy gives EPA latitude not to pursue civil penalties only when the regulated satisfies the documentation requirements set forth in Part I.A of the Policy. (*See* EPA Opp. Br. at 4-6.) EPA therefore rejects the contention that the Policy is certain to result in increased pollution. Indeed, it casts that proposition as rank speculation, and so argues that Plaintiffs have not raised a genuine question of fact concerning whether their individual members either have been harmed by the Policy or will imminently be harmed. (*See* EPA Opp. Br. at 17-19.)

In *Spokeo v. Robins*, 136 S. Ct. 1540 (2016), the Supreme Court developed the contours of the injury in fact doctrine in relation to the concreteness requirement. Plaintiff, an unemployed Virginia resident, discovered inaccurate information about himself on Defendant's consumer report website. Plaintiff alleged that the inaccuracies harmed his employment prospects and filed

a class action alleging a violation of the Fair Credit Reporting Act ("FCRA"). (*See* Dkt. No. 1,

First Amended Complaint at 2, 7, *Robins v. Spokeo, Inc.*, 10-cv-5306, 2011 WL 1793334 (C.D.

Cal. May 11, 2011).

The District Court dismissed the case, holding that Plaintiff lacked standing under Article III

because the alleged harm to his employment prospects was "speculative, attenuated and

implausible." *Robins*, 10-cv-5306, 2011 WL 11562151 at *1 (C.D. Cal. Sept. 19, 2011).

The Ninth Circuit reversed and remanded. *Robins v. Spokeo, Inc.*, 742 F.3d 409, 414 (9th Cir.

2014). In so doing, the panel relied on circuit precedent to hold that violation of a private

statutory right is "usually a sufficient injury in fact to confer standing." *Id*. at 412 (citing

*Edwards v. First Am. Corp*., 610 F.3d 514, 517 (9th Cir. 2010); *Fulfillment Servs. Inc. v. United*

*Parcel Serv., Inc.*, 528 F.3d 614, 619 (9th Cir. 2008)).

The Supreme Court vacated and remanded. *Spokeo*, 136 S. Ct. at 1550. Writing for the Court,

Justice Alito reaffirmed that, to satisfy constitutional standing, a plaintiff must show that they

suffered injury in fact: an invasion of a legally protected interest that is "concrete and

particularized" and "actual or imminent, not conjectural or hypothetical." *Id*. at 1548 (quoting

*Lujan*, 504 U.S. at 560). The Court stressed that particularization and concreteness are two

separate but necessary conditions. An injury must be particularized to "affect the plaintiff in a

personal and individual way, *id.* (*quoting Lujan*, 504 U.S. at 560 n.1). But it must *also* be

concrete: "real, and not abstract" even if intangible, *id.* (internal quotations omitted).

Six months after *Spokeo*, the Second Circuit considered the implications of the decision for

the concrete injury requirement in the context of alleged procedural violations. *See Strubel*, 842

F.3d at 188-90. In *Strubel*, the Circuit established a two-pronged test for concreteness: (1)

whether the statutory provisions at issue were established to protect plaintiff's concrete interests

(as opposed to purely procedural rights), and if so, (2) whether the specific procedural violations alleged in this case actually harm, or present a material risk of harm to, such interests. *Id*. at 189-90 (citing *Spokeo*, 136 S. Ct. at 1549-50; *Akins*, 524 U.S. at 20-25; *Public Citizen v. Dept. of Justice*, 491 U.S. 440, 449 (1989)). A plaintiff can fail to satisfy the second condition when the violation in question could not result in harm to the Plaintiff's asserted interest. *See Spokeo*, 136 S. Ct. at 1550 ("It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm.")

Here, the statutory violation at issue –unreasonable delay under the American Procedures Act – was clearly established to protect procedural rights, and Plaintiffs sue under a statute that vindicates procedural rights. That is uncontested. (Pl. Opp. at 10).

Therefore, we move to the second prong of the *Strubel* test: whether the specific procedural violation alleged – EPA's purported delay in responding to the Petition – actually harms Plaintiffs' members or presents a material risk of doing so.

The typical environmental advocacy association suit asserts that the challenged actions resulted in injury by exposing its members to increased pollutants. In the instant case, however, Plaintiffs' allegation of injury rests on the fear that their members have of facing increased exposure to a risk of environmental harm – as opposed to actual exposure to pollution – due to EPA's announced intention to exercise enforcement discretion pursuant to a temporary Policy whose belatedly announced end date is fast approaching. (Pl. Combined Opp. and Reply, ("Pl. Opp. Br.") Dkt. No. 47 at 2.) To Plaintiffs, because the Policy announces to regulated entities that EPA will not seek enforcement penalties for certain noncompliance – and because the Policy does not require entities to disclose when they are availing themselves of EPA's perceived lenience – it will naturally lead to increased noncompliance, not just with monitoring and

reporting obligations but with polluting activity, all without any notice to the public. It is the fear

that pollution will increase, thereby exposing Plaintiffs' members who live and work near

regulated entities to risk of harm, that is the harm alleged. (*See* Pl. Opp. Br. at 2, 5; Pl. Br. at 23.)

However, at this moment in time, Plaintiffs' claim to injury in fact is built on multiple layers

of speculation that do not entitle Plaintiffs to summary judgment – or even give rise to any

genuine issue of fact so as to defeat the Government's cross motion. They offer not a scintilla of

evidence that pollution is increasing at any regulated entity that may or may not be monitoring

and reporting during the ongoing national crisis. Since they admit that the Plaintiff organizations

themselves engage in monitoring activities, their failure to offer more than speculation about

what might happen dooms their cause.

Aside from the articles asserting that the failure to report and monitor correlates with

increased pollution, the only evidence that is offered are declarations from two NRDC members

– Mr. Domin and Ms. Feld – who live in proximity to a concentration of EPA-regulated

facilities. (*See* Fedinick Decl. ¶¶ 22-23, Dkt. No. 22; Second Fedinick Decl. tbls. 1-2

(documenting EPA-regulated facilities in Houston and Baton Rouge) & maps 1, 3 (showing

EPA-regulated facilities in proximity to Mr. Domin and Ms. Feld's neighborhoods). Both

individuals fear an increase in environmental emissions from which they fear they will be unable

to protect themselves in the absence of information about who is not monitoring and reporting at

the present time.

But Plaintiffs have not pointed out any actual violations of environmental rules that are or

imminently will be taking place at those nearby facilities; they merely hypothesize that such

violations might occur. On a motion for summary judgment, Plaintiffs have taken no air quality

measurements; they have not tested water samples; they do not even attest that the air in their

neighborhoods has become more polluted or that it smells different – allegations that might, under *Twombly* and *Iqbal*, give rise to a reasonable inference that polluting activities were on the rise since the promulgation of the Policy. Plaintiffs' bare assertion that regulated entities will respond to the Policy by suspending monitoring and reporting whether COVID conditions impact their operations or not – and that they will then use this loophole to increase polluting activities – has no evidentiary support in the record. Moreover, Plaintiffs' speculation ignores the very real risk of enforcement action by EPA (whose Policy goes not further than to authorize enforcement discretion, not enforcement abandonment), as well as states and citizens. The gravamen of their harm is a purely conjectural and hypothetical future injury. *Spokeo*, 136 S. Ct. at 1548.

Plaintiffs cite to *N.Y. Public Interest Research Grp. (NYPIRG) v. Whitman*, 321 F.3d 316, 325 (2d Cir. 2002) for the proposition that a member's "uncertainty" about exposure to excess pollution at nearby facilities is a cognizable injury sufficient to constitute injury in fact in the environmental context.[8] 321 F.3d 316, 325 (2d Cir. 2002); *see id*. at 326 (stating that the "distinction between an alleged exposure to excess ... pollution and uncertainty about exposure is one largely without a difference" and affects at most "the extent, not the existence, of the injury). Putting to one side the fact that NYPIRG predates *Spokeo* and *Strubel* by more than a decade, which calls its continuing viability into question, the allegations of injury made by the plaintiffs

---

[8] Though Plaintiffs also purport to rely on *Baur v. Veneman*, 352 F.3d 625, 633-34 (2d Cir. 2003) for the proposition that increased threat of exposure to risk is a cognizable injury, that holding was limited to "the specific context of food and drug safety suits" and the Circuit explicitly declined to "adopt [the] broad view" that "enhanced risk generally qualifies as sufficient injury to confer standing." *Id.* at 634. It was also in the "specific context of food and drug safety suits" that the Circuit announced, in *NRDC v. U.S. FDA*, 710 F.3d 71, 81 (2d Cir. 2013), *as amended* (Mar. 21, 2013), that "present exposure to risk" represented by a potentially harmful product constituted injury in fact. And of course, both of these cases predate *Spokeo* and *Strubel*.

in that case were far more concrete than those at issue here. NYPIRG pointed to specific CAA permitting deficiencies at specific facilities "within a few miles" from where members of the organization were located. *Id.* at 323. It was in this context that the Circuit found that "NYPIRG's allegations of administrative failure [were] sufficiently concrete in the context of the final approval and NOD challenges to establish actual or imminent, rather than purely conjectural, injury." *Id.* at 326.

Whether *NYPIRG* remains good law is a question for another day, however. The record here is woefully deficient. Plaintiffs' claim to a concrete environmental injury rests on a chain of possibilities that have not been established with sufficient evidentiary support. At the summary judgment stage, this conjecture does not comport with Article III's requirement that an injury be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id*. at 1548; *see Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 (2013) ("speculative chain of possibilities" does not suffice to establish injury in fact).

### 2.  <u>Fairly Traceable to the Alleged Violation</u>

That Plaintiffs do not allege actual ongoing exposure to increased pollutants also implicates the other standing factors: causation and redressability. *See NYPIRG*, 321 F.3d at 326. Indeed, in addition to showing that their members have suffered or are imminently threatened with an injury, Plaintiffs must show that their injury is traceable to the purported failure to address their Petition within a reasonable time. *Spokeo*, 136 S. Ct. at 1547.

In *NYPIRG* the Plaintiffs were challenging "final decisions by the [EPA]" declining to issue Notices of Deficiencies where "the EPA was aware that New York's Title V program was deficient" and Plaintiffs directly alleged "that the EPA violated its obligation under the CAA to object to defective permits." *See id. at* 316.

Here, the challenge is neither to the Policy itself – which, per Plaintiffs' reasoning, is what is likely to cause them harm – nor to any final decision by EPA. Rather Plaintiffs challenge EPA's "delay" in rendering a decision on their Petition within a reasonable period of time. But the "delay" in responding to the Petition – just fifteen days at the time the Complaint was filed – is simply not the cause of the environmental harms that Plaintiffs allege. (*See* Pls. Br. at 23.)

Plaintiffs' primary contention is that EPA's delay in responding to the Petition exacerbates the main failure of the Policy—that EPA's purported invitation to noncompliance with monitoring and reporting obligations without notice to the EPA or the public presents a risk to Plaintiffs' members who live and work near those facilities. Plaintiffs further claim that, in the absence of the reporting required by the requested rule, their members would not know whether they are being exposed to "more pollution and a greater risk of chemical disasters without knowing it." (Pl. Br. at 24; *see* Domin Decl. ¶¶ 8-23; Feld Decl. ¶¶ 4-13; *see also* Ahmed Decl. ¶¶ 26-27; Goldtooth Decl. ¶¶ 5-7.) Without the requested disclosures, Plaintiffs claim that their members will not be able to take steps to protect themselves. (Pl. Br. at 24.) Therefore, Plaintiffs' aver, their harms are fairly traceable to EPA's delay in responding to the Petition.

To credit Plaintiffs' argument would require not only accepting that the Policy will cause regulated entities to cease monitoring and reporting temporarily because their employees are locked down due to COVID and unable to come to work – a proposition I have no difficulty embracing – but also that the EPA's policy of selective nonenforcement (bounded by certain requirements imposed on the regulated entities) will in turn cause those entities to increase pollution and create chemical safety hazards – this despite the fact that the Policy does not change any substantive requirements, let alone substantive emissions or discharge limits, or alter the ability of EPA, states, and citizens to sue where there are such environmental law violations.

Even if there were evidence to support all that conjecture, EPA's delay in responding to the Petition (not, it bears repeating, it's delay in actually adopting the rule proposed by Plaintiffs) would not be the cause of those environmental harms.

Moreover, as EPA points out, the Policy itself expressly requires regulated entities to contact EPA or an authorized state agency if their facility operations impacted by the COVID-19 pandemic "may create an acute risk or an imminent threat to human health or the environment," or if a facility "suffers from failure of air emission control or wastewater or waste treatment systems or other facility equipment that may result in exceedances or enforceable limitations on air or discharges to water, or land disposal, or other unauthorized releases." (Policy at 4.) Plaintiffs' retort that facilities will not be aware of acute risks if they suspend monitoring fails to take into account that the Policy actually counsels entities whose activities might give rise to acute risks to advise the appropriate implementing authority *before* deciding to suspend monitoring.

In short, Plaintiffs have not established that their alleged injury is fairly traceable to EPA's purported "unreasonable delay" in responding to the Petition, rather than the unique circumstances presented by the COVID-19 pandemic itself.

*** 

Plaintiffs have neither established that they have suffered a sufficiently concrete injury nor that that alleged injury is fairly traceable to EPA's purported delay in responding to the Petition. Therefore, it is unnecessary to address whether it would be redressed by the only relief I could offer in this instance, ordering the EPA to respond to the Petition.

**CONCLUSION**

Plaintiffs' motion for summary judgment is DENIED. Defendants' cross-motion for summary judgment is GRANTED.

This constitutes a written opinion and order of the Court.

The Clerk of Court is directed to mark the motions at Docket Nos. 15 and 41 off the Court's list of open motions.

Dated: July 8, 2020

_____

Chief Judge

BY ECF TO ALL COUNSEL